E77svri:in

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VRINGO, INC.,

                   Plaintiff,

            v.                        14 Civ. 4988 (LAK)

ZTE CORPORATION, et al.,
                                      Conference
                   Defendants.

------------------------------x

                                      New York, N.Y.
                                      June 7, 2014
                                      4:20 p.m.
Before:

        HON. LEWIS A. KAPLAN

                                      District Judge


        APPEARANCES


ALSTON & BIRD LLP
        Attorneys for Plaintiff
BY:  KARL GEERCKEN
     AMBER WESSELS-YEN


KING & SPALDING
        Attorneys for Defendants
BY:  DAVID JOFFE
     PAUL A. STRAUS
     ROBERT F. PERRY
```

1          (Case called)

2          THE COURT:  Mr. Geercken, the floor is yours.  I have

3     read your papers.

4          MR. GEERCKEN:  Thank you, your Honor.  As you can see

5     from the papers, we are here seeking to enjoin and temporarily

6     restrain the use of certain prohibited confidential information

7     by the defendants in a pending Chinese proceeding in Shenzhen,

8     China, and elsewhere in the world.

9          By way of background, your Honor, we only learned of

10    the improper use of this information on June 26th, when Vringo

11    received a copy of the Chinese complaint.

12          THE COURT:  Let's cut to the Chase.

13          MR. GEERCKEN:  Sure, your Honor.

14          THE COURT:  You have a contract that says that the

15    confidential information shall not be used or referenced in any

16    way by any party in existing or future judicial or arbitration

17    proceedings.  It seems clear as a bell, although I haven't

18    heard from the other side.

19          The other side goes running into court in China, they

20    sue you, they rely on this, and they attach the papers.  Based

21    on that, you come in with a laundry list of stuff you want in

22    terms of a TRO, most of which I have doubt that I could grant

23    you after a trial on the merits, and basically don't address

24    any of the serious issues that most of this raises.

25          I'm sort of of the view that if I should do anything

1    at all, and I want to hear more from the other side about that,

2    what I should do is enter a restraining order barring them from

3    making any use of the confidential information in judicial or

4    arbitration proceedings, including that already pending in

5    China.  Why isn't that the case, sir?

6            MR. GEERCKEN:  I agree, your Honor, that is the answer

7    at this stage.  I think that is the relief that we should get.

8    During the course of the proceedings and if a preliminary

9    injunction hearing is required, we would like to elaborate as

10   to why we think the Chinese courts have been tainted or

11   infected by this information that has been disclosed to them.

12           THE COURT:  Since you are not asking for that today,

13   we will leave that to one side for the moment.  What else is

14   there to be said on your side?  You have a contract.  Your

15   position is they are in breach.  Without having yet heard from

16   the other side, it seems you're right.  But then it usually

17   seems that the plaintiff is right before you hear from the

18   defendant.  Why shouldn't we hear from the defendant?

19           MR. GEERCKEN:  Your Honor, there are a couple of cases

20   that the defendants have cited.  I can address them briefly, a

21   couple of arguments they have raised.  I'll be very quick in

22   addressing them.

23           One is they cited a District of Colorado case, somehow

24   arguing that a provision, a nondisclosure agreement, ought not

25   be observed in certain circumstances.  That was a completely

1  distinguishable case.  That was a case where parties had agreed

2  in at least one proceeding to have information filed under

3  seal.  They had further discussions.  It is a District of

4  Colorado case.  Here the plaintiffs and the defendants have

5  agreed to come to New York and to be governed by New York law

6  and to be in a New York forum.

7         There is another case that has been cited that deals

8  with a situation where there is an investigation of improper

9  activity and says an NDA can't shield information in that type

10 of a proceeding.  Again, not relevant here.

11        Your Honor, we don't think those cases are relevant.

12 We think the parties are appropriate.  There is some argument

13 that ZTE Corporation is the only appropriate defendant.  We beg

14 to differ.  The nondisclosure agreement makes clear in the very

15 first paragraph that ZTE Corporation and all of its

16 subsidiaries --

17        THE COURT:  I don't think much turns on this.

18        MR. GEERCKEN:  I agree, your Honor.  That's all I have

19 for now.

