E7ogvric

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VRINGO and VRINGO
    INFRASTRUCTURE, INC.,
4
                    Plaintiffs,
5
                v.                          14 CV 4988(LAK)
6
    ZTE CORPORATION, and ZTE USA
7   INC.,

8                   Defendants.

9   ------------------------------x
                                        New York, N.Y.
10                                      July 24, 2014
                                        3:40 p.m.
11
    Before:
12
                        HON. LEWIS A. KAPLAN,
13
                                        District Judge
14
                            APPEARANCES
15
    ALSTON & BIRD, LLP
16       Attorneys for Plaintiffs
    KARL GEERCKEN
17  AMBER WESSELS-YEN

18  KING & SPALDING, LLP
         Attorney for Defendants
19  PAUL STRAUS

20

21

22

23

24

25

2

E7ogvric

1          (In open court)

2          MR. GEERCKEN:  Thank you for hearing us this

3    afternoon, your Honor.

4          Now that the injunction issue has been fully briefed,

5    I don't think there can be, or is any serious dispute, that

6    Vringo has now met all of the elements required for an

7    injunctive and for the injunctive relief that it's seeking

8    here.

9          On the likelihood of success, I think we have a very

10   clear nondisclosure agreement and we have a very clear breach

11   of that nondisclosure agreement.

12         We have irreparable harm.  We have confidential

13   negotiation information concerning settlement talks and

14   licensing rates and related information disclosed to the

15   Chinese court, disclosed to a translation company.

16         There are third parties that are aware of the lawsuit

17   and have been asking questions of lawyers about it.

18         THE COURT:  There's nothing wrong with their being

19   aware of the lawsuit, is there?

20         MR. GEERCKEN:  I think, your Honor, now they're asking

21   questions about it.  They asked a lawyer, a law firm, to tell

22   them what the law firm knows about the lawsuit and these could

23   be, for all we know, competitors or licensees.

24         THE COURT:  You could have been sued notwithstanding

25   the nondisclosure agreement, and had you been sued

1    notwithstanding the nondisclosure agreement, people presumably

2    or may have learned about the lawsuit and been asking questions

3    about it.  I don't know where that gets you.

4          MR. GEERCKEN:  Your Honor, we also have an article

5    that came out from Mlex.  It's an international newswire that

6    has an antitrust focus.  We didn't have that until today.  It

7    reports about the case.

8          It reports that there's going to be a hearing on

9    August 15 in the antitrust dispute between ZTE and Vringo.

10   I'll be happy to hand up a copy if you'd like, your Honor.

11         THE COURT:  Thank you.

12         MR. GEERCKEN:  This also alerts third parties to the

13   fact that the case is out there.  Potential competitors,

14   potential patent licensees may continue to investigate and may

15   appear and try and be at the hearing.

16         Now, the hearing, we've had some discussion by the

17   experts as to whether or not that will be open or not.  We have

18   seen no evidence to suggest that ZTE has moved to file anything

19   confidentially or under seal in China.

20         THE COURT:  Did they ask to close the hearing?

21         MR. GEERCKEN:  We're not aware of that, your Honor.

22   We don't believe that's the case.

23         THE COURT:  Did you?

24         MR. GEERCKEN:  We have not appeared yet in the action,

25   although we have deadlines that we believe are coming up before

E7ogvric

1   the end of the month.  That is something that certainly our

2   counsel will be considering, your Honor.

3          Your Honor, since you seem to have a little bit of

4   misgivings or want a little bit more information on the

5   irreparable harm element, we think that irreparable harm under

6   these circumstances where we have such a strong showing of a

7   likelihood of success that the risk of disclosure is so great

8   that irreparable harm is showed.

9          We cited a case to that effect, the *Blom v. Pictometry*

10  case in the Southern District, where under circumstances the

11  Court said the risk of disclosure warranted the issuance of an

12  injunction.

13         THE COURT:  The Supreme Court has spoken to the

14  irreparable harm point several times in the last two or three

15  years, *Winter*, *eBay*, I think there's a third case.  There are

16  two or three important Second Circuit cases on irreparable harm

17  and related matters in light of *eBay* and so forth, none of

18  which has been briefed by either side, except, to a small

19  degree, by your adversary who cites *Winter*.

20         Then you're effectively asking me to enjoin the

21  Chinese litigation, and neither side has made any material nod

22  in the direction of addressing China trade and *Paramedics* and

23  all the Second Circuit law on that and when you come in and

24  tell me this has all been fully briefed, I'm asking myself how

25  with two such well-known law firms is it possible all the key

E7ogvric

1    law on the two key points in the case has basically been

2    ignored to be absolutely candid and frank about it.

3         MR. GEERCKEN:  Well, I appreciate your advising us of

4    that, your Honor.  We believe that the case law that we cited

5    gets us there, particularly in light of the harm that we're

6    exposed to.

7         THE COURT:  We have a square holding by the Supreme

8    Court within the last three years that says that the

9    possibility of harm does not get you there, ever, ever.  Right?

10        MR. GEERCKEN:  Well, we're beyond that, I would say,

11   your Honor.  I think we're in a situation where the harm is out

12   there.

13        THE COURT:  I don't know what that means.  Maybe you

14   can clarify.

15        MR. GEERCKEN:  If I could, we're at a situation now

16   where we're before a Chinese court.  We're going to have to

17   respond about protected information that we specifically

18   contracted about not having to do.

19        THE COURT:  I understand that.

20        MR. GEERCKEN:  That is a harm in and of itself.

21   There's a translation company --

22        THE COURT:  What's the harm?  That you're going to

23   have to respond to it?

24        MR. GEERCKEN:  That we're going to have to respond to

25   it, that we have a litigant in another proceeding using

E7ogvric

1      information.

2                  THE COURT:  You have a litigant in another proceeding

3      who has let the horse out of the barn.

4                  MR. GEERCKEN:  Right.

5                  THE COURT:  You're now saying, well, I have a choice

6      now:  I can either try to catch the horse or I can just close

7      the barn door, and I'm not sure how that's irreparable harm

8      prospectively.

9                  MR. GEERCKEN:  Prospectively.

10                 THE COURT:  Obviously, there's harm in the past.

11                 MR. GEERCKEN:  I think there is harm in the past, and

12     I think the prospect of imminent irreparable harm is out there

13     because we have information that is now no longer subject or

14     guaranteed to be kept confidential.

15                 THE COURT:  Is it guaranteed that the Chinese court

16     will not seal it?

17                 MR. GEERCKEN:  Well, it is guaranteed that as far as

18     we're aware, that it has not been sealed thus far.

19                 THE COURT:  Is it guaranteed it will not be?

20                 MR. GEERCKEN:  That I can't say.

21                 THE COURT:  Is it guaranteed that it's available to

22     your competitors, today, now?

23                 MR. GEERCKEN:  Our competitors may very well know

24     about it.

25                 THE COURT:  They may, they may not.

E7ogvric

1          MR. GEERCKEN:  They may not, but we bargained for --

2          THE COURT:  I know what you bargained for.

3          MR. GEERCKEN:  New York policy is strong in enforcing

4   clearly written agreements, and also there's a policy of

5   confidentiality with regard to settlement discussions.  There

6   is also the policy of this Court under *Paramedics* and *Laker*

7   *Airways* protecting its own jurisdiction.

8          Your Honor, you have two parties that come to you that

9   now acknowledge that you're the arbiter of this issue.  They

10  could have come to you before commencing the action in China

11  very simply and said your Honor, they're suppressing illegal by

12  this, we want to bring that up with you.  We want a declaratory

13  judgment action, and we want you to decide this.

14         They get the horse out of the barn and what they're

15  trying to do is say, the horse is out, slap our wrists, nothing

16  we can do about this, we won't do anything wrong further.

17         Chinese courts are different than U.S. courts.

18  Mr. Clark has testified to that.  He has said that Chinese

19  judges can investigate these issues.  We may be required in

20  open court to talk about these issues.

