**VRINGO, INC.**
**VRINGO INFRASTRUCTURE, INC.**

                              **Plaintiffs,**          **Civil Action No. 14-cv-4988 (LAK)**

**v.**

**ZTE CORPORATION**
**ZTE USA INC.,**

                              **Defendants**

## FIRST AMENDED COMPLAINT

Plaintiffs Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") file this first amended complaint against ZTE Corporation ("ZTE Corp.") and ZTE USA Inc. ("ZTE USA") (collectively, "ZTE") for breach of a Non-Disclosure Agreement dated effective December 6, 2013 between Vringo and ZTE (the "NDA"), fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unfair competition.  Vringo hereby alleges as follows:

## I.    THE PARTIES

1.    Plaintiff Vringo, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

2.    Plaintiff Vringo Infrastructure, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

3.     Defendant ZTE Corp. is a corporation organized under the laws of China, having its principal place of business in Shenzhen, China.

4.     Defendant ZTE USA is a corporation organized under the laws of New Jersey, having its principal place of business at 2425 N. Central Expressway, Suite 323, Richardson, Texas 75080.

## II.     NATURE OF THE ACTION

5.     This is a civil action for breach of contract, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unfair competition.  It arises out of ZTE's bad-faith entry into the NDA and blatant breach of the NDA only seven weeks after it was signed.

## III.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs, and is between citizens of different States.  Vringo is a citizen of New York, and the ZTE entities are citizens of Texas and China.

7.     Upon information and belief, ZTE conducts business in New York and sells products within this judicial district.  ZTE has submitted to the jurisdiction of the United States District Court for the Southern District of New York.  ZTE engaged in actions outside of the United States, the consequences of which (including harm to a New York company) ZTE knew would be felt in New York and, thus, ZTE should have reasonably expected to be haled into New York courts.  The United States District Court

for the Southern District of New York has personal jurisdiction over ZTE by virtue of the above-referenced facts.

8.     ZTE has expressly consented to the jurisdiction of the United States District Court for the Southern District of New York for disputes arising out of or in connection with the NDA.

9.     The NDA between Vringo and ZTE specifically provides that the "courts of the State of New York located in New York County or the United States Federal Courts located in New York County, New York shall have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Agreement and, for these purposes, the Parties irrevocably submit to the jurisdiction of said courts and agree not to object to the jurisdiction of such courts."  (Attached hereto as Exhibit A, ¶13).  This Court has personal jurisdiction over ZTE by virtue of the above-referenced facts.

## IV.     BACKGROUND

### A.     Vringo Overview

10.     Vringo, Inc., which is publicly traded on the NASDAQ, was founded in 2006 and, until the recent sale of its mobile partnerships and application business in February 2014, developed and distributed mobile application products and services through partnerships with handset manufacturers and mobile network operators.

11.     Vringo, Inc. offered its social and video ringtone mobile applications globally through mobile application stores.  Vringo, Inc. was awarded the "Global Telecom Business Wireless Network Infrastructure Innovation Award" for launch of the world's first Video Ringtone Service and was also chosen by AlwaysOn as an "On Media

Top 100 Winners." It was also given the "Sony Ericsson Special Recognition Award" as a winner for best use of all functionality and the "MIPCOM Mobile and Internet Award" as a winner for "Best Mobile Service for Social Community and User Generated Products."

12. Vringo Infrastructure, Inc., a subsidiary of Vringo, Inc., is an early stage technology company that was founded in August 2012 at which time it acquired a global patent portfolio covering a variety of technologies.

13. Vringo is engaged in the innovation, development and monetization of intellectual property and mobile technologies. Vringo's intellectual property portfolio consists of more than 600 patents and patent applications covering a variety of technologies related to Internet search, mobile handsets, telecommunications infrastructure, and wireless communications.

**B.    Vringo's Standard Essential Patents and ZTE's World-Wide Infringement of Vringo's Patents**

14. In August 2012, Vringo purchased a patent portfolio from Nokia Corporation. A significant number of these patents are declared as essential or potentially essential to 2G, 3G, and 4G telecommunication standards – the Global System for Mobile Communications ("GSM") Standard (2G technology), the Universal Mobile Telecommunications System ("UMTS") Standard (3G technology), and Long Term Evolution ("LTE") (4G technology). In other words, the technology of these patents is claimed as necessary or "essential" or potentially essential for the operation of telecommunication equipment and, thus, these patents are commonly referred to as standard essential patents ("SEPs"). Vringo's patent portfolio includes hundreds of SEPs throughout the world (the "Vringo SEPs"). The Vringo SEPs cover fundamental aspects

of telecommunications equipment and its operation. Vringo's patent portfolio also includes hundreds of patents that are not SEPs.

15.     Since the Vringo SEPs are declared as essential or potentially essential to the GSM, UMTS, and LTE standards, to the extent that these patents are actually essential under the relevant definitions of the applicable rules of certain standard setting organizations ("SSOs"), Vringo must be prepared to grant licenses under those patents on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions. The remaining Vringo patents are not subject to the FRAND requirements.

16.     As a part of the acquisition of the Vringo SEPs from their prior owner, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs.

17.     ZTE Corp., which is publicly traded on the Shenzhen and Hong Kong stock exchanges, manufactures, distributes, and sells telecommunications products such as infrastructure equipment and smartphones throughout the world through its subsidiaries.

18.     Since 2002, ZTE has been selling GSM, UMTS and/or LTE compliant telecommunications equipment that uses Vringo's patented technology. ZTE has done and continues to do so without a license to the Vringo SEPs.

19.     Despite attempts by Vringo – including an in-person meeting at ZTE's Shenzhen headquarters attended by Vringo senior management and follow-up in-person and phone discussions by Vringo representatives – to date, ZTE has not taken a license to any of the Vringo SEPs.

20.     Upon information and belief, when approached by the prior owner of the Vringo SEPs, ZTE refused to take a license to any of the prior owner's SEPs, which included the Vringo SEPs.   Upon information and belief, this refusal lasted approximately 10 years.