20        THE COURT:  Thank you.

21        Mr. Straus.

22        MR. STRAUS:  Thank you, your Honor.

23        THE COURT:  Where do you guys come off?

24        MR. STRAUS:  Your Honor, I apologize, we are just

25 getting our arms around this dispute.  We heard about this on

1   Thursday.  We have a client in China.  We have gone done the

2   best we can to get up to speed.

3         THE COURT:  Your 4th of July wasn't a holiday there.

4   I don't think they celebrate that too much.

5         MR. STRAUS:  To the point, your Honor, there is no

6   reason to enter a restraining order at this point.  The

7   plaintiffs have not established irreparable harm, let alone a

8   threat of imminent irreparable harm.

9         To back up, the system in China is different from our

10  system.  My understanding is that documents filed in Chinese

11  courts, unlike ours, which are open to the public, are not open

12  to the public and the only parties who have access to them are

13  the judges, their clerks, and the attorneys for the parties to

14  the case.  It is tantamount to filing under seal here.

15        THE COURT:  I have for that proposition the affidavit

16  of what well-known expert on Chinese civil practice?

17        MR. STRAUS:  We do have a declaration, your Honor,

18  that we are preparing.  We have not had a certified translation

19  done.  If your Honor wishes, I could hand up the declaration.

20        THE COURT:  It won't help me very much without a

21  translation.

22        MR. STRAUS:  I'm sorry, your Honor.  It has an English

23  translation, but it is not certified.  It was best we could do

24  in the time frame.

25        I understand, your Honor.  More to the point, what the

1    plaintiffs are saying under their own papers is that this

2    action was filed in February, which it was.  It's been pending

3    for four months.  In those four months they have not alleged in

4    their papers a single instance of this being disclosed to

5    anyone other than the judges.  Their argument that merely

6    disclosing confidential information to a court under any

7    circumstances would mean that they could literally use an NDA

8    to prevent us from filing an action.

9         THE COURT:  Maybe your client should have thought

10   about that before they signed it.  This isn't one that says we

11   agree everything you tell us is confidential.  Oh, no.  This is

12   one where your client said, we agree that all this information

13   shall not be used or referenced in any way in any future

14   judicial proceeding.

15        MR. STRAUS:  In fairness, your Honor, there are

16   provisions like that in NDAs that are entered into in

17   connection with settlement discussions.  Typically, the purpose

18   of that is to prevent the party the information is being

19   disclosed to to use it in contravention of, for example,

20   Federal Rule of Evidence 408.  The idea is we are going to make

21   a settlement offer to you, you are not going to use that to

22   show that that is --

23        THE COURT:  You guys at King & Spalding, you know all

24   about rule 408.  I know that.  You could have written this

25   thing in such a way that it was an absolute lead-pipe copy of

1   rule 408, and then there wouldn't be any question about that.

2   But that's not what your client signed.

3            MR. STRAUS:  For the record, your Honor, we did not

4   prepare that or represent the client in connection with that

5   NDA.

6            THE COURT:  Am I to take from that either that it was

7   drafted by some American lawyer entirely ignorant of rule 408

8   or it was drafted by a Chinese individual, a lawyer, who didn't

9   know anything at all about 408 and thus this should not be read

10  in light of 408 because it is news to them?

11           MR. STRAUS:  Respectfully, your Honor, I think we are

12  skipping ahead of the first and most important element on the

13  TRO.  We are going to the merits of whether this was or was not

14  a breach of the NDA, which is one of the elements of

15  plaintiff's claim.

16           THE COURT:  Based on what I have before me, the answer

17  is yes.  Maybe in a fuller context it will appear differently.

18  I, of course, like any other rational human being, come to

19  provisional opinions soon in some cases and change my mind in

20  the fullness of time and consideration and evidence, and that

21  may well happen here.

22           But as of right here this afternoon, it seems to me if

23  I were drafting a clause to prevent your client from doing what

24  it did, this is the one I would have drafted.  The likelihood

25  that you are going to prevail on the no breach claim, given

1   what's on the record today, which may change, not high.  Let's

2   move to the next step.

3        MR. STRAUS:  The irreparable harm step is a very

4   important one, your Honor.  This is an extraordinary remedy.

5   What the plaintiffs are asking for is a very high remedy.  They

6   are preventing us from going forward with a litigation in

7   another country.

8        THE COURT:  No, no, no.  I made it clear, I think, to

9   your adversary that I didn't see how I could do that here

10  today.  The only thing I'm seriously considering is requiring

11  your client henceforth to comply in all respects with its

12  contract.  They may find that inconvenient in the litigation,

13  but they can go jolly well ahead with it.