21         The horse really is out of the barn.  We have harm

22  already.  We have the prospect of further harm as well, just as

23  in *Pictometry*.  In that case you, had one litigant that signed

24  a cooperation agreement with another.  It had not disclosed any

25  information yet.  Same situation.

E7ogvric

1          The Court there said, you know, the risk of

2     irreparable harm is such that we find that injunction ought

3     enter, particularly where there's been such a good showing on

4     the likelihood of success.

5          THE COURT:  Do you mean *Winter, eBay* or post?

6          MR. GEERCKEN:  I don't have the date of it in front of

7     me.  Amber, if you can find that and let me know, I will let

8     you know, Your Honor.

9          But in any event, the risk here is that we're

10    creating -- ZTE is creating a roadmap.  Come in, use

11    confidential information in a foreign jurisdiction with the

12    full knowledge that if you come back and you get caught and you

13    come to the Southern District of New York, you're just going to

14    be told don't breach any further.

15         THE COURT:  For all I know, injunction or no

16    injunction, you're going to get a judgment against them for

17    damages for very serious money and conceivably enormous

18    punitive damages.  Certainly punitive damages, putting aside

19    the contract tort controversy, would seem entirely possible on

20    these facts.

21         MR. GEERCKEN:  I think that's right.  By the way, the

22    *Blom v. Pictometry* case is 2010.

23         Your Honor, I'm glad you bring that up.  Punitive

24    damages, damages, aren't going to put us back where we should

25    be.  We have competitors, licensees, potential licensees if we

E7ogvric

1    get this information won't tell us and we're going to be

2    hamstrung in dealing with these negotiations and this is going

3    to have significant harm on our ability to negotiate rates in

4    the future.

5           I also think that the very nature of an injunction is

6    to preserve the status quo ante.  That is the position before

7    the offending conduct.

8           THE COURT:  The status quo is measured as of this

9    moment, and the status doesn't help you too much.

10          MR. GEERCKEN:  Status quo ante, your Honor, I think

11   the cases we cited on that says it's before the offending

12   conduct took place.  Again, the *Blom* case has that in there as

13   well, and I think it's the *LaRouche v. Kezer* case from the

14   Second Circuit also stands for that, your Honor.  It's to bring

15   the parties to the position they were in before the offending

16   conduct took place.  That we think is bedrock law, your Honor.

17          In terms of the *Paramedics* case, we think *Paramedics*

18   is at tier and militates in favor of granting us the injunction

19   we're looking for.  In that case, you had the same issue:  A

20   clear agreement, your Honor, a clear agreement about

21   arbitration.  It says that this dispute will be governed by

22   arbitration; you will have to go to an arbitral forum in order

23   to resolve it.

24          Technimed, one of the answers, we're going to bring

25   suit elsewhere.  They bring suit elsewhere.  GE Medical comes

E7ogvric

1    to the court, this court.

2            THE COURT:  What was critical to Judge Jacobs' opinion

3    in *Paramedics* is that there was an existing judgment of the

4    American Court.  Isn't that true?

5            MR. GEERCKEN:  I think it was critical.  The critical

6    language I believe was that there was the arbitration provision

7    and that you had Magistrate Eaton finding that --

8            THE COURT:  There was a judgment of the American court

9    saying thou shalt arbitrate this dispute.

10           MR. GEERCKEN:  That's correct.

11           THE COURT:  There's no judgment of an American court

12   here.

13           MR. GEERCKEN:  But we have two parties that freely

14   enter into an agreement that says thou shalt not use this

15   information in any pending or existing action.

16           I think it's small comfort for business people to know

17   that their freely-entered into agreements are not going to be

18   upheld unless there's a judgment saying so.

19           I think that's contrary to the policy of New York and

20   to this Court, your Honor.  I think Magistrate Eaton found that

21   he could issue an antisuit injunction, he did and he issued a

22   contempt order, and he didn't merely suspend the case,

23   Technimed ultimately suspended the case, and Magistrate Eaton

24   said that's not good enough.  And he made a contempt finding,

25   and the Second Circuit is upheld that contempt finding.

1   There's an issue as to the amount of the contempt finding, but

2   he found that there was contempt and that the injunction ought

3   issue.

4          *Laker Airways* is very similar.  The D.C. Circuit said

5   we're going to enjoin you from proceeding in litigation in the

6   UK because that will affect another litigant's, the

7   plaintiff's, right to avail themselves of antitrust laws in the

8   United States.  The *Laker Airways* Court said it is a duty of

9   the district courts to protect their legitimately conferred

10  jurisdiction.  And equitable factors were in play there, too.

11         Here, we have one litigant, ZTE, filed an answer

12  yesterday and they're seeking a declaratory judgment of their

13  rights under the NDA.

14         THE COURT:  Who did that?

15         MR. GEERCKEN:  Our adversary ZTE yesterday.  In this

16  case, they filed their answer and a counterclaim.  They're

17  seeking a declaratory judgment from you, your Honor, declaring

18  their rights under the NDA.

19         THE COURT:  They may very well get it.  They may not

20  be too happy with it, but they may get it.

21         MR. GEERCKEN:  What we're asking you to do is less

22  intrusive than what the parties in both *Paramedics* and *Laker

23  Airways* sought.

24         We're saying, your Honor, you have the authority, you

25  have the power to rule on this issue.  Nobody should divest you

1    of the jurisdiction on this issue dear.

2               THE COURT:  We're not talking about ruling on this

3    issue.  We're talking about effectively ruling on the issue,

4    and then in consequence of the ruling, enjoining a lawsuit in

5    another country.  That's a different matter.

6               MR. GEERCKEN:  Your Honor, I would say that it is a

7    slightly different matter, but I don't think it is as intrusive

8    as the other cases.

9               We're asking you to compel them to withdraw their

10   action and then they can refile it without the offending

11   information.  Since they were already before you seeking to

12   have this issue resolved under the NDA, I think it's well

13   within your power to say I'm going to enjoin them from

14   proceeding with any litigation, make them withdraw in Shenzhen

15   pending resolution of this case.  And you can impose upon me

16   and you can impose upon the other side an obligation to move

17   forward with alacrity.  If there's any issue of a tolling

18   issue, then we can sign a tolling agreement on that.

19              We're not enjoining the entire litigation.  We're

20   reserving for you that which the parties said should be

21   reserved for you.  And they did it very clearly by having

22   clearly written choice of law and choice of forum provisions,

23   your Honor.

24              The important federal policies in play, just like in

25   *Paramedics*, we have a situation where we have a clear, written

E7ogvric

1   agreement that confers jurisdiction upon you, your Honor.  We

2   have federal and state policy in favor of confidential

3   settlement discussions.

4           THE COURT:  There's a rule of evidence about

5   admissibility of settlement discussions to prove liability.

6   Let's not get too far carried away with the rhetoric that we

7   lose sight of what we're talking about.  It's not really very

8   helpful.

9           MR. GEERCKEN:  It's a point well taken, but there is a

10  policy in favor of enforcing contracts as they're written.

11          THE COURT:  Yes, sure there is, but let's not get

12  carried away with stuff that is just overblown which both sides

13  are vastly guilty of, to tell you the truth.

14          MR. GEERCKEN:  I don't mean to have overblown it, but

15  it is a very important issue given the harm that has befallen

16  us and the harm that is likely to befall us if an injunction

17  isn't entered and the other side is allowed to move forward.

18          The monetary damages are only as good as the other

19  adversary.  We don't know whether they can make good on that.

20  We'll be in a bad situation *vis-à-vis* --

21          THE COURT:  Is there an issue of solvency here or

22  anything like that?  I thought this was a big company.

23          MR. GEERCKEN:  I'm not aware of it.  I do know we've

24  had issues with this company in the past and they have not

25  abided by Court orders.  We listed one instance in the

E7ogvric

1    Netherlands where we obtained an order from the Netherlands to

2    search the offices.