21.     ZTE has similarly refused to take a license to other companies' SEPs. Huawei, a telecommunications company which is also based in China, has also had to sue ZTE in several jurisdictions around the world to secure a license in relation to Huawei's SEPs.

22.     As a result of ZTE continuing to sell products without a license, since October 2012, Vringo has brought patent infringement lawsuits against ZTE and its subsidiaries in certain countries where Vringo's patents are in force and ZTE sells allegedly infringing products, including in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania, and the United Kingdom.

23.     In a number of litigations throughout the world, ZTE has taken the position that it will not consider negotiating the terms of a license for any Vringo patent until that patent has been determined by a court to be both valid and infringed.  As such, Vringo has been forced to bring lawsuits against ZTE to prove that Vringo's patents are valid and infringed.  In many of those jurisdictions, ZTE has alleged either directly or implicitly that Vringo, through its litigations, has violated relevant antitrust laws that purportedly govern the enforcement of SEPs, even though it is ZTE that has insisted that litigation is necessary before ZTE will take a license.

## C. Vringo's Proposed Term Sheet and Attempt to Have a Neutral Arbiter Determine FRAND Issues

24.     It is well known in the industry that many companies that license SEPs make their royalty rates for their SEPs – "rack rates" – public.  The rack rates are almost always expressed as a portfolio-wide percentage royalty rate to be applied on a per-device basis or based on a relevant business unit's revenue.  For example, many of the leading industry players, including Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia, Qualcomm and ZTE, have publicly committed to specific rack rates to be applied to their LTE SEPs.  *See* Royalty Rates And Licensing Strategies For Essential Patents On LTE (4G) Telecommunication Standards.  (Attached hereto as Exhibit B.)

25.     In March 2013, Vringo provided ZTE with a proposed licensing term sheet that contained its rack rates and key license terms, including the royalty rate for a global license to the Vringo SEPs as well as separate royalty rates by technology standard (e.g., GSM, UMTS, and LTE) (the "Term Sheet").  The Term Sheet was made public in June 2013.  The Term Sheet contains the royalty rates that Vringo offers to any potential licensee who seeks to license the Vringo SEPs.  Vringo offered to negotiate the terms of the Term Sheet with ZTE.

26.     As ZTE recognized in a July 24, 2014 filing in the Netherlands, the Term Sheet was the only non-confidential license fee proposal that ZTE received from Vringo.

27.     In June 2013, Vringo proposed to have a ***neutral arbiter*** – the United Kingdom High Court of Justice (the "UK High Court") – determine whether the Term Sheet, including its rack rates, were in accordance with FRAND principles.  Vringo further proposed, that if any provision of the Term Sheet was not in accordance with FRAND principles, that the UK High Court alter the royalty rate and/or amend the key

terms of the Term Sheet to bring the Term Sheet in compliance with FRAND principles. Vringo agreed to be unconditionally bound by the UK High Court's determinations. The UK High Court was willing to make such determinations if ZTE agreed. ZTE, however, refused.

### D. The Parties' Meeting in Shenzhen and the NDA

28.     In late November 2013, after over a year of litigation, ZTE personnel agreed to meet with Vringo personnel to discuss a resolution to the intellectual property dispute between the parties. Vringo agreed to meet ZTE in Shenzhen, China at ZTE's headquarters. A meeting was set for December 10, 2013.

29.     Prior to the meeting, in late November 2013, Vringo provided ZTE with a proposed non-disclosure agreement ("NDA") so that the parties could engage in good faith negotiations and freely discuss their settlement positions.

30.     Consistent with industry practice, Vringo would not make any detailed settlement offer specific to ZTE without the protections of the NDA in place. This industry practice is common in nearly every negotiation of this kind. ZTE understands the importance of having a non-disclosure agreement in place before parties engage in negotiations, having, on information and belief, successfully stalled at least one significant negotiation for many years simply by creating conditions whereby ZTE was "unable" to execute a non-disclosure agreement.

31.     On December 9, 2013, ZTE returned a signed copy of the NDA (which is dated effective December 6, 2013) to Vringo. ZTE never sought to discuss, comment upon, or otherwise amend the terms of the NDA. The NDA was executed on behalf of ZTE by ZTE's Chief Intellectual Property Officer, Shen Jianfeng. (Exhibit A.)

32.     The NDA places strict restrictions on the use and disclosure of confidential settlement information:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and without prejudice and ***shall not be used or referenced in any way by any Party in any*** existing or ***future judicial*** or arbitration ***proceedings*** or ***made the subject of any public comment*** or press release.

(Exhibit A, ¶2) (emphasis added).

33.     The NDA also provides that it shall be "governed by and construed and enforced in accordance with the laws of the State of New York" and that it "shall be binding upon the parties hereto in the United States and worldwide." (Id., ¶12.).

34.     Pursuant to the NDA, the parties also agreed that they would be "entitled to seek equitable relief, including injunction and specific performance, for any actual or threatened breach of the provisions of this Agreement, in each case, without the necessity of posting bond or other security or proving actual damages." (Id., ¶10).

35.     ZTE understood the provisions of the NDA when it entered into the NDA. At the time ZTE executed the NDA, ZTE had outside counsel in the United States and at least one in-house United States lawyer, J. Ray Wood, ZTE USA's Chief Patent Counsel.

36.     On December 10, 2013, Vringo met with ZTE in Shenzhen, China.  At that meeting and in reliance on the NDA, Vringo provided a 40-page presentation to ZTE which included payment terms and a roadmap explaining how Vringo arrived at Vringo's opening settlement offer (the "Prohibited Material").  The payment terms and the roadmap, which gives insight into how Vringo applies its rack rates in the context of the litigation between Vringo and ZTE to arrive at a settlement offer, are highly sensitive business confidential information.  Disclosure of the roadmap and payment terms to third

parties, such as Vringo's competitors and potential licensees, would be harmful to Vringo's patent licensing business.