14       MR. STRAUS:  I guess I don't understand what your

15  Honor is thinking about ordering.

16       THE COURT:  The confidential information as defined in

17  the NDA shall not be used or referenced in any way by any party

18  in any existing or future judicial or arbitration proceedings.

19  That's what I'm thinking about.

20       MR. STRAUS:  Your Honor, the case that we do cite, the

21  Otter Products case, does stand for the proposition that one

22  can't use an NDA or similar agreement to prevent another party

23  from bringing an independent claim.  My client is not using

24  this in the same case.

25       THE COURT:  That may be the law in the District of

1   Colorado, but I have a feeling it is not going to be the law

2   here.

3          MR. STRAUS:  It is a recent case, your Honor, and it

4   cited a Southern District case in the 1990s.  The reason it

5   said that is that a nondisclosure agreement should not be

6   prevent a party from bringing a separate, independent --

7          THE COURT:  Entered the nondisclosure agreement before

8   the District of Colorado to specifically undertake not to use

9   the information in court proceedings?  Did it do that?

10         MR. STRAUS:  I don't know that, your Honor.

11         THE COURT:  Your client could have signed a general

12  release, right?  It could have signed a general release:  We

13  hereby release all claims that we have against you.  Could they

14  have done that?

15         MR. STRAUS:  Yes, they could have done that.

16         THE COURT:  Had they done that, it would have

17  prevented them from bringing an independent lawsuit, would it

18  not?

19         MR. STRAUS:  It would have, your Honor.

20         THE COURT:  They could have signed a covenant not to

21  sue:  We hereby agree that no matter what, no matter how badly

22  you have treated us up to now, we will never sue you.  Could

23  have done it?

24         MR. STRAUS:  Yes, your Honor.

25         THE COURT:  Could they have been sued for breach of

1       that agreement had they brought the suit?

2               MR. STRAUS:  Possibly, your Honor.

3               THE COURT:  Quite possibly.  If they signed an

4       agreement saying we won't use this information in any existing

5       or future lawsuit, why can't they be prevented from breaching

6       that agreement?

7               MR. STRAUS:  First of all, there is an issue about the

8       merits.  I understand your Honor's position on that, but there

9       is an issue about whether there is a breach.  Setting that

10      aside, though, for your Honor to enter the extraordinary relief

11      that you are considering today is unnecessary.

12              In order to get that relief, if there is a breach of

13      this agreement, the plaintiffs will have every opportunity to

14      litigate this case and seek whatever damages for whatever harm

15      they have suffered.  They have not shown that they have

16      suffered any harm at this point and they have not shown that

17      they will suffer any harm or that any harm is imminent.

18              THE COURT:  I'm not sure if it is a floor or ceiling,

19      but they have put a figure on the price that they are prepared

20      to take to allow exploitation of their alleged intellectual

21      property, have they not?  That's right there in that material.

22              MR. STRAUS:  They made a settlement offer, your Honor.

23              THE COURT:  Right.  At one point they say it's their

24      bottom line, at another point they say it's their opening

25      offer.  We all know what it was.  Nonetheless, to the extent

 1    that the circumstances of the Chinese company are comparable to

 2    the circumstances of someone else interested in licensing their

 3    technology or settling an IP dispute with them, that is

 4    extremely sensitive information, isn't it.

 5         MR. STRAUS:  It may be that it is relevant to those

 6    claims, your Honor.

 7         THE COURT:  I don't know much about what else is in

 8    that document, but if that number is out there and they are in

 9    the licensing business, which seems to be the business they are

10    in, that's not very good for their business, is it?

11         MR. STRAUS:  Your Honor, there has been no showing

12    that that number will, as it were, get out there.

13         THE COURT:  Now we are trusting on the security of

14    information in the Chinese court system.  Maybe it's great,

15    maybe it's not.  You are the one who says it's fabulous,

16    nothing leaks in China.

17         MR. STRAUS:  Your Honor, it is the plaintiff's burden

18    to show that there will be a leak.  The action has already been

19    filed.  The wrong that they are complaining of, the breach, is

20    the filing of this information with the Chinese court.  That

21    was done in February.  There is no indication and they haven't

22    alleged any indication and we are certainly not aware of any

23    indication that anything has happened in those four months,

24    that there has been a leak, as your Honor put it, or that

25    anyone other than the judges in the court have obtained it.