3              THE COURT:  I read it.  Let me see if I understand one

4    of the points you have just made.

5              There's been no discussion, up until today that I can

6    recall, about there being exclusive jurisdiction in courts in

7    New York to decide the issue you would like decided, which is

8    the question of the respective rights of the parties under the

9    NDA.

10             Are you actually suggesting to me that by virtue of

11   that provision of the NDA I have some power that I wouldn't

12   have absent that provision *vis-à-vis* the Chinese litigation?

13             MR. GEERCKEN:  I'm suggesting that the parties have

14   agreed to this as an exclusive forum for resolution of

15   disputes.  I'm sorry.  Let me continue and see if I can get to

16   your point.  We are not asking you to take any action *vis-à-vis*

17   the Chinese courts.

18             THE COURT:  I understand that.  I made that clear in

19   my opinion recently.

20             MR. GEERCKEN:  Yes.

21             THE COURT:  Let me try to rephrase it since I'm

22   apparently not getting through.

23             Are you saying that the choice of forum clause means

24   that I have any greater scope than I would have in its absence

25   to enjoin the defendant from pursuing the Chinese litigation?

E7ogvric

1                MR. GEERCKEN:  No, I'm not, your Honor.

2                THE COURT:  Thank you.

3                MR. GEERCKEN:  I think I hit all of my main points

4    right now and I'll reserve a minute or two for rebuttal, but if

5    there are any questions you have right now, I'm happy to take

6    them.

7                THE COURT:  Doesn't China trade in *Paramedics* require

8    as a prerequisite to an antisuit injunction of the character

9    you are seeking a finding on my part that the result here would

10   be dispositive of the Chinese case?

11               MR. GEERCKEN:  Our facts are slightly different, your

12   Honor.  I think there is the requirement that there are the

13   same parties in each suit.  You're right, both cases talk about

14   there being a requirement that resolution of the suit here in

15   New York would be dispositive of the case in China.

16               I believe if you were to enjoin their use of the

17   prohibited material in China, it would resolve that portion of

18   the suit, and we would allow them to go forward with the other

19   portion.

20               THE COURT:  I asked the question very deliberately.

21               MR. GEERCKEN:  Yes.

22               THE COURT:  I didn't ask you whether it is true that

23   *Paramedics* in China trade require that a decision here would be

24   dispositive of some issue or piece of the Chinese litigation.

25   I asked you whether they don't require a finding here that this

1  would resolve the Chinese litigation, be dispositive of the

2  Chinese litigation, a requirement that you clearly have not

3  met, right?

4          MR. GEERCKEN:  I think that's what the cases hold, but

5  I think we're a little different from those fact patterns

6  there, if I could elucidate.

7          We are dealing with one aspect of the case, as I said

8  before, that deals with this prohibited material.  We're

9  content for the remainder of the case to go forward in China.

10  We just think they should withdraw the current action and then

11  they could go forward with the other part of the action that

12  does not include this information and just carve out that

13  information, so we think it's less intrusive in that we're not

14  seeking a complete antisuit injunction; we're seeking to stop

15  them from proceeding.

16          THE COURT:  You want this suit enjoined altogether.

17  You want this one gone.  You're prepared to have them file some

18  fragment of it somewhere else, but the case they have got now

19  you want me to make go away.

20          MR. GEERCKEN:  That's correct, your Honor.  I think

21  they're coming to you as well seeking a judicial resolution of

22  the issues.

23          I think under the circumstances, it's appropriate to

24  enjoin them from using the confidential information abroad and

25  you can make a resolution of that issue here and we can move

E7ogvric

1  forward as quickly as humanly possible, your Honor, to get that

2  resolved.

3        THE COURT:  How do I stop the Chinese judges doing

4  from whatever they're going to do with it?

5        MR. GEERCKEN:  You can't.

6        THE COURT:  Right.

7        MR. GEERCKEN:  It may well be that they don't heed

8  your direction to them.  That's entirely possible.  You're not

9  enjoining them to do anything.  If the Chinese court doesn't do

10  it, well, we have availed ourselves of our rights and the case

11  law in this jurisdiction makes clear that the courts have the

12  power to enforce issues that are reserved to them according to

13  a parties' agreement.  It's just not a classic parallel

14  proceeding case that we have here.

15        THE COURT:  Isn't the import of China trade that in

16  those circumstances, you don't get an injunction against the

17  not-quite-parallel foreign proceeding?

18        MR. GEERCKEN:  I would argue, your Honor, that it

19  would be allowed under these circumstances because the other

20  proceeding could go forward in China.

21        THE COURT:  What's your best case for that

22  proposition?

23        MR. GEERCKEN:  I think our best cases are the ones I

24  have talked to you about, *Paramedics*, *Laker Airways*, the cases

25  that I said that say that the status quo ante, that's *LaRouche*

E7ogvric

1    and the *Blom v. Pictometry* case, it's the status quo that

2    should be put back in place as of the time before the offensive

3    conduct took place, your Honor.

4            THE COURT:  Anything else?

5            MR. GEERCKEN:  The other thing I would note that I

6    think is important.  Part of the relief we're seeking is a

7    statement on the record or a statement and a declaration

8    letting us know where else the other side may have used or

9    abused privy material.

10            THE COURT:  That's a discovery matter.

11            MR. GEERCKEN:  Well, we think it would help us get the

12    full relief that we're entitled to, and it would allow any

13    injunction to be fully enforced and would avoid a situation

14    where we befall further harm unbeknownst to us.

15            THE COURT:  How is the language you rely on in *Blom*,

16    specifically "The risk of unauthorized disclosure of trade

17    secrets is sufficient to give rise to a showing of irreparable

18    harm," how is that language possibly reconcilable with the

19    Supreme Court's holding, subsequently I believe, but in any

20    case, it doesn't matter, that the mere possibility of

21    irreparable harm doesn't get you a preliminary injunction?

22            Is there any way to reconcile those two propositions?

23            MR. GEERCKEN:  I think the difference, your Honor, is

24    that it's not just the mere possibility anymore.  It's a

25    substantial risk when you enter into a cooperation agreement as

1    they did in the *Blom v. Pictometry* case with another party

2    where, arguably, they would disclose information after that

3    agreement came into place.

4         Likewise, I think there's more than a mere possibility

5    here where we have information about the case out there, we

6    have a court, we have a translation company, we don't know if

7    they were subject to an NDA, that has the information, we know

8    licensees and competitors are likely following this case

9    because we have an affidavit of Mr. Light.

10        THE COURT:  Let's focus on the translation company for

11   a minute.  Where are they located?

12        MR. GEERCKEN:  I don't know, your Honor.

13        THE COURT:  The United States or not the United

14   States?

15        MR. GEERCKEN:  I think it's China, your Honor, but I'm

16   sure Mr. Straus can comment on that.

17        THE COURT:  If they have the information, which

18   presumably they do, how does an injunction against the

19   defendants here prevent the translation company from giving or

20   selling it to the highest bidder?

21        MR. GEERCKEN:  If they are required to comply with

22   their obligations, I think they would have to advise the

23   translation company of this as well.

24        THE COURT:  Well, they might have to advise them of

25   it; you could advise them of it.  But what good does that do

E7ogvric

1    anybody?

2            MR. GEERCKEN:  It allows them to know that there is

3    recourse if they sell this to the highest bidder.

4            THE COURT:  What recourse is there against them?

5            MR. GEERCKEN:  Well, we can commence suit against them

6    as well, your Honor.

7            THE COURT:  And you're going to have a jolly time

8    getting jurisdiction over them in the United States, let alone

9    enforcing a judgment.

10           MR. GEERCKEN:  That may well be, your Honor, but we

11   have so much information out there.  There's Mlex that is

12   reporting about this case --

13           THE COURT:  I'm very sympathetic.  I made my views

14   about the agreement clear, at least on a provisional basis –

15   and I mean on a provisional basis – last time.  But you know,

16   your client took a huge risk, and if they weren't wise to the

17   risk, they should have been, and that is, that there might

18   prove to be no real way to enforce the agreement.