37.     Vringo's opening settlement offer was a proposed application of Vringo's rack rates to ZTE's infringing activity and was expressed in a dollar amount (the "ZTE Specific Offer").

38.     Each and every page of Vringo's presentation was clearly designated: CONFIDENTIAL – VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA.

**CONFIDENTIAL - VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA**

39.     The cover page of Vringo's presentation is attached hereto as Exhibit C.

**E.      The Shenzhen Lawsuit and ZTE's Disclosure of the Prohibited Material**

40.     On February 21, 2014, ZTE filed an antitrust complaint against Vringo (the "Chinese Complaint") in its home jurisdiction in China, the Shenzhen Intermediate People's Court (the "Shenzhen Court").[1]

41.     The Chinese Complaint is based on the Chinese Anti-Monopoly Law.  In the Chinese Complaint, ZTE alleges that Vringo's royalty rates and the ZTE Specific Offer are an abuse of Vringo's purported dominant market position.  The alleged abuse is in large measure, according to ZTE, based on Vringo's alleged refusal to license the Vringo SEPs on FRAND terms.

---

[1] The General Counsel of ZTE, Mr. Guo Xiaoming, is a member of the Shenzhen Municipality People's Congress, which is the body that has supervisory authority over the activities of the Shenzhen Court and that is able to appoint and remove all judges and the president of the Shenzhen Court.  *See* Dkt. No. 25, Supp. Clark Decl., ¶ 27.

42.     Yet, eight months earlier, it had been ZTE who refused Vringo's proposal to have a ***neutral arbiter*** – the UK High Court – decide a world-wide FRAND royalty rate and FRAND licensing terms for the Vringo SEPs, including for the Vringo SEPs in China.

43.     A first hearing was scheduled to take place in the Shenzhen Court on August 14, 2014, for the purpose of exchanging evidence.  (Dkt. No. 6, Clark Decl., ¶7). The Shenzhen Court also scheduled a substantive hearing to take place on the next day, August 15, 2014. (*Id.*)

44.     In order to demonstrate Vringo's purported abuse of a dominant market position, ZTE used the Prohibited Material, ***which includes payment terms and the roadmap contained in Vringo's December 10th presentation explaining how Vringo arrived at the ZTE Specific Offer***, as ***the basis*** for ZTE's antitrust allegations in the Chinese Complaint.  ZTE included the Prohibited Material as an exhibit to the Chinese Complaint.  Chinese procedural rules did not require ZTE to submit the Prohibited Material at the time of filing the Chinese Complaint.  (Dkt. No. 25, Supp. Clark Decl., ¶9).

45.     ZTE also included the ZTE Specific Offer in the Chinese Complaint – an amount that was calculated using the roadmap in Vringo's December 10th presentation. In particular, the Chinese Complaint states: "In the second price quotation in December 2013, the Defendant [Vringo] actually intended to charge the Plaintiff USD **[REDACTED]** for its standard-essential patents portfolio license...."  (See Exhibit D at

6-7).[2]  For the purpose of this Amended Complaint, Vringo has redacted the ZTE Specific Offer from the above quote.

46.  ZTE and/or its attorneys also provided the Chinese Complaint to a translation company, Beijing Baijia Translation Company, based in Beijing, China.

47.  At the time of filing the Chinese Complaint, ZTE did not seek to have the Chinese Court treat the Prohibited Material as confidential.  Nor has ZTE requested that the Prohibited Material not be discussed or disclosed at public hearings including those hearings that were scheduled to take place in August 2014.

48.  Vringo did not become aware of the Chinese Complaint until it received a copy of the Chinese Complaint on June 26, 2014.

49.  By June 26, 2014, multiple judges in the Shenzhen Court and possibly the Guangdong Higher People's Court ("Guangdong Appellate Court") had had access to, and carefully considered, the Prohibited Material and Chinese Complaint for more than four months.

50.  ZTE's inclusion of the Prohibited Material[3] in the Chinese Complaint is in violation of the NDA, which states that such information "shall not be used or referenced in any way by any Party in any . . . judicial . . . proceedings."  (Exhibit A, ¶2).

51.  In July 2014, Vringo filed a jurisdictional challenge in the Shenzhen Court.  As a result, the August 2014 hearing dates were postponed until the resolution of the jurisdictional challenge.

---

[2] Attached hereto as Exhibit D is an English-language translation of the relevant pages of the Chinese Complaint as received from the Shenzhen Court.  Vringo made all the redactions in Exhibit D.
[3] The Chinese Complaint was accompanied by an "Evidence List" (attached as Exhibit E hereto) and fourteen exhibits.  Vringo's presentation is exhibit number eight on that list, which is described as "the second offer from defendant to plaintiff and its translation", with an alleged "purpose of evidence" that "the defendants abuse its [sic] dominant market positions."  In fact, the document attached to this Amended Complaint as Exhibit C is the cover page from the actual version of Vringo's presentation that was submitted to the Shenzhen Court as exhibit eight to the Chinese Complaint.

52.     On April 10, 2014, ZTE filed a complaint with the European Commission (the "EC") alleging that Vringo infringed European antitrust laws (the "ZTE EC Complaint"). Vringo was served with a copy of the ZTE EC Complaint on May 15, 2014. Vringo was given the opportunity to provide a response to the ZTE EC Complaint.