1        What the plaintiffs are really saying, Judge, is that

2   just giving it to the judges is a harm, that that is what we

3   should be prevented from doing.  That's what I'm saying is not

4   the case.  Under the Chinese procedure, an action is filed, is

5   filed with evidence, like other systems but unlike ours, and it

6   is not that familiar to me.  The evidence is considered by the

7   judges before they even decide whether it states a claim.  If

8   they decide to formally accept the claim, then notice is given

9   to the other side and the case goes forward.

10        In other words, by virtue of the fact that that notice

11   has been given, it means that the Chinese court has already

12   considered not only the complaint but the evidence that was

13   submitted with the compliant and decided that it does state a

14   nonfrivolous claim.

15        THE COURT:  What happens next?

16        MR. STRAUS:  The next thing that is scheduled in that

17   case in China is that the defendants respond and there are

18   hearings.

19        THE COURT:  Presumably, they are going to have to make

20   a response to the confidential evidence that your client filed

21   with the court in breach of its contractual obligations, right?

22        MR. STRAUS:  Yes, and their response will be treated

23   as confidential the same way the other evidence has been since

24   February, your Honor.

25        THE COURT:  Maybe, maybe not.

F77evr14

1          MR. STRAUS:  Your Honor, that is speculation.  That is

2     not what the plaintiffs can make out.  Plaintiffs can't

3     speculate to make out their burden.  They've got to show more

4     than that.  In fact, I don't think they really are saying that.

5     The attorney that they say submitted the declaration --

6          THE COURT:  You're saying there is no risk of this

7     stuff getting out, and you're the one who put it out to the

8     Chinese court in violation of this contract, as I see it today.

9     Why shouldn't they assume that, absent relief, your client is

10    going to misuse it not only in this way but in other ways?

11         MR. STRAUS:  Because the clients assume that they are

12    entitled to use it in a legal matter.

13         THE COURT:  Your client assumed they were entitled to

14    use it in flat contravention of the words on the piece of paper

15    they signed.  That's what your client did.

16         MR. STRAUS:  Not to their understanding, your Honor.

17         THE COURT:  That's what you say.  Who advised them

18    they could do this, if anybody?

19         MR. STRAUS:  I think, again, that is going to the

20    merits.

21         THE COURT:  It's a pretty interesting question, don't

22    you think, if they have a general counsel who told them they

23    could do this, if they have an outside law firm who told them

24    they could do this?

25         MR. STRAUS:  The "this," though, your Honor, is filing

1    it with the court.

2              THE COURT:  I know what it is.  We have been all over

3    that.

4              MR. STRAUS:  My point, your Honor, is that it comes

5    back to harm, which critical on this motion.  This is extra-

6    ordinary relief.  It is their burden to show the harm.  It is

7    not our burden to show that they will not be harmed.  Just

8    taking their own papers, they have not met that burden.  All

9    they have done is shown that it was filed with the court in a

10   system where the courts maintain the confidentiality of the

11   filings.

12             Their own attorney says the risk is that it is

13   possible that somehow there may be a leak, that contrary to

14   Chinese law, some attorney who is not affiliated with the case,

15   who does not represent one of the parties, may get it.  That is

16   his speculation.  That attorney himself says in his declaration

17   that that is not really the case anymore because of something

18   that happened at the trial, but the trend is away from that.

19             THE COURT:  There is a further problem.  It seems to

20   me that it is a permissible inference and not a crazy inference

21   to say that given your client's cavalier disregard of this

22   agreement by filing it in the Chinese court, your client may

23   disclose it and use it improperly in other ways to other people

24   in other circumstances.  Why is that crazy?

25             MR. STRAUS:  Your Honor, if they did that and if it

1    caused harm to the plaintiffs, then they would have whatever

2    remedy they have.  The point is they didn't share this with

3    their --

4              THE COURT:  That's right.  They could lock that barn

5    door after the horses are out, they sure could.

6              MR. STRAUS:  Your Honor, my client didn't share this

7    with competitors.  They did one thing with it.  They filed it

8    in a litigation in court in a system where you file the

9    evidence together with the complaint and where it is maintained

10   under the law as confidential.