19           MR. GEERCKEN:  I think they would say that they built

20   into the agreement their protections, and the agreement

21   provides that injunctive relief would likely be appropriate.

22   And they built in protections having this Court's jurisdiction

23   and this Court's law apply.  They wanted to believe that under

24   this law that their duly entered into commercial agreements

25   would be honored.

1           THE COURT:  All understood, but life's never that

2     simple, especially in the global economy.  Not anymore.

3           Anything else?

4           MR. GEERCKEN:  Nothing right now.

5           THE COURT:  Thank you.

6           I'm very interested to know, Mr. Straus, whether you

7     received my deputy email setting this hearing.

8           MR. STRAUS:  I apologize for being late.  I have no

9     reason to think I did not receive it, but I did not see it at

10    the time.  I apologize for being late and keeping your Honor

11    and others waiting.

12          THE COURT:  If we hadn't done you the courtesy of

13    calling to find out where you were, you wouldn't have been here

14    at all.  And it's not two months since I had the unhappy duty

15    of writing an opinion involving another firm's failure to read

16    their emails, which didn't do them any good either.

17          But in any case, you are here now, so let's proceed.

18          MR. STRAUS:  Thank you, your Honor.

19          Just to turn, first, to the irreparable harm point and

20    the reason I turn to that first is because the Second Circuit,

21    as I think your Honor knows, says the Court has to look at

22    irreparable harm first.  As your Honor said, the *Winter* case,

23    decided by the Supreme Court, which we cite as your Honor said,

24    does set out a standard for that.  It holds that the movant has

25    to show that irreparable harm is imminent and probable.  And it

E7ogvric

1    made very clear that it's not sufficient for it to be likely or

2    that there's a risk of it.

3             THE COURT:  It is sufficient for it to be likely.

4    "Risk of it" doesn't do or at least "possibility" doesn't do,

5    but "likely" has been the standard probably for 350 years.

6             MR. STRAUS:  I misspoke.  I meant possible.  It's not

7    sufficient that it be possible.

8             THE COURT:  It is possible.

9             MR. STRAUS:  Well, possible, the Second Circuit has

10   also held that prong needs to be addressed first, and if there

11   is not a more likely than not probability that --

12            THE COURT:  I'm not sure they have ever said that.

13            MR. STRAUS:  At a minimum, the Supreme Court has said

14   it has to be probable, which I would take to mean --

15            THE COURT:  They said "likely" and probable is a

16   meaning of likely if you look at your Oxford English

17   dictionary, and then probable has various synonyms, too.

18            But in any case, we have the great old problem of what

19   exactly is the mathematical possibility, probability,

20   likelihood of further harm here?  How are we going to determine

21   that?

22            MR. STRAUS:  There are two possible harms that the

23   plaintiffs allege:  One is the disclosure to the Court itself

24   and under the law, that itself does not constitute the harm.

25            THE COURT:  That's not the now-threatened harm; that's

1   the horse is out of the barn to that extent, but it is

2   certainly harm.

3          MR. STRAUS:  Your Honor, if the harm is that they're

4   held likely in China for antitrust violations --

5          THE COURT:  But that doesn't cut it either.  They made

6   a deal with your client and your client welched.  It's that

7   simple.  Think *Pennzoil v. Texaco*.

8          MR. STRAUS:  Well, I guess just to deal with the harm

9   for a moment, if the harm is that the Court will find them

10  liable, then I don't think that's harm.

11         THE COURT:  You keep going to that because it's a

12  whole lot better than talking about the fact from your point of

13  view that your client signed an agreement that couldn't have

14  been any more clear and then weeks later, they decided to tear

15  it up, in figurative terms, and breach it as blatantly as

16  anybody could possibly have done it.

17         MR. STRAUS:  To address that, it would not be – and

18  your Honor I know is familiar with our argument – that to the

19  extent the agreement is being used to prevent a Court from even

20  considering evidence, setting aside whether it's admissible or

21  not, but even look at the evidence, that, under New York law,

22  has been held to be unenforceable.

23         THE COURT:  Let's see.  I read your New York cases,

24  and to suggest that the proposition you assert is the settled

25  law of New York would be such an overreach as to be almost

E7ogvric

1    indescribable.

2              You're relying on a dictum in a 1913 Westchester

3    County case and more dictum from a very old New York Southern

4    District case that was entirely unnecessary to the result and

5    was issued on facts wildly different from this case, so you've

6    got no law in New York that supports you at all to speak of.

7              Let's talk about it in terms of practicality, right?

8    No one would disagree with the proposition that if you and I

9    agree that with knowledge of some pending criminal case or

10   grand jury investigation one of us will not, even under

11   subpoena, disclose information to the grand jury and a trial

12   court that that agreement is void as against public policy,

13   because there's a public policy in the enforcement of the

14   criminal laws and compliance with the laws on compulsory

15   process.

16             You would agree with that, I take it, right?

17             MR. STRAUS:  Yes.

18             THE COURT:  You would agree, I take it, that if A and

19   B contract that they're going to exchange some information and

20   neither will disclose it to anybody else for any purpose absent

21   legal compulsion and C walks in and says please show me the

22   information, neither one of them can properly give it to C.

23             Would you agree with that?

24             MR. STRAUS:  I would say it depends on the

25   information.

E7ogvric

1              THE COURT:  You would.

2              MR. STRAUS:  Well, to give your Honor an example:  If

3       we entered into this NDA on the eve of the settlement meeting,

4       and this is a hypothetical, if at the settlement meeting Vringo

5       had come in and said settle with us at a certain rate or we'll

6       burn down your offices, if there was a coercive act like that,

7       I would say that it would be that Vringo could not then use the

8       NDA to prevent ZTE from using that, from introducing that fact

9       for the purpose of whether it's prosecuting them or otherwise.

10             The same principle applies here in that the parties

11      enter into an NDA before any communications happen.  There are

12      prospective communications, then the communications happen.

13      And under the law or under applicable requirement obligations,

14      Vringo is required to make a certain kind of offering, an offer

15      that's FRAND, that's fair, reasonable and nondiscriminatory.

16             THE COURT:  And what law is that?

17             MR. STRAUS:  This is the law of the agencies that

18      regulate the patents.

19             THE COURT:  What agencies?

20             MR. STRAUS:  There are a number of them, your Honor.

21      They're listed in the Wang (ph) declaration.  When Vringo

22      bought its patents, it bought subject to Nokia's rights with

23      respect to those patents and obligations, and it was a member

24      of these organizations.

25             THE COURT:  In other words, am I correctly

E7ogvric

1   understanding you that Nokia had a contract with somebody or

2   some group of people or organizations?

3            MR. STRAUS:  It was a member of the organization, your

4   Honor.

5            THE COURT:  And as a member, they had certain

6   responsibilities as a member?

7            MR. STRAUS:  Correct.

8            THE COURT:  You're not telling me that there's a

9   federal statute you could point to, a state statute, a statute

10  of another country that requires a certain kind of offer,

11  right?

12           MR. STRAUS:  Not a U.S., federal or state statute,

13  your Honor.

14           THE COURT:  Not any governmental statute, right?

15           MR. STRAUS:  It's an obligation, though.

16           THE COURT:  Excuse me.  Answer my question, please.

17  I'm serious.  I don't have two weeks to unsort this whole

18  thing.  If I ask you a question, it's because I want to know

19  the answer.  Please answer it.

20           MR. STRAUS:  I can't say that it would violate a U.S.

21  government statute.

22           THE COURT:  So therefore what you're saying is that

23  Nokia had what, at best, was a contractual obligation to some

24  organization or group of other people, and the plaintiff took

25  an assignment of all these patents, in whatever the form the

E7ogvric

 1    transaction was, and in your submission succeeded to Nokia's

 2    contractual obligations?