53.     In May 2014, the EC published a commitments decision that concluded its antitrust investigation into Samsung's enforcement of Samsung's UMTS SEPs. In the EC's *Samsung* case, Samsung committed not to seek injunctions in Europe on the basis of its SEPs against licensees who agreed to a certain licensing framework. Under this framework, any dispute over what the FRAND terms should be for Samsung's SEPs would be determined by a court or arbitrator.[4]

54.     The Commissioner responsible for competition and Vice-President of the European Commission, Joaquin Almunia, recognized that this approach is the appropriate solution for FRAND disputes. He noted that the Samsung commitments provide "clarity to the industry on what constitutes an appropriate framework to settle disputes over 'FRAND' terms in line with EU antitrust rules."[5]

55.     On June 18, 2014, Vringo filed a response to the ZTE EC Complaint. Since ZTE had rejected the UK High Court's offer to determine the parties' FRAND issues, following the model established in the EC's *Samsung* case, Vringo's response to the EC attached as exhibits a cover letter, two arbitration proposals, and a side proposal

---

[4] Attached hereto as Exhibit F, Case AT.39939 Samsung – Enforcement of UMTS Standard Essential Patents (29 April 2014) (available at http://ec.europa.eu/competition/antitrust/cases/dec_docs/39939/39939_1501_5.pdf).
[5] Attached hereto as Exhibit G, Press release (29 April 2014), IP/14/490. (available at http://europa.eu/rapid/press-release_IP-14-490_en.htm).

to ZTE. Vringo sent these same materials to ZTE on the same day that Vringo filed its response.

### G. Vringo's Breach of Contract Lawsuit Against ZTE

56. On July 3, 2014, Vringo filed this lawsuit against ZTE for breach of the NDA. Vringo sought a temporary restraining order ("TRO") and injunction, amongst other remedies. This Court issued a TRO on the record on July 7, 2014 and formalized it on July 9, 2014, enjoining ZTE from "using, referencing, or disclosing any Confidential Information . . . in any manner inconsistent with" the NDA.

### H. ZTE's Discussions with the Chinese News Media

57. On July 25, 2014, the People's Daily, the official newspaper of the Central Committee of the Communist Party of China, published an article entitled "Patents: Why fight back?" The article was picked up and published by the Xinhua News Agency, the official news agency of the Government of China, and other media in China. (Attached hereto as Exhibit H, and available in the original Chinese-language version at http://news.xinhuanet.com/tech/2014-07/25/c_126795305.htm.)

58. Upon information and belief, ZTE caused the article to be written and/or published by the People's Daily and/or the Xinhua News Agency.

59. The article discusses Vringo's dispute with ZTE and quotes: (1) an unnamed "ZTE representative;" (2) ZTE's Vice President and Chief Counsel, Guo Xiaoming; and (3) ZTE's Chief Intellectual Property Officer, Shen Jianfeng. Shen Jianfeng is the ZTE lawyer who signed the NDA and has been leading the discussions with Vringo.

60.     The article contains the following statement: "*In the course of negotiations* by both sides in past two years, **Vringo has always insisted on its high and obviously unreasonable patent licensing prices** and continually filed lawsuits against ZTE in many countries."  (Ex. H) (emphasis added).

61.     ZTE's senior in-house legal staff, who have intimate knowledge of the parties' settlement discussions, went "on the record" with a Chinese newspaper and/or news agency and, upon information and belief, provided information about the parties' settlement discussions.

I.      **Examples of ZTE's World-Wide Improper Behavior**

62.      On May 9, 2014, pursuant to a request filed by Vringo Infrastructure, Inc. against ZTE, the President of the District Court of The Hague in The Netherlands allowed that a bailiff appointed by Vringo seize evidence present at or available from a ZTE subsidiary's offices in The Netherlands.  On May 21, 2014, the bailiff commenced the evidentiary seizure pursuant to the President's order, but ZTE refused to provide the bailiff access to ZTE's sales data in its external systems (e.g., by providing the necessary passwords and log-in codes) in violation of the President's order.  The penalty for non-compliance set by the President in his order was 50,000 Euros.  On May 22, 2014, the President increased the penalty for non-compliance to 50,000 Euros *per hour* (for every hour after a two hour grace period) until ZTE complied with the court order.  Only then did ZTE comply with the President's order.

63.      In December 2013, the High Court of Delhi in New Delhi, India agreed to set aside a preliminary injunction against ZTE that it had granted to Vringo in exchange for ZTE posting a bond and rendering sales accounts of infringing products for the past

and future.  The bond was based on the amount of sales of ZTE's alleged infringing Code Division Multiple Access ("CDMA") products in India prior to the institution of Vringo's lawsuit against ZTE.  As incorrect sales data was provided by ZTE, Vringo filed a motion for contempt against ZTE which is currently pending in the Indian court. Subsequently, ZTE's customers were directed by the Indian court to provide declarations disclosing purchases of CDMA products from ZTE.  In the contempt proceedings, Vringo argues that the sales data provided by ZTE is orders of magnitude lower than the sales data provided by ZTE's customers.

64.     On February 9, 2011, ZTE issued a press release claiming that some of its base station products were being used in over 40 countries, including Spain.  In May 2013, the Commercial Court of Madrid ordered ZTE to provide discovery regarding the offering, import, reception, commercialization (either through sales, rent or any other kind of distribution), delivery or order of those base stations in Spain.  ZTE represented to the Madrid Court that "no act of offering, import, reception, commercialization, delivery, or order in connection" with the base stations occurred in Spain in the past five years.  ZTE's representation was inconsistent with the press release.  As such, on February 18, 2014, the Madrid Court granted Vringo's request to seek discovery of four of ZTE's Spanish customers regarding their commercial relationship with ZTE.  Based on the response from one of the mobile operators, ZTE's representation to the Madrid Court was incorrect.

## V.     ZTE FRAUDULENTLY INDUCED VRINGO TO ENTER INTO THE NDA

65.     Unbeknownst to Vringo, upon information and belief, prior to ZTE executing the NDA, ZTE considered filing an antitrust lawsuit against Vringo in China. Upon information and belief, prior to ZTE executing the NDA, ZTE believed it was

missing a critical piece of evidence for an antitrust lawsuit against Vringo in China – a ZTE Specific Offer which ZTE could allege was not compliant with FRAND principles.

66.     Upon information and belief, ZTE looked to the litigation strategy of Huawei as a model for potential Chinese litigation against Vringo.