11             What is the harm that the plaintiffs allege?  Well,

12   you're filing it in a foreign system and we don't know about

13   China and, for all we know, that may be leaked out.  For the

14   last four months it hasn't been leaked out.

15             THE COURT:  How do we know that?

16             MR. STRAUS:  We are not aware of it, they are not

17   aware of it.  They haven't been able to allege any harm as a

18   result of it.  If it has leaked, apparently that is not as

19   harmful to them as they think it might be.  But it is their

20   burden.  The harm is their burden.  They have to show that not

21   only was this a breach, which we dispute, but setting that

22   aside, they have to show that they are going to suffer harm

23   from it.

24             Their own papers suggest that there is no harm.  There

25   certainly has been no harm.  They also suggest that there is

1    not likely to be any harm given the fact that this has already

2    been out there, as it were, for four months.  By out there, I

3    just mean submitted at the Chinese court.  That is the only

4    place they have alleged that it's gone.

5         Given the harm that they allege in their papers, what

6    they would be doing if your Honor grants relief in this case

7    would be coming in and saying, look, Judge, we have an open and

8    shut case of breach of contract on the merits, don't worry

9    about harm, because there is a good chance that there will be

10   some harm, but look how strong we are on the merits, and

11   getting relief, getting a federal order directing the other

12   party.

13        That is not the case.  They assert a claim for damages

14   in their complaint.  If they show a breach and if they show

15   they have been harmed in any way, they will be entitled to

16   whatever damages they can prove.  But that is not the case.

17        THE COURT:  What would be the precise measure?

18        MR. STRAUS:  It is a little bit early in the case.

19        THE COURT:  It is a little bit early, and you don't

20   like preliminary injunctions to get granted with such

21   regularity in intellectual property and trade secret cases and

22   specific performance cases because you can't readily determine

23   the damages.  That's why.  You know that.

24        MR. STRAUS:  Here to even get to that, that is an

25   extra step, the amount of damages is, to give this information

1    to a competitor who is going to use it in their next

2    negotiation with us.  And we don't know what that is going to

3    cost us ultimately.

4              THE COURT:  Nor would they be able to prove that.

5              MR. STRAUS:  That is not the case here.  This is not a

6    case where we have given it to a competitor.  It's been filed

7    in a court.  That is the only thing they have alleged.  In the

8    four months it has been with that court, they haven't shown any

9    harm.  They haven't done anything other than speculate.

10             THE COURT:  Thank you, Mr. Straus.

11             Mr. Geercken, any response?

12             MR. GEERCKEN:  Very briefly, your Honor.  The argument

13   I'm hearing is that the horse has left the barn and don't

14   worry, it's not going to get lost, it's not going to get used.

15   We don't know who is going to ride it in the meantime or misuse

16   the horse, but don't worry about it, you can't prove that

17   anything went wrong, that anything is going to happen to the

18   horse.

19             You are absolutely right, your Honor.  We are in the

20   business of licensing our IP rights and our technology.  Our

21   competitors, the people with whom we are licensing, they are

22   not going to come to us and tell us we've got this information.

23   They are going to use it against us in the negotiation

24   surreptitiously, and thereby we are going to be harmed.

25             The statement that we have not made any showing is

1    also inaccurate, that there is a likelihood of irreparable

2    harm.  Mr. Doug Clark submitted an affidavit, rather a

3    declaration, for us.  He is the author of the book Patent

4    Litigation in China that I understand is the authoritative work

5    on it.

6              He says in paragraph 7 and paragraph 8 of his

7    declaration that there are no procedures for ensuring complete

8    confidentiality of filings in China.  He says that well-

9    connected lawyers can get access to information and in some

10   instances other individuals can as well.  So, we think we have

11   met the irreparable harm element as well.

12             We have heard precious little on the likelihood of

13   success.  It looks like it's all but conceded other than some

14   statement that they may contest that in the future.

15             Likewise, your Honor, we think we have met the

16   balancing of the equities elements here.  There is no right or

17   benefit that should inure to a party by breaching its

18   agreement, whereas we here have a real interest in enforcing

19   our agreements and being able to be sure that settlement

20   negotiations remain confidential.  I think there is a public

21   policy to that effect as well, your Honor.

22             So, the irreparable harm element here, the information

23   is out there.  They can't tell us that it won't be used.  We

24   already know that they have used it in court and it's been

25   shown to various judges.  That gives them a little bit of a

1    benefit in their pending litigation in and of itself, your

2    Honor.

3              Unless you have other questions, your Honor, I'm going

4    to rest.