 3           Is that your position?

 4           MR. STRAUS:  And also there would be a violation, and

 5    I apologize, your Honor, that if they do not make an offer that

 6    complies with this, that constitutes an abuse of patents, which

 7    is a statute.

 8           THE COURT:  That constitutes an abuse of patents under

 9    what authority?

10           MR. STRAUS:  In the Chinese action that we brought in

11    that complaint under the Chinese antitrust regulations.

12           THE COURT:  So the law of China is, you're telling me,

13    that if you make an offer that's noncompliant with this FRAND

14    thing, that's an antitrust violation?

15           MR. STRAUS:  I believe so, your Honor.

16           THE COURT:  You believe so?

17           Is there anything in the papers that you've submitted

18    that supports that?

19           MR. STRAUS:  We discussed FRAND in the Wang (ph)

20    declaration.

21           THE COURT:  That's not the question.  Is there

22    anything in the papers that supports the assertion you just

23    made?

24           MR. STRAUS:  The assertion is made in the complaint

25    that Vringo attached.

E7ogvric

1          THE COURT:  What precisely is the assertion in the

2     complaint?

3          MR. STRAUS:  The assertion is that the offer, without

4     using any particular information, your Honor, the assertion in

5     the complaint that Vringo attached, Vringo made offers which

6     abused the dominant market position that Vringo had with

7     respect to the patents and violated the antimonopoly law.

8          THE COURT:  That's rather different, isn't it?  I

9     understand all about that.  That's not so dissimilar from

10    American patent antitrust law, abuse of the dominant position.

11    I know where that comes from.

12         Where does it say that by virtue of making an offer

13    that didn't comply with FRAND they violated the Chinese

14    antitrust law?  Does it say that anywhere?

15         MR. STRAUS:  I guess setting aside FRAND, I don't want

16    to get hung up on any one position.  Your Honor was originally

17    asking whether there was a statutory violation at issue, I

18    think was the question.  My answer is, yes; the allegation in

19    China is that the offer is an abuse of Vringo's dominant market

20    position.

21         THE COURT:  What you're seeking in China is what?

22         MR. STRAUS:  We're seeking relief under the Chinese

23    antitrust laws.

24         THE COURT:  Antitrust laws.  Got it.  What relief?

25    Damages?

E7ogvric

1          MR. STRAUS:  Yes, your Honor.

2          THE COURT:  Anything else?

3          MR. STRAUS:  Also an injunction against the defendant

4     or an injunction that the defendant stop the monopoly,

5     including setting up fairly high prices.

6          THE COURT:  Is it your position that your client could

7     not, the day before that complaint was filed, have entered into

8     a binding contract not to sue them under the Chinese antitrust

9     laws?  Would that have been illegal?  The client couldn't do

10    it?

11         MR. STRAUS:  Obviously that's not the case.

12         THE COURT:  Obviously.

13         Is it your position that having brought the suit, you

14    can't give them a general release and waive any and all claims

15    you have against them?

16         MR. STRAUS:  We can certainly give them relief with

17    respect to things that have occurred.

18         THE COURT:  Can you covenant not to sue them with

19    respect to classes of imaginable claims that may arise in the

20    future?

21         MR. STRAUS:  Possibly, your Honor.  The difference is,

22    this was something that had not happened yet.

23         THE COURT:  What is?

24         MR. STRAUS:  Sorry, the settlement meeting and

25    whatever discussions were held.

E7ogvric

 1          THE COURT:  No.  You filed your case after the

 2   settlement meeting.

 3          MR. STRAUS:  I'm sorry.  I misunderstood the question,

 4   your Honor.

 5          THE COURT:  You could have agreed not to sue them.

 6   You could release the claim.  You could agree not to sue them

 7   in the future.

 8          All true?

 9          MR. STRAUS:  This is after the settlement meeting,

10   your Honor, you're asking?

11          THE COURT:  Before, after, either way.

12          MR. STRAUS:  I guess to the extent we agreed before

13   not to use information that we didn't have at the time and if

14   that information itself constitutes a violation of a

15   statute --

16          THE COURT:  The information constitutes a violation?

17          MR. STRAUS:  Well, the offer, your Honor.

18          THE COURT:  If they had come in and offered to give

19   you a worldwide license for the next ten years for $1.40, you

20   could have filed a complaint saying that $1.40 was excessive

21   and it was, therefore, an unlawfully high price and an abuse of

22   a monopoly position.

23          You could have filed such a case, right?

24          MR. STRAUS:  If it were not a frivolous case.

25          THE COURT:  So it was entirely foreseeable to you when

E7ogvric

1    you signed that agreement that after all the years of

2    litigation with this other company, their opening offer would

3    be higher than you were going to be prepared to write a check

4    for, right?  Totally foreseeable.  Indeed, no rational business

5    man on the face of the earth would have thought anything else,

6    right?

7            MR. STRAUS:  I guess there's a difference from being

8    higher than it being an abuse of its dominant market position.

9            THE COURT:  And that's in the eye of the beholder,

10   isn't it?

11           MR. STRAUS:  Your Honor, in this case, that's

12   something --

13           THE COURT:  If I put my apartment on the market and

14   say I want $25 million for it, God should only allow this to be

15   done credibly, and suppose, for some reason, I had market

16   power, obviously a contractual hypothesis, but suppose, and

17   some guy walked in the next day and said, it isn't worth

18   anything more than 19 million - antitrust violation,

19   unreasonable price, abuse of monopoly position, market power.

20           Are you kidding me?  I know when I put that asking

21   price on it that the first guy is not going to pay asking.  I

22   understand it's New York and it's 2014, God only knows.  But in

23   the real world, a rational world nobody comes in and does that.

24   Everybody knows there's a counteroffer.

25           And if the counterofferor doesn't like the price, it's

E7ogvric

totally foreseeable there's a disagreement as to whether it was
reasonable, in good faith, excessive.  I mean, really.  Come to
the game.

MR. STRAUS:  The enforceable issue comes in when
you're preventing a Court from even considering these issues.

THE COURT:  That's the whole point of it.  You,
knowing full well that you were going to get an opening offer
at this meeting that you were not going to like, and, secretly,
even if you liked it, that you'd try to get a better offer,
knew that you had this person with allegedly a dominant market
position who was going to make an offer that in your eyes was
too high and abusive.  Therefore, when you agreed not to use
anything said in that meeting against them, you gave up
something knowing full well what you were giving up.

Indeed, I wouldn't be surprised, although I form no
judgment about it because I have no facts, to see discovery
conducted in this case along the lines of whether you didn't
bring the lawsuit pursuant to a plan that existed before you
signed the NDA.

MR. STRAUS:  As your Honor said, there's no evidence
of that.

THE COURT:  Not yet, and maybe there will never be.
Maybe this is just, you know, a thought that's occurred to me
and there will never be any evidence of it, but the argument
you're making leads me right to it.

1          MR. STRAUS:  But it should not apply to this motion,

2     your Honor.  There's no evidence on the record.

3          THE COURT:  No, but the question on this motion that

4     you're raising is whether I should say that this clause is

5     unenforceable even though it's clear as a bell and even though

6     your client knew exactly what it was doing when it signed it

7     and welched on it weeks later.  And in deciding whether it's

8     some great offense against public policy, I need to consider

9     the context in which it was executed.  And the context was in

10    the context of a negotiation contemplated in which it was

11    entirely foreseeable that there was going to be a disagreement

12    about the price, which you tell me is what makes the antitrust

13    violation.  I didn't have any idea that was the case when I

14    walked in here this afternoon.

15         MR. STRAUS:  In fairness, that's not the only thing

16    that's alleged in the complaint.

17         THE COURT:  Maybe not, but it was foreseeable.  The

18    whole thing was foreseeable.

19         MR. STRAUS:  Your Honor, I submit that there's a

20    difference between foreseeing an offer to tie and an offer that

21    someone reasonably believes and nonfrivolously believes is an

22    antitrust violation and it's the latter.