67.     In December 2011, Huawei brought two complaints before the Shenzhen Court against a US-incorporated company and SEP holder named InterDigital. Similar to ZTE's lawsuit against Vringo, the first Huawei lawsuit against InterDigital sought damages and alleged that InterDigital had (1) engaged in practices constituting an abuse of its dominant market position, and (2) as an owner of several SEPs for 2G, 3G and 4G telecommunications technology, failed to negotiate on FRAND terms in violation of Chinese antimonopoly laws. In 2013, the Shenzhen Court found that InterDigital violated Chinese antimonopoly laws and awarded damages; the Guangdong Appellate Court upheld the ruling later that year.

68.     In its second lawsuit against InterDigital, Huawei sought for the Shenzhen Court to determine a FRAND rate for InterDigital's SEPs. The Shenzhen Court determined that InterDigital's licensing offer to Huawei should be evaluated under Chinese law and issued an unprecedented ruling against InterDigital setting a low FRAND rate (without any explanation of how the Shenzhen Court arrived at its determination). The FRAND rate determination by the Shenzhen Court was reported to be the first time that any judicial authority anywhere in the world determined the royalty rate that should be applied to a FRAND SEP.[6]

---

[6] *See* Exhibit I attached hereto, "Chinese Court Issues Landmark Decision Determining a FRAND Royalty Rate, available at,
http://www.americanbar.org/content/dam/aba/publications/antitrust_law/at315000_tidbits_20130405.authc
heckdam.pdf.

69.     In addition, the National Development and Reform Commission (the "NDRC") one of China's antitrust authorities, opened an anti-monopoly investigation against InterDigital.

70.     Indeed, the Chinese regulatory authorities have been using China's new anti-monopoly laws with increasing frequency to bring regulatory actions against foreign companies at the urging of Chinese manufacturers, including one widely-reported action in which another telecommunications company, Qualcomm, faces the potential of a $1 billion fine.[7]

71.     Similar to the Huawei/InterDigital case, ZTE has commenced proceedings in the Shenzhen Court against Vringo[8] with the potential for a regulatory action by the NDRC, in an attempt to force Vringo to accept FRAND rates that would be far lower than any rates that any other court or arbitral tribunal would establish.

72.     Upon information and belief, ZTE developed a plan to induce Vringo to provide information that ZTE could use in its Chinese antitrust complaint.

73.     Upon information and belief, prior to ZTE executing the NDA, ZTE believed that the rack rates provided by Vringo to ZTE in the Term Sheet were insufficient to state a claim for an antitrust lawsuit against Vringo in China.

74.     Upon information and belief, ZTE believed that it needed a ZTE Specific Offer to file its antitrust complaint, at least in part, because ZTE's own rack rates were substantially higher than Vringo's rack rates.  For example, on December 22, 2008, ZTE published a 1% rack rate for its LTE SEP portfolio.  (*See* Exhibit K attached hereto, "The

---

[7] *See* Exhibit J attached hereto, China's Latest Anti-Trust Probes Revive Protectionism Concerns, dated August 7, 2014, available at http://www.reuters.com/article/2014/08/07/us-china-antitrust-idUSKBN0G70VA20140807.

[8] InterDigital's recent SEC filings disclose that ZTE has also filed a similar lawsuit against InterDigital.

Licensing Policy on LTE essential patents of ZTE," available at http://wwwen.zte.com.cn/en/press_center/news/200810/t20081008_350799.html.) As of December 22, 2008, ZTE's LTE SEP portfolio only included 1 issued patent (1 family). On the other hand, Vringo's rack rate for its LTE SEP portfolio, which includes 30 issued patents (5 patent families), is 0.5%.

75.     Prior to the December 10th meeting, the ZTE Specific Offer, the roadmap explaining how Vringo arrived at the ZTE Specific Offer, and payment terms were unknown to ZTE.

76.     Upon information and belief, ZTE knew that Vringo would not make any ZTE Specific Offer to ZTE or engage in settlement discussions with ZTE without the protections of an NDA.

77.     Upon information and belief, in order to obtain a ZTE Specific Offer from Vringo that ZTE could use as part of an antitrust lawsuit against Vringo in China, ZTE agreed to meet with Vringo in December 2013 and entered into the NDA under the guise of discussing possible settlement of Vringo's patent infringement claims.

78.     Vringo entered into the NDA believing that ZTE shared Vringo's objectives of engaging in good faith settlement discussions and would abide by the terms of the NDA.  Moreover, Vringo entered into the NDA as part of Vringo's effort to comply with its FRAND obligations.

79.     However, upon information and belief, ZTE entered into the NDA knowing that it would not comply with one or more provisions of the NDA.  Specifically, upon information and belief, ZTE never intended to comply with the NDA's restrictions

regarding the use/disclosure of Prohibited Material under Paragraph 2 of the NDA, including the restriction against using the Prohibited Material in a judicial proceeding.

80. Moreover, upon information and belief, ZTE intended to breach the NDA in a public manner so as to harm Vringo's ability to engage in SEP licensing discussions with third parties.

81. In reliance that ZTE would honor the NDA, at the December 10th meeting, Vringo provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer, in order to engage in good faith discussions with ZTE regarding a potential settlement. Until the December 10th meeting, ZTE did not have payment terms or an offer from Vringo that applied Vringo's royalty rates to ZTE's sales revenue.

82. But for the NDA being signed by ZTE and in place before the December 10th meeting, Vringo: (1) would not have provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer; (2) would have limited its discussions at the December 10th meeting; and/or (3) would have cancelled or postponed the December 10th meeting.

## VI. ZTE ATTEMPTED TO IMMUNIZE ITSELF FROM BREACH OF THE NDA

83. Prior to responding to the ZTE EC Complaint, on June 4, 2014, Vringo sent a letter to ZTE requesting permission (i.e., a waiver from ZTE) to disclose the parties' settlement discussions to the EC. Vringo sought to use this information to respond to ZTE's EC complaint to defend itself and because Vringo could foresee questions from the EC about the course of the parties' negotiations. Vringo understood

that any materials submitted to the EC would be governed by strict confidentiality rules and could not normally be disclosed to third parties.