5              THE COURT:  Thank you.

6              MR. STRAUS:  Your Honor, may I have a response?

7              THE COURT:  Briefly.

8              MR. STRAUS:  By way of clarification, Judge, or a

9    point, it is not clear to me what relief the Court could grant

10   at this point.  In other words, the information that there

11   already had been filed with the Chinese court, it is on file

12   with the Chinese court.  To talk about relief like not using

13   that information, it is not clear to me what that would mean.

14             THE COURT:  How about this.  If your client or its

15   lawyer stands up in that Chinese court and refers to it, then I

16   think your client may well be in contempt of court if I enter

17   the order that I spoke of earlier.  How about that?

18             MR. STRAUS:  OK.  One other point.  The point of this

19   kind of relief is to preserve the status quo.  That is why,

20   when there is concern about confidential information or trade

21   secrets going out there, courts sometimes enter orders to

22   protect those.  In this case it is really the opposite.  The

23   only thing that has happened is the filing with the court.

24             There is nothing else to do in the case.  The

25   plaintiffs here and the defendants in that case control what

F77SEVR1A

 1    they file, obviously.  There is nothing scheduled to happen

 2    until hearings in the future, and those can be made closed to

 3    the public.

 4          The point is we are not scheduled to file anything

 5    else, so to award any relief at this point would be an

 6    affirmative injunction in the sense that upsets the status quo

 7    rather than preserves the status quo.

 8          THE COURT:  Thank you.

 9          I am going to grant a temporary restraining order.  A

10    few words about it.  It is an interesting case.  These parties

11    seven months and one day ago, for the purpose of facilitating

12    settlement discussions relating to widespread patent infringe-

13    ment litigation that had been brought by the plaintiff against

14    at least one of the defendants, entered into a nondisclosure

15    agreement.

16          That agreement in pertinent part provided, "Any and

17    all statements made, positions taken, or documents used in or

18    exchanged by either party during the course of the discussions

19    ('confidential information') shall be confidential,

20    inadmissible, and without prejudice and shall not be used or

21    referenced in any way by any party in any existing or future

22    judicial or arbitration proceedings."  Included in the

23    confidential information as defined in the agreement, among

24    other proprietary information, was the plaintiff's proposal for

25    settlement of the litigation, including the amount of a

1    specific settlement offer.

2            The plaintiff, it should be noted, is in the business

3    of managing and licensing a portfolio of patents that appears

4    to be its lifeblood.  Thus, knowledge by competitors or

5    potential licensees or infringers or potential infringers of

6    the dollar amount or other currency amount of what the

7    plaintiff was prepared to settle its case with the defendants

8    for would be of enormous significance to people commercially

9    interested in an adverse way to the plaintiff.

10           Depending on whether the plaintiff was a licensor or

11   licensee, probably a licensor, it puts a cap or a floor on what

12   others probably would be willing to pay to the extent the

13   circumstances were comparable to those of the relationship

14   between the plaintiff and the defendant.  It is about as

15   sensitive a piece of information as one can imagine, at least

16   of a commercial nature.

17           The discussions that were envisioned by that

18   nondisclosure agreement began, and they, certainly at least to

19   this point, have not culminated in a settlement.  Instead, the

20   defendant in February of this year filed an action against the

21   plaintiff in a court in China.

22           According to the complaint in this case, and it is not

23   denied by the defendant here, the confidential presentation

24   made by the plaintiff in this case constituted the basis for

25   the allegations of antitrust violations under Chinese law made

1    by the defendant in this case, who is the plaintiff in China.

2         Thus, the confidential information that was made

3    available in reliance on the nondisclosure agreement have been

4    used by the defendant here, and I'll refer to them hereinafter

5    as ZTE, for precisely a purpose forbidden by the agreement they

6    signed only two months and a week earlier.  They used it and

7    referred to it in judicial proceedings, a flat violation of the

8    contract.

9         That is my provisional view.  I understand that in the

10   fullest of time there may be some other view of this of which

11   I'll be persuaded.  I have heard no evidence on the point, I

12   have heard only argument.  Maybe future evidence will prove

13   persuasive and my provisional view will change.