23         THE COURT:  The difference very well may be depending

24    on which side of the offer you stand on.

25              Certainly, you're not asserting that your client

E7ogvric

1  learned anything new about the market position of the other

2  side in that meeting that you didn't know before, right?

3          MR. STRAUS:  Not at the moment, your Honor.

4          THE COURT:  So if it's your position they were a

5  monopolist or something close to it, you knew it going in,

6  right?  And you knew that there was a very high likelihood they

7  were going to ask what you thought would be too much money.

8          All I can tell you, it's going to be a hell of an

9  interesting trial if we ever get that far.

10          MR. STRAUS:  The difference is under the law, they're

11  entitled to have a Court address that.

12          THE COURT:  Address what exactly?

13          MR. STRAUS:  Whether this was a violation.

14          THE COURT:  Well, maybe not, maybe not.  That's the

15  whole issue, isn't it?

16          MR. STRAUS:  I think at some point, your Honor, there

17  could have been a violation.

18          THE COURT:  If you can drop that claim today, you

19  could have prospectively dropped it certainly in circumstances

20  in which the outlines of the claim were well known to you in

21  advance.  You knew that was coming.

22          If you could have dropped it then, you could contract

23  it away in a more limited sense by limiting the evidence you

24  could use.  I don't understand why not.

25          MR. STRAUS:  We didn't bargain to drop that claim I

1    guess is my point.

2          THE COURT:  No, but if you could have, why can't you

3    bargain to drop your ability to use certain kinds of evidence

4    if you brought the claim?

5          MR. STRAUS:  Because we didn't bargain to even prevent

6    a Court from considering whether that was a violation.

7          THE COURT:  Who did you think you were talking about

8    when you were signing the agreement about not using it in

9    judicial proceedings?  A hot dog vendor?

10          MR. STRAUS:  As I said, there are often agreements

11    like that that are really designed to prevent the parties from

12    using a settlement offer as proof of the actual value.

13          THE COURT:  You could have said that very easy.  In

14    fact, if you look at Rule 408 of the Federal Rules of Evidence,

15    you could have copied it, right?

16          It says, "Evidence of the following is not admissible

17    on behalf of either party, any party, either to prove or

18    disprove the validity or amount of the disputed claim or to

19    impeach a prior inconsistent statement or a contradiction," and

20    then it lists settlement offers.

21          Now, if you wanted to foreclose the use of anything

22    said in the meeting to prove the value of the license, all you

23    had to do was copy it out of the book.  Cheap.  Well litigated.

24    Everybody knows what it means.  That's not what you did.  That

25    was way broader.

1          MR. STRAUS:  It's broader.  It was drafted by Vringo

2     in my understanding.  And I don't --

3          THE COURT:  So you're going to plead you don't have

4     lawyers or something?  We're not dealing here with a consumer

5     credit transaction.

6          MR. STRAUS:  It was still nevertheless not the

7     intention to -- as I said, your Honor, anything could have

8     happened in that meeting.  I don't think a statutory violation

9     was foreseeable.

10         THE COURT:  You got to be kidding.

11         Go ahead.

12         MR. STRAUS:  The other argument, again, or the

13    principal or the first argument we made is that the movant has

14    failed to show irreparable harm and that needs to be

15    established before we even get into the merits.  The Court

16    needs to find that it's probable.  The harm that they addressed

17    and what they came up with in the reply does not meet that

18    standard.

19         THE COURT:  The thing is, the more I think about it,

20    the more troubled I am by your client's cavalier behavior here;

21    and the more cavalier the behavior is, the more likely it seems

22    to me that there's going to be more cavalier behavior.  I made

23    that point when I issued the TRO.  And then I see this

24    remarkable declaration you submitted from Mr. Zhou Wang (ph).

25         MR. STRAUS:  Yes, your Honor.

E7ogvric

1          THE COURT:  In paragraph 14 of that declaration, and

2     this was a centerpiece of your whole response to this motion,

3     he related that Vringo wrote a letter seeking permission to

4     disclose confidential information to the European commission,

5     right?

6          MR. STRAUS:  Yes, your Honor.

7          THE COURT:  Then Mr. Zhou (ph) under penalty of

8     perjury says, Without waiting for ZTE to reply, Vringo filed a

9     response to the European commission using information from the

10    same meeting that Vringo now seeks to stop ZTE from using.

11         That's what he said, right, under penalty of perjury.

12    Do you withdraw that statement now?  It's inaccurate, isn't it?

13         MR. STRAUS:  It appears to be.  I would say, your

14    Honor, that in responding to this, it's not clear to me -- the

15    movant's statements are very specific about this and what was

16    not used.  They submitted a redacted version of the response to

17    us, which described the information that was being redacted.

18         THE COURT:  Right.

19         MR. STRAUS:  Our understanding was that the unredacted

20    version was being submitted to the commission.

21         THE COURT:  Who told you that?

22         MR. STRAUS:  Our understanding was through -- well,

23    that's what it appeared to be, your Honor.

24         THE COURT:  So nobody told you that, right?

25         MR. STRAUS:  It was an understanding that we got from

E7ogvric

1   the European counsel, your Honor.

2              THE COURT:  Who was the European counsel from whom you

3   got that understanding?  I want the name.

4              MR. STRAUS:  I apologize.  The name is escaping me at

5   the moment.

6              THE COURT:  I'll tell you the way it looks to me.  You

7   folks leapt to a conclusion, I don't know exactly who

8   personally, we may get there.  And then either Mr. Zhou (ph) on

9   his own hook, which I doubt but it's possible, decided to swear

10  that the conclusion that he or somebody else had jumped to was

11  the fact without actually knowing at all or somebody drafted an

12  affidavit for him to sign, a declaration based on the same

13  assumption and got this man to declare under penalties of

14  perjury that it was a fact, and nobody knew what the fact was,

15  and everybody acted in, at least, reckless disregard of the

16  truth of what was sworn to in this declaration submitted to

17  this Court and made a centerpiece of your opposition to this

18  motion.

19             Do I have it wrong?  And to this day, you don't know

20  what the fact is, is the best I can put on this.  Isn't that

21  so?

22             MR. STRAUS:  It's true we don't know what Vringo has

23  shared with the commission.  This is an understanding based on

24  their description in their response.

25             THE COURT:  I'm sorry.  Would you run that sentence

E7ogvric

 1   past me again?

 2          MR. STRAUS:  It's based on their description in the

 3   redacted response that they shared with us, which was labeled

 4   "redacted for ZTE."

 5          THE COURT:  That's the one that contains footnote 35.

 6          MR. STRAUS:  Correct, your Honor.

 7          We have not heard anything further or we have not

 8   discussed yet with Vringo if there is anything else that was

 9   submitted to the European commission.  In other words, we

10   understand they said that the version submitted to the European

11   commission was redacted with respect to paragraph 34 in the

12   same way it was redacted in the version it got to us.

13          THE COURT:  Don't get excited that I'm standing up.

14   I've been sitting for too long.  That's all.

15          Now, this little exchange about the European

16   commission is mighty interesting to me for another reason.  I

17   find your client's answer to the request for waiver to be

18   really remarkably illuminating about your position in this

19   case.

20          Your client's position before me is all we understand

21   the NDA says is we can't disclose any of this information to

22   any judicial or other body, whatever it says exactly, but

23   that's the substance, but it doesn't really mean that; or, if

24   it means that, it's not enforceable because you can't stop

25   anybody from going and complaining and providing evidence to a

E7ogvric

1    Court or official body.

2              Is that a fair summary of your position?

3              MR. STRAUS:  Generally, your Honor.

4              THE COURT:  So when they asked your client for a

5    waiver of the NDA for the purpose of making a submission to the

6    European commission, your client did not say, Why are you

7    asking us for that, of course you're allowed to do that under

8    the NDA, did they?

9              MR. STRAUS:  Your Honor, the difference would be

10   that Vringo was not trying to use this to assert a statutory

11   violation.