84.     On June 25, 2014, ZTE responded to Vringo's June 4th letter but refused to provide a waiver unless Vringo agreed to two conditions: (1) the waiver should be reciprocal; and (2) the parties agreed that the "waiver only concerns the information exchanged under the NDA that is of direct relevance to the complaint ZTE has filed with the European Commission in April 2014."  Dkt. No. 16-3.  ZTE's letter did not say that the NDA was void as against public policy or that settlement discussions could be freely used if legally required, nor did it mention that ZTE had used the Prohibited Material in the Chinese Complaint filed in the Shenzhen Court over four months earlier.

85.     Vringo has not responded to ZTE's June 25, 2014 letter.

86.     Upon information and belief, at the time of writing and sending its June 25th letter, ZTE believed that Vringo had not received a copy of the Chinese Complaint, and Vringo was thus unaware of the Chinese Complaint.  Upon information and belief, ZTE saw Vringo's June 4th request as a fortuitous opportunity to immunize itself from its breach of the NDA that occurred when it filed the Chinese Complaint in February 2014. Since the Prohibited Material was "of direct relevance" to the EC Complaint as well as the Chinese Complaint, which also alleged antitrust violations, if Vringo agreed to ZTE's conditions, ZTE would have received a retroactive waiver for use of the Prohibited Material in the Chinese Complaint and, thus, avoided its breach of the NDA.

87.     The fact that ZTE attempted to obtain such a broad mutual waiver from Vringo further evidences that ZTE is (and was) fully aware of the obligations imposed by the NDA.

## VII. ZTE SEEKS LEVERAGE IN ITS DISPUTE WITH VRINGO

88.     Upon information and belief, the Xinhua News Agency and/or People's Daily article was orchestrated by ZTE with the Shenzhen lawsuit with the intent to cause Chinese regulatory authorities to investigate Vringo.  Notably, the People's Daily article concludes by recommending that "[t]he antitrust law enforcement authorities should pay more attention to the new patent holding companies, especially those so-called 'patent trolls' aiming at Chinese enterprises."  *See* Exhibit H, attached hereto.

89.     Paragraph 3 of the NDA describes limited circumstances that govern when the parties are required to provide information to governmental entities.  By its breach of the NDA and its Chinese press strategy, ZTE is seeking, among other things, to create circumstances under which the NDRC or other Chinese regulatory authorities will demand access to Prohibited Material.

90.     Upon information and belief, ZTE intends to use the Shenzhen lawsuit and a regulatory investigation as leverage against Vringo to thwart Vringo's claims against ZTE for global patent infringement.  For example, in the Xinhua News Agency/People's Daily article, Mr. Jianfeng Shen was quoted as saying:  "We will respond to lawsuits actively, and take various methods allowed by law to defend our legitimate rights and interest.  ***Our sole aim is to make Vringo responsible and rational***, and to resolve the IP disputes between us through negotiations."  *See* Exhibit H, attached hereto. (emphasis added).

91.     Upon information and belief, ZTE set in motion its plan to induce Vringo into executing a NDA so that Vringo would make ZTE a settlement offer; and ZTE could then use Vringo's settlement offer to commence an antitrust lawsuit in the Shenzhen

Court and encourage Chinese regulators to investigate Vringo. In this way, ZTE could obtain leverage to settle Vringo's world-wide patent infringement lawsuits on more favorable terms. Upon information and belief, at no time did ZTE ever intend to honor all of its obligations under the NDA.

## VIII.    IRREPARABLE HARM TO VRINGO

92.    Vringo entered into the NDA so that Vringo would not have to litigate over materials exchanged by the parties under the NDA and so that the parties could engage in candid and open negotiations without the fear of terms being disclosed to third parties. Through no fault of Vringo, that is no longer the case. ZTE willfully breached the NDA by filing the Prohibited Material in the Shenzhen Court. Vringo must now defend against specious litigation claims in China that are based on the Prohibited Material and Vringo's confidential information is now in the hands of a third party that is not bound by the NDA in its use or further disclosure of that confidential information.

93.    Moreover, an unknown number of judges in the Shenzhen Court and possibly the Guangdong Appellate Court have been exposed to the Prohibited Material. Because ZTE concealed from Vringo for over four months that it was using the Prohibited Material while multiple judges in the Shenzhen Court (and potentially the Guangdong Appellate Court) reviewed, analyzed and discussed that material before deciding that the Chinese Complaint adequately stated a claim, the Shenzhen Court and possibly the Guangdong Appellate Court have been irretrievably tainted by ZTE's wrongful acts.

94.    By the time Vringo received notice of the Chinese Complaint on June 26, 2014, third parties were already aware of and investigating the Chinese Complaint. (Dkt. No. 26, Laight Decl., ¶¶3-4).

95.     Indeed, in the Chinese legal system, lawyers who are not involved in a particular case have nevertheless generally been able to access court files to obtain documents that have been filed in that case.  (Dkt. No. 6, Clark Decl., ¶8).  While this has become less common in recent years, there are cases when individuals uninvolved in the case had access to the court file containing the types of material filed in the Shenzhen Court.  (*Id.*; see also Dkt. No. 25 Supp. Clark Decl., ¶17).  Further, Chinese courts are not immune from corruption and improper behavior, as has been substantiated by official Chinese government reports.[9]  (Dkt. No. 25, Supp. Clark Decl., ¶¶22-27).

96.     While the August 2014 hearings have been postponed because of Vringo's jurisdictional challenge, future hearings will be ***open to the public (and potentially available on the Internet)*** unless the Shenzhen Court decides to close the hearings.  As of the filing of this Amended Complaint, the Shenzhen Court has not indicated that it would close any hearings in this case.