14        But insofar as ZTE has argued here that the

15   nondisclosure agreement permitted the use of this confidential

16   information in the Chinese proceeding, the argument, in my

17   view, is flatly wrong.  It flies in the face of the plain

18   language of the nondisclosure agreement, which ZTE willingly

19   and voluntarily signed in the hope of securing commercial

20   advantage.  When the advantage it sought was not forthcoming,

21   they simply ignored the contractual obligation.

22        Given the record before me today, the plaintiff's

23   likelihood of success on the merits of the breach of contract

24   allegation approaches certainty.

25        It is, of course, true that in order to get any

injunctive relief, even a mere temporary restraining order, there has to be a finding of a threat of irreparable harm.  I find that there is a cognizable and significant threat of irreparable harm.

The defendant argues strenuously that these materials under the Chinese legal system are at this point exhibited only to judges, that they are held in confidence, and that only the lawyers in the case would see them other than the judges. Conceivably.  There are two answers to the argument.

The first answer, also provisional, as is necessarily the case, is this.  I have no evidence at all from ZTE of any persuasiveness as opposed to assertions, which I am sure were made in good faith but may prove perhaps not totally accurate, that the Chinese system is structured to be as airtight as counsel apparently believes it is.  The possibility of a leak -- "leak" may be too pejorative of a word.  The possibility of disclosure or public access in China in perfect compliance with Chinese law has not been excluded.  It may be, but it has not been.

Quite apart from that, the plaintiff, Vringo, V-R-I-N-G-O, has submitted an affidavit from Douglas Clark, a barrister of the high court of Hong Kong, who has handled, with the assistance of local counsel, hundreds of litigation cases in the People's Republic of China.  He is the author of what I gather is a noted treatise on patent litigation in China.

He has submitted a declaration in which he states, and I quote, "In my experience, certain generally well-connected lawyers not involved in a particular case have been able to access court files to obtain documents that have been filed in the case. While this has become less common in recent years, it is possible that other individuals not involved in the case could access the court file."

I think in the circumstances there is a material risk of a disclosure, lawful or otherwise under Chinese law, through the Chinese court system, whether by public availability, contrary to what counsel believes it ought to be, or through an illicit or unappropriate leak.

There is a sliding scale in applications like this. You need to have a likelihood of success on the merits of some degree and a threat of irreparable harm of some degree. The more of one that you have, the less you need of the other. Here, given that I find that the likelihood of success even at this early stage, subject to qualification down the road, approaches certainty, the degree of a threat of irreparable harm required is correspondingly lower.

There is another consideration that bears on this as well. The further consideration is that the risk of further dissemination of the confidential information here is not confined to the risk that some stranger to all of this will somehow get access to the Chinese court file. There is a risk

1    that the defendant, who already has this confidential

2    information, will in some additional way disseminate it or make

3    it available to others.

4         There is not evidence that they have done so to date

5    or that there is some specific set of factual circumstances

6    that indicate the likelihood of a particular disclosure of

7    particular information to a particular recipient.  That is not

8    here.

9         What there is here is the fact that the defendant two

10   months and a week or so after signing the nondisclosure

11   agreement, which specifically prohibited use of the materials

12   provided under it in any future judicial proceeding, went right

13   ahead and disclosed it.  They completely disregarded, so far as

14   I can see on the basis of this record, the obligations they had

15   undertaken.

16        The nondisclosure agreement provides, as I quoted

17   earlier, that ZTE is obliged to maintain in confidence any and

18   all confidential information that was provided.  That doesn't

19   mean only not using it in court proceedings, it means

20   maintaining it in confidence, not disclosing it to anybody

21   else, and so forth.

22        I take ZTE's proven action in having filed this stuff

23   with the court in China in defiance of the NDA to betoken a

24   likelihood of at least significant risk, risk sufficiently

25   significant to justify a TRO, that it will make such use of the

confidential information as it considers to be in its interest

irrespective of its obligations under the NDA.  That, in my

view, further supports a finding of a threat of irreparable

injury and further supports the entry of a TRO.

         That said, the relief sought by the plaintiff at page

2 and page 3 of its memorandum of law is dramatically over-

reaching.  I have no intention whatever, certainly on a

temporary restraining order, of enjoining the action in China.

If and to the extent that can go forward in a manner consistent

with the ZTE obligations under the nondisclosure agreement,

they are welcome to go forward with it.

         I certainly am not enjoining the courts of the

Republic of China from doing anything at all.  Equity operates

in personam, and my order is confined to the defendants and

those other persons bound by it under rule 65 of the Federal

Rules of Civil Procedure.