12             I guess the point I made earlier is a very narrow

13   exception that the agreement is unenforceable to assert that.

14   This was not raised by ZTE in that case.  ZTE did not make any

15   filing or seek to file any NDA-protected material at that time

16   in that case.  It was raised by Vringo, and that was the

17   response.

18             THE COURT:  I'm sorry.  It was raised by Vringo?

19             MR. STRAUS:  I'm sorry.  Vringo requested a waiver.

20             THE COURT:  For the purpose of?

21             MR. STRAUS:  Submitting information, submitting

22   settlement discussions in the European commission case.

23             THE COURT:  In what European commission case?

24             MR. STRAUS:  It was a case that was brought by ZTE,

25   your Honor.

E7ogvric

1          THE COURT:  Right.  So in your view, it's perfectly

2     okay for your client to submit confidential information as a

3     plaintiff against Vringo because public policy prohibits any

4     other result, but it's a violation of the NDA to submit the

5     same kind of information to the European commission to defend

6     against a competition complaint by your client against them.

7          MR. STRAUS:  We did not take the position that it

8     would have been a violation.

9          THE COURT:  No, but wait a minute.  You didn't say you

10    don't need our permission, no problem, it would be against

11    public policy to stop you from providing information with

12    regard to ZTE's alleged allegation of abuse of a monopoly

13    position or whatever the claim is exactly, but if the shoe's on

14    our foot, it works for us.

15         MR. STRAUS:  The request of the European commission

16    was that it be mutual.

17         THE COURT:  I'm sorry.

18         MR. STRAUS:  The request that ZTE made of the European

19    commission is that it be mutual.

20         THE COURT:  That's a request you made of Vringo.

21         MR. STRAUS:  Correct.

22         THE COURT:  Right.  But you were trying very much to

23    have your cake and eat it, too.  That's what you were trying to

24    do.  And as I view it, your position is internally totally

25    inconsistent and I don't have to get there because, it seems to

E7ogvric

 1    me, it has no merit to begin with, but there it is.

 2              MR. STRAUS:  I guess I would say it's not inconsistent

 3    because Vringo was requesting a waiver.  They wanted to use

 4    information in there.  And ZTE was just saying we also want to

 5    be able to use this information; we just want a clarification

 6    that this is mutual, that if you can use it, we can, too, so

 7    you're not the only one who can use this information.

 8              THE COURT:  You had already filed in China by then,

 9    right?

10              MR. STRAUS:  That's correct, your Honor.  The case had

11    not yet been accepted by the court.

12              THE COURT:  Right.  Just refresh my recollection:  Had

13    the existence of the case been disclosed to Vringo by the time

14    you wrote that letter or not?

15              MR. STRAUS:  No, it had not, but again, your Honor --

16              THE COURT:  Frankly, I've seen some remarkable things

17    here in 20 years, but this is right up there.

18              MR. STRAUS:  Your Honor, just to address that, we were

19    not seeking to prevent Vringo from using this information.

20              THE COURT:  I know.  You were trying to use it for

21    whatever you could get out of it.  That's what you were trying

22    to do.

23              MR. STRAUS:  We were trying to make the ability --

24              THE COURT:  You were trying to get yourself an

25    immunity bath for having filed this stuff in the Chinese court

E7ogvric

1    probably knowing full well that you were going to get hammered

2    for having done so.  That's what you were trying to do.

3              You wanted it to be reciprocal because that would get

4    you off the hook on the very claim they brought against you

5    once they found out what you had done in China.

6              Is that not right?

7              MR. STRAUS:  Your Honor, I don't have the letter right

8    in front of me, but I'm not sure that the reciprocity would

9    apply worldwide other than in the European commission.

10             THE COURT:  Well, condition number one:  The waiver

11   should be made reciprocal, meaning that Vringo and all of its

12   subsidiaries, blah, blah, blah, who signed the NDA should also

13   waive the confidentiality obligations under the NDA on ZTE and

14   all of its subsidiaries.  That's what it says.

15             MR. STRAUS:  The June fourth letter, and I apologize,

16   I'm speculating a little bit because this particular issue is

17   going a bit beyond our motion, but --

18             THE COURT:  No, it's not.  It's right in there.

19             MR. STRAUS:  Their June fourth letter asked to use the

20   information to disclose the information to the European

21   commission.  The response asks that the waiver should be made

22   reciprocal.  I don't know exactly what the thinking was

23   candidly, your Honor.

24             THE COURT:  I see your argument.  It could be read

25   another way, too.  Maybe you're right.  It does need to be read

E7ogvric

1    in light of the June four letter, but I'm not sure I'm mistaken

2    in the hypothesis I've articulated.

3         There's an awful lot of clever behavior going on here

4    and I imagine in various law offices around the world where at

5    least people think it's clever.

6         MR. STRAUS:  Just to address what your Honor perceives

7    as the cavalierness, and this is important for that reason, and

8    I think it's important not to go beyond the record --

9         THE COURT:  I'm not going to go beyond the record one

10   inch.  Don't worry about it.  But what I see is an agreement

11   that is clear as a bell, absolutely clear as a bell.

12        MR. STRAUS:  I guess what this shows, your Honor, is

13   that there's no unwillingness on the part of ZTE to have this

14   information used; they just want things to be reciprocal.  The

15   same would be true in China.

16        Setting aside the harm for a moment on the merits, the

17   argument on the merits would be that they were entitled to have

18   this claim, it's a nonfrivolous claim, addressed by the Chinese

19   court.

20        THE COURT:  If they had given a general release, would

21   they have had a right to have the claim addressed by the

22   Chinese court?

23        MR. STRAUS:  Assuming there was no exception to the

24   release, your Honor --

25        THE COURT:  No, they wouldn't, correct?

E7ogvric

1          MR. STRAUS:  I don't mean to be --

2          THE COURT:  Assuming they had covenanted not to sue,

3     they would have no right to have the claim heard in the Chinese

4     court, right?

5          MR. STRAUS:  Again, I don't mean to be disrespectful,

6     but there are exceptions to the --

7          THE COURT:  You certainly haven't been that.

8          MR. STRAUS:  There are exceptions to the

9     enforceability of all of those things, and with respect to the

10    agreement in this case, your Honor is familiar with our

11    argument on the enforceability, and that's the point we're

12    making if your Honor understands our argument.

13         THE COURT:  I do.

14         MR. GEERCKEN:  May I.

15         THE COURT:  I'm not sure Mr. Straus is done.

16         MR. STRAUS:  Thank you, your Honor.

17         One other point, again, going to if there's any

18    perception of bad faith, my client had no incentive to share

19    Vringo's confidential information.  This is not a case where,

20    for example, it's getting information about customers and it's

21    a competitor and it's using it for commercial gain.  If

22    anything, the information would benefit Vringo.

23         THE COURT:  I don't know where the facts will

24    ultimately shake out, but I've been on this bench for 20 years

25    and I did what you do for 25 before that and I've represented

E7ogvric

1   lots of companies in lots of negotiations and lots of

2   litigations.  I have a pretty good idea of what's going on

3   here.

4            It is likely, though, the evidence will ultimately

5   show that everybody is trying to negotiate the best commercial

6   deal they can and that's always a matter of leverage.

7            Let's speak in plain terms:  The Chinese litigation is

8   leverage.  That's what it is.  If it were not the case that

9   your client would be just as happy to see that litigation and

10  all the lawyers' fees disappear if it could get the right

11  license deal with the other side, it would be really quite

12  remarkable.

13           If the other side could get what they regard as an

14  adequate license deal, they'd be perfectly happy to do all

15  kinds of things, stop all the litigations all over the world.

16  I understand all of that.  We all do.

17           Part of your client's leverage is they don't want to

18  litigate in China.  Part of your client's litigation seems to

19  be that they don't trust the Chinese system.  I make no comment

20  about that one way or another.  They have items of leverage,

21  too.