97.     ZTE has engaged in a series of improper acts which demonstrate that ZTE is likely to repeat its behavior in the future and provide the Prohibited Material to third parties, publicly disclose the Prohibited Material, and/or take actions that will result in the public disclosure of the Prohibited Material: (a) ZTE filed the Shenzhen lawsuit using Vringo's settlement presentation in ***flagrant and willful*** violation of the NDA; (b) when preparing the Shenzhen lawsuit, ZTE provided the Chinese Complaint to a translation company; (c) there is no evidence that ZTE has sought to protect Vringo's settlement information from public disclosure by the Shenzhen Court, Chinese translation company, or otherwise; (d) ZTE's senior in-house legal staff went "on the record" with a Chinese

---

[9] The Chinese government has also documented judicial corruption in Shenzhen.  In particular, five judges from the Shenzhen People's Intermediate Court were arrested in 2006 on corruption charges, and three of them were sentenced to jail terms.  Dkt. No. 25, Supp. Clark Decl., ¶23.

newspaper and/or news agency regarding litigation between ZTE and Vringo and, upon information and belief, the parties' discussions; (e) without informing Vringo of the Shenzhen lawsuit, ZTE sought a reciprocal waiver of the NDA's confidentiality provision from Vringo in an apparent attempt to retroactively obtain immunity for ZTE's breach of the NDA; (f) a ZTE employee provided this Court with a declaration alleging that Vringo violated the NDA in Vringo's response to the EC;[10] this allegation was inaccurate and made in reckless disregard for the truth; and (g) ZTE publicly filed an excerpt of Vringo's response to the EC with this Court – a response that was supposed to be kept confidential under EC regulations.

98. Amongst other things, Vringo is in the business of licensing its patents. Vringo's economic worth as an enterprise is intrinsically linked to the value of its patent portfolio. ZTE is seeking to harm Vringo by making the Prohibited Material public, resulting in the Prohibited Material falling into the hands of Vringo's competitors as well as every other third party that might negotiate with Vringo in the future for a license to the Vringo SEPs.

## IX. FIRST CAUSE OF ACTION: WILLFUL BREACH OF CONTRACT AS AGAINST VRINGO

99. Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 98 above as if set forth fully herein.

100. Vringo and ZTE entered into the NDA which restricted the use and disclosure of the parties' settlement information:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and

---

[10] On August 5, 2014, ZTE sought to withdraw the portions of the declaration related to such allegations as well as the portion of its opposition brief relying thereon.

without prejudice and ***shall not be used or referenced in any way by any Party in any*** existing or ***future judicial*** or arbitration ***proceedings*** or ***made the subject of any public comment*** or press release.

(Exhibit A, ¶2) (emphasis added).

101.　　The NDA is a valid and binding contract.

102.　　Vringo has at all times complied with its obligations under the NDA and is willing and able to perform any remaining obligations.

103.　　ZTE has been and is able to perform its obligations under the NDA, but has instead flagrantly, willfully and maliciously breached the NDA by at least including the Prohibited Material in the Chinese Complaint.　ZTE is also engaged in an ongoing breach of the NDA, which by its express terms requires ZTE to take all reasonable measures to protect the secrecy of and avoid disclosure and use of Vringo's Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those person authorized under the NDA to have any such information. In particular, ZTE has failed to withdraw Vringo's information covered by the NDA from the Shenzhen Court.　ZTE's ongoing breach can only be remedied by an order requiring specific performance of ZTE's obligations under the NDA.

104.　　Vringo has suffered and will continue to suffer harm, including irreparable harm, by ZTE's flagrant, willful and malicious breach of the NDA.

105.　　Vringo has no adequate remedy at law for the irreparable harm.

106.　　ZTE's flagrant, willful and malicious breach of the NDA undermines important New York public policies including, but not limited to, policies encouraging settlements.　Vringo is entitled to permanent injunctive relief and specific performance.

Vringo has also suffered additional damages as a result of this misconduct in an amount to be determined at trial.

## X.    SECOND CAUSE OF ACTION: FRAUDULENT INDUCEMENT

107.    Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 106 above as if set forth fully herein.

108.    Upon information and belief, ZTE made a material misrepresentation to Vringo that: (1) ZTE would comply with the terms of the NDA including the terms restricting the use and/or disclosure of settlement information; (2) ZTE would not use and/or disclose the Prohibited Material in any judicial proceeding; and/or (3) ZTE agreed to meet with Vringo in December 2013 with the sole intent to discuss possible settlement of Vringo's patent infringement claims.

109.    Upon information and belief, ZTE made these misrepresentations knowing their falsity and intending to deceive Vringo.  Upon information and belief, ZTE never intended to honor all of its obligations under the NDA.  Only a few months after signing the NDA, ZTE included the Prohibited Material in the Chinese Complaint.

110.    Upon information and belief, ZTE entered into the NDA with the intent to induce Vringo to rely on ZTE's misrepresentations in order for ZTE to obtain a settlement offer from Vringo that ZTE could use as part of an antitrust lawsuit against Vringo in China.  Upon information and belief, ZTE knew that Vringo would not make an offer without an NDA in place.

111.    Given that ZTE had signed an NDA and agreed to meet to have settlement discussions, when entering the NDA and providing the Prohibited Material, Vringo justifiably relied on the representations that: (1) ZTE would comply with the terms of the

NDA including the terms restricting the use and/or disclosure of Prohibited Material; (2) ZTE would not use and/or disclose the Prohibited Material in any judicial proceeding; and/or (3) ZTE had agreed to meet with Vringo in December 2013 with the sole intent of discussing possible settlement of Vringo's patent infringement claims. Vringo did not become aware of ZTE's true motives until Vringo received the Chinese Complaint in June 2014 – months after its December 10th meeting.

112. But for the NDA being signed by ZTE and in force before the December 10th meeting, Vringo: (1) would not have provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer; (2) would have limited its discussions at the December 10th meeting; and/or (3) would have cancelled or postponed the December 10th meeting.

113. Vringo has suffered and will continue to suffer harm, including irreparable harm, by at least ZTE's prosecution of a lawsuit that is based on the Prohibited Material and disclosure of the Prohibited Material to third parties.

114. By its breach of the NDA and its Chinese press strategy, ZTE is also seeking, among other things, to create circumstances under which the NDRC or other Chinese regulatory authorities will demand access to the Prohibited Material, which will cause further irreparable harm to Vringo.