         The terms of the temporary restraining order are that

the defendants and those additional persons covered by rule 65

be and they hereby are enjoined, to and including July 21,

2014, from using, referring to, or disclosing any confidential

information as the term "confidential information" is defined

in paragraph 2 of the nondisclosure agreement entered into the

6th of December 2013 by and between Vringo, ZTE, and others, in

any manner inconsistent with paragraph 2 of that agreement.

         That is to say, any and all statements made, positions

E77svr.14

taken, or documents used in or exchanged by either party, as

defined in the agreement, during the course of the discussions,

as defined in the agreement, shall be confidential,

inadmissible, and without prejudice and shall not be used or

referenced in any way by any party in any existing or future

judicial or arbitration proceeding.

The July 21 date is subject to extension in accordance

with the rules.

One more thing.  The plaintiff will submit an order

tomorrow consistent with what I have said on the record, but

the temporary restraining order takes effect immediately, 4:58

p.m., New York time, July 7, 2014.

Briefing schedule, folks.  When does the defense want

to put in papers?

MR. STRAUS:  Your Honor, could we have ten days?

THE COURT:  You can have whatever you want, but the

TRO moves with it.

MR. STRAUS:  Understood.  Is July 21st the hearing on

the preliminary injunction?

THE COURT:  I hadn't set that yet.  I hadn't gotten up

to that.  You want ten days.  You would like till July 17th.

How long does the plaintiff want to respond?

MR. GEERCKEN:  We would like five days, your Honor.

THE COURT:  July 22.  I will endeavor to schedule an

argument promptly that week.  Do I have the defense agreement

1       that the TRO will continue until I decide the preliminary

2       injunction?

3                THE STRAUS:  I'm sorry, your Honor.  I didn't

4       understand you.

5                THE COURT:  Do I have your agreement that the TRO will

6       remain in effect until I decide the preliminary injunction

7       motion?

8                MR. STRAUS:  May we move to modify it?

9                THE COURT:  It's a free country.

10               MR. STRAUS:  I understood your Honor to be entering a

11      TRO and that it would --

12               THE COURT:  I entered a TRO and I conformed to the

13      10-day limitation in rule 65, which is arguably not applicable

14      here, because this is not granted without notice.  But in an

15      abundance of caution, I did that.  I have the right to extend

16      it for another ten days, which means two weeks thereafter.  I

17      am asking you, independent of all of that, is it your agreement

18      that it will remain in effect until I decide the motion?

19               MR. STRAUS:  Yes, your Honor.

20               THE COURT:  Then the temporary restraining order will

21      remain in effect not until July 21st but until I decide the

22      motion.  If for some reason that starts to seem to the defense

23      to be taking a long time, you can move to vacate or modify it.

24               MR. GEERCKEN:  Your Honor, one point of clarification.

25      The way we understand your temporary restraining order is that

1    it precludes defendants from using the confidential information

2    as defined in the nondisclosure agreement.

3            THE COURT:  Yes.  What I meant by "as defined," I

4    meant confidential information as defined.

5            MR. GEERCKEN:  The point of complication for me is

6    that we would understand that to mean they would have to

7    withdraw that exhibit from their complaint.

8            THE COURT:  I didn't say anything about withdrawing

9    it.

10           MR. GEERCKEN:  Your Honor --

11           THE COURT:  I know what you want.  I read all of it.

12   It was an overreach.  You may find yourself in a position not

13   wildly different from what I found myself in 35 years ago.  I

14   was litigating some case out there in the circuit court for

15   Clark County, Nevada, and some federal judge in Los Angeles

16   enjoined my client from pursuing that case, which didn't stop

17   the other side from moving for summary judgment.

18           I went out there to Clark County, and that judge

19   started having a hearing on it.  The judge looked at me and he

20   said, Mr. Kaplan, I see you're sitting behind the bar.  Why are

21   you sitting back there?  I said, your Honor, my client has been

22   enjoined from pursuing this case.  He said, I understand

23   perfectly.

24           MR. GEERCKEN:  I understand, your Honor.  We are not

25   seeking to enjoin --

1              THE COURT:  I am enforcing your contract.  That's what

2     I'm doing.  I know you would like more.

3              MR. GEERCKEN:  Thank you, your Honor.

4              THE COURT:  Thank you.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25