22           The question ultimately really is at this moment so

23  far is likely success on the merits is whether one element of

24  the leverage your client is trying to exert is actually

25  something they contracted away when they signed the NDA.  I

1    think they're in trouble on that issue.  I think they're in

2    deep trouble on that issue.

3            Now, there are lots of issues in this case.  I think

4    your adversary understands that I have thought a great deal

5    about irreparable injury in this case, and it's a very

6    interesting subject.  And I reiterate how surprised I am that

7    it was not adequately addressed by either side.  Certainly, I

8    made clear how troubled I am about an antisuit injunction, and

9    I am.

10           And nobody should misunderstand the fact that I get

11   engaged in cases, as I've obviously manifested, for anything

12   more than a testing of the limits of everybody's arguments,

13   and, on occasion, and this is one of them, provisional views on

14   different issues that are strong, but by no means unchangeable.

15   Nobody should misunderstand that.  You're going to get a result

16   right down the middle to the extent anybody is able to do that,

17   and I think I am.  I'm sure of it.  But I see great strength in

18   elements of their case and strength in certain elements of your

19   position, and we'll see where it goes.

20           Now, if your respective clients have any sense, they

21   will settle this because I can see them spending a vast amount

22   of money here and doing it in a very short period of time and

23   maybe winding up with a result that doesn't make anybody

24   entirely happy and just contributes to the greater wealth of

25   the legal profession that used to be much nearer and dearer to

E7ogvric

1   my heart than it is now, but there it is.  That's what I think

2   you should do.

3            How long would it take to try this case, assuming you

4   had expedited discovery and we went to trial?  Let me ask one

5   other thing.  Is there a damages claim in this case?  I guess

6   there is.

7            MR. STRAUS:  There is.

8            THE COURT:  I guess we covered that.  That makes it

9   more difficult.  Maybe what we need to do is have some

10  expedited discovery, and I would not be entirely surprised if

11  there was a motion for summary judgment or partial summary

12  judgment on the contract issue.  Maybe that's where it will go.

13           Beyond that, had this been a pure injunction case, I

14  think I would have had you on trial within 90 days, but I don't

15  think I can do that if there's a jury demand and a damage

16  claim.

17           Does Mr. Geercken want to respond briefly?

18           MR. GEERCKEN:  Very briefly.

19           MR. STRAUS:  Before that on the antisuit injunction

20  argument, I wanted to say on *Paramedics* I think your Honor is

21  correct that it was critical that there was a judgment that was

22  already entered.

23           THE COURT:  I thought so.  Thank you.

24           MR. STRAUS:  Thank you, your Honor.

25           MR. GEERCKEN:  We don't presently have a jury demand,

E7ogvric

1    and I don't think that we would be asserting one, your Honor,

2    so I give you that information.

3                THE COURT:  Have they answered yet?

4                MR. GEERCKEN:  They answered yesterday.

5                THE COURT:  Is there a jury demand?

6                MR. STRAUS:  It's not in the answer.

7                THE COURT:  Are you going to demand a jury?  Is either

8    side going to demand a jury?

9                MR. GEERCKEN:  We will not, your Honor.

10               THE COURT:  Mr. Straus.

11               MR. STRAUS:  I'm not certain, your Honor.  We are

12   still considering that.

13               THE COURT:  I can't hear you.

14               MR. STRAUS:  I'm not certain.  We are still

15   considering that.

16               THE COURT:  Will you let me know in a week?

17               MR. STRAUS:  Yes, your Honor.

18               THE COURT:  Thank you.

19               MR. GEERCKEN:  The very last point I want to make

20   deals with irreparable harm, and it is our position that given

21   the cumulative disclosures that have taken place thus far, the

22   interest that there's been in the case, the reporting by Mlex

23   about the case saying that the Shenzhen court publicized the

24   upcoming hearing, we think it is likely that there will be

25   instances of disclosure and more irreparable harm.

E7ogvric

1          I would just like to quote what Justice Ginsburg said

2    in *Winter*, albeit in dissent, but I think the point of law is

3    accurate, your Honor.

4          She said, "Consistent with equity's character, Courts

5    do not insist that litigants uniformly show a particular,

6    predetermined quantum of probable success or injury before

7    awarding equitable relief.  Instead, Courts have evaluated

8    claims for equitable relief on a "sliding scale," sometimes

9    awarding relief based on a lower likelihood of harm when the

10   likelihood of success is very high.  This Court has never

11   rejected that formulation, and I don't believe it does so

12   today."  And I think we have a very high likelihood of success

13   on the merits.  And I do believe, given the cumulative

14   disclosures that we have thus far, we do have a likelihood of

15   imminent irreparable harm.

16         THE COURT:  Where does that get you beyond a

17   preliminary injunction framed just as the TRO had it?

18         MR. STRAUS:  I think it gets us there, which is

19   important, but I do believe that there are enough differences

20   between what we're asking in the posture of this case between

21   *Paramedics* and the China case that allows you to grant the

22   limited injunction we're asking for, allowing them to refile

23   again without this offending information, so it's different

24   from the classic parallel.

25         THE COURT:  What's the point of refiling again?  You

E7ogvric

1   want it in a different venue, right?

2            MR. GEERCKEN:  We want it outside of the Shenzhen

3   court, but anywhere in the Guangdong province.  And it is,

4   according to our expert and we submitted an affidavit to his

5   declaration to this effect, it is possible they can bring suit

6   elsewhere at Guangdong.

7            THE COURT:  This is all on the theory that having some

8   Chinese judges in Shenzhen have read this material is

9   irreparable harm to you; I should start monkeying around with

10  the venue of a Chinese lawsuit?

11           MR. GEERCKEN:  At a minimum, your Honor, we think that

12  the case in its current form ought to be withdrawn.  And if

13  they want to refile it immediately --

14           THE COURT:  I know, but that's your Christmas list.

15  I'm not Santa Claus.

16           MR. GEERCKEN:  I understand, your Honor.  I do think

17  that the case law that we have cited, we have discussed, would

18  allow you to grant this type of an injunction over the litigant

19  and not over the court.

20           THE COURT:  I understand that distinction.  You may

21  have read something I wrote about that recently.

22           MR. GEERCKEN:  Yes.

23           THE COURT:  Thank you.

24           MR. GEERCKEN:  Thank you, your Honor.

25           THE COURT:  I would like further briefing on the China

E7ogvric

1    trade point and on where the sliding scale test stands in light

2    of *Winter* and *eBay* and the other Supreme Court and Second

3    Circuit decisions since the Supreme Court decisions on

4    preliminary injunctions, not to exceed ten pages on either

5    side, simultaneous exchange.

6            Is a week from tomorrow doable?

7            MR. GEERCKEN:  That's fine from our perspective.

8            THE COURT:  Fine.  Just to be clear about the jury, do

9    I have agreement that everybody agrees that if either side is

10   going to demand a jury in this case, it will be demanded by a

11   week from tomorrow and a failure to demand it by a week from

12   tomorrow is a waiver?

13           Do both sides agree to that?

14           MR. GEERCKEN:  Yes, your Honor.

15           MR. STRAUS:  Yes, your Honor.

16           THE COURT:  I appreciate that.  If there's not going

17   to be a jury in this case, depending on how my schedule shakes

18   loose, there's a possibility of a trial in October.  There's a

19   possibility in January or February.

20           MR. GEERCKEN:  October would be fine.

21           THE COURT:  I rather suspected you might say that.

22   Thank you.  I hope I wasn't too rough on anybody.  It's never

23   personal.  It's always intellectual.  And I need to get to the

24   heart of this and I did that.

25           Thank you.

E7ogvric

1          MR. GEERCKEN:  Thank you, your Honor.  Does the TRO

2    remain in place?

3          THE COURT:  Yes, I think it says so by its terms,

4    doesn't it?

5          MR. GEERCKEN:  Yes.

6          THE COURT:  Yes.

7          MR. GEERCKEN:  Yes.

8          THE COURT:  Thank you.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25