115. Vringo has been damaged by this misconduct in an amount to be determined at trial.

## XI. THIRD CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

116. Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 115 above as if set forth fully herein.

117. The NDA is governed by New York law. The covenant of good faith and fair dealing is implied in every contract governed by New York law.

118. Vringo and ZTE entered into the NDA which restricted the use and disclosure of the parties' settlement information:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and without prejudice and ***shall not be used or referenced in any way by any Party in any*** existing or ***future judicial*** or arbitration ***proceedings*** or ***made the subject of any public comment*** or press release.

(Exhibit A, ¶2) (emphasis added).

119. When entering into the NDA, it was the intention of the parties to maintain the confidentiality of settlement information. As such, Vringo was reasonably justified in understanding that ZTE would comply with the NDA in good faith and not disclose the Prohibited Material to third parties, or use the Prohibited Material, including in judicial proceedings, in direct violation of the NDA.

120. By flagrantly, willfully and maliciously violating the NDA less than three months after execution, ZTE destroyed and/or injured Vringo's rights to receive the fruits of the contract, namely, that the Prohibited Material would not be disclosed to third parties or used by ZTE, including in judicial proceedings, and that Vringo would not lose control of its confidential and proprietary information.

121. Paragraph 3 of the NDA describes limited circumstances that govern when the parties are required to provide information to governmental entities. By its breach of the NDA and its Chinese press strategy, ZTE is seeking, among other things, to create circumstances under which the NDRC or other Chinese regulatory authorities will demand access to Prohibited Material.

122. The obligation of ZTE to refrain from disclosing the Prohibited Material to third parties, or using the Prohibited Material, including in judicial proceedings, in direct violation of the NDA is not inconsistent with other terms of the NDA.

123. The foregoing misconduct by ZTE constitutes a willful breach of the implied covenant of good faith and fair dealing.

124. ZTE's flagrant, willful and malicious breach of the NDA breach of the implied covenant of good faith and fair dealing, and the resulting injury to Vringo, undermines important New York public policies including, but not limited to, policies encouraging settlements. Vringo has been damaged by this misconduct in an amount to be determined at trial.

## XII. FOURTH CAUSE OF ACTION: UNFAIR COMPETITION

125. Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 124 above as if set forth fully herein.

126. Vringo invested time, labor, skill, expenditures – including that of in-house counsel, outside counsel, outside consultants, a translator, and Vringo executives – in developing the Prohibited Material. Amongst other things, Vringo is in the business of licensing. The Prohibited Material confers upon Vringo a commercial advantage that belongs exclusively to Vringo, and that would be extremely valuable in the hands of ZTE and other third parties, including Vringo's potential licensees and competitors.

127. Upon information and belief, ZTE entered into the NDA with the intent to induce Vringo to provide the Prohibited Material to ZTE.

128. ZTE then, acting in bad faith, misappropriated all of Vringo's commercial advantage contained in the Prohibited Material by disclosing the Prohibited Material to

third parties, including, but not limited to, the Shenzhen Court, in flagrant, willful and malicious breach of the NDA.

129. Upon information and belief, ZTE disclosed the Prohibited Material to third parties without any restrictions on further dissemination or use of the Prohibited Material. By its breach of the NDA and its Chinese press strategy, ZTE is also seeking, among other things, to create circumstances under which the NDRC or other Chinese regulatory authorities will demand access to Prohibited Material.

130. ZTE has put the fruits of Vringo's efforts in developing the Prohibited Material to use for at least ZTE's own benefit including, but not limited to, obtaining a royalty rate for use of Vringo's SEP portfolio that is lower than the royalty rate that is objectively reasonable in view of FRAND principles.

131. ZTE's flagrant, willful and malicious breach of the NDA undermines important New York public policies including, but not limited to, policies encouraging settlements. Vringo has been damaged by this misconduct in an amount to be determined at trial.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Vringo prays for judgment as follows:

a. That ZTE has willfully breached the NDA, causing harm to Vringo;

b. That ZTE fraudulently induced Vringo to enter into the NDA, causing harm to Vringo;

c. That ZTE violated the covenant of good faith and fair dealing implied in the NDA, causing harm to Vringo;

d.      That ZTE has engaged in unfair competition based on misappropriation of information, causing harm to Vringo;

e.      That ZTE's conduct, including fraudulently inducing Vringo to sign the NDA and then flagrantly, willfully and maliciously breaching the NDA, warrants the imposition of compensatory and punitive damages;

f.      That ZTE, its subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to comply with the NDA and be required pursuant to the NDA's express terms to specifically perform their obligations to take all reasonable measures to protect the secrecy of and avoid disclosure and use of Vringo's Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those person authorized under the NDA to have any such information;

g.      That ZTE, its subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to take all steps necessary to ensure that the Prohibited Material is not discussed or disclosed in a public hearing or otherwise made public;

h.      That ZTE, its subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to take all steps necessary to withdraw or dismiss the Chinese Complaint; or alternatively, that ZTE, its subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them, remove the exhibit with Prohibited

Material from the Chinese court file and amend the Chinese Complaint to remove reference to the Prohibited Material;

i.      That ZTE, its subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to disclose any other instances in which ZTE has used, disclosed or otherwise referenced the Prohibited Material;

j.      That Vringo be awarded its attorneys' fees and costs; and

k.      That Vringo be awarded such other and further relief as this Court deems just and proper.

Dated: August 13, 2014                    Respectfully submitted,

                                          VRINGO, INC.
                                          VRINGO INFRASTRUCTURE, INC.


                                          _____/s/ Karl Geercken_____
                                          KARL GEERCKEN
                                          AMBER WESSELS-YEN
                                          Alston & Bird LLP
                                          90 Park Avenue
                                          New York, New York 10016
                                          Telephone: (212) 210-9400
                                          Facsimile: (212) 210-9444

                                          *Attorneys for Vringo, Inc. and*
                                          *Vringo Infrastructure, Inc.*