## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **VRINGO, INC., et ano.**<br><br>                    **Plaintiffs,**<br><br>**v.**<br><br>**ZTE CORPORATION, et ano.**<br><br>                    **Defendants** | **Civ. No. 14-cv-4988 (LAK)** |

## SECOND AMENDED COMPLAINT

Plaintiffs Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") file this second amended complaint against ZTE Corporation ("ZTE Corp.") and ZTE USA Inc. ("ZTE USA") (collectively, "ZTE") for (1) a first breach of a Non-Disclosure Agreement dated December 6, 2013 between ZTE Corp. and its subsidiaries (including ZTE USA) and Vringo (the "NDA") by ZTE using Vringo's NDA-protected material as the basis for filing a civil complaint in China, (2) a second breach of the NDA by ZTE using Vringo's NDA-protected material as the basis for inducing a regulatory investigation against Vringo, and (3) fraudulent inducement.  Vringo hereby alleges as follows:

## THE PARTIES

1.      Plaintiff Vringo, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

2.      Plaintiff Vringo Infrastructure, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

3.      Defendant ZTE Corp. is a corporation organized under the laws of China, having its principal place of business in Shenzhen, China.

4.      Defendant ZTE USA is a corporation organized under the laws of New Jersey, having its principal place of business at 2425 N. Central Expressway, Suite 323, Richardson, Texas 75080.

## NATURE OF THE ACTION

5.      This is a civil action for, among other things, repeated material breaches of contract and fraudulent inducement.  It arises out of ZTE's bad-faith entry into the NDA and breaches of the NDA shortly after it was signed as well as additional material misrepresentations made by ZTE to Vringo.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs, and is between citizens of different States.  Vringo is a citizen of New York, and the ZTE entities are citizens of Texas and China.

7.      Upon information and belief, ZTE conducts business in New York and sells products within this judicial district.  ZTE has submitted to the jurisdiction of the United States District Court for the Southern District of New York.  ZTE engaged in actions outside of the United States, the consequences of which (including harm to a New

York company) ZTE knew would be felt in New York and, thus, ZTE should have reasonably expected to be haled into New York courts.  The United States District Court for the Southern District of New York has personal jurisdiction over ZTE by virtue of the above-referenced facts.

8.     ZTE has expressly consented to the jurisdiction of the United States District Court for the Southern District of New York for disputes arising out of or in connection with the NDA.

9.     The NDA between Vringo and ZTE specifically provides that the "courts of the State of New York located in New York County or the United States Federal Courts located in New York County, New York shall have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes, which may arise out of or in connection with this Agreement and, for these purposes, the Parties irrevocably submit to the jurisdiction of said courts and agree not to object to the jurisdiction of such courts."  (Attached hereto as Exhibit A, ¶13).  This Court has personal jurisdiction over ZTE by virtue of the above-referenced facts.

## BACKGROUND

### Vringo Overview

10.     Vringo, Inc., which is publicly traded on NASDAQ, was founded in 2006 and, until the sale of its mobile partnerships and application business in February 2014, developed and distributed mobile application products and services through partnerships with handset manufacturers and mobile network operators.

11.     Vringo, Inc. offered its social and video ringtone mobile applications globally through mobile application stores.   Vringo, Inc. was awarded the "Global

Telecom Business Wireless Network Infrastructure Innovation Award" for launch of the world's first Video Ringtone Service and was also chosen by AlwaysOn as an "On Media Top 100 Winners."  It was also given the "Sony Ericsson Special Recognition Award" as a winner for best use of all functionality and the "MIPCOM Mobile and Internet Award" as a winner for "Best Mobile Service for Social Community and User Generated Products."

12.    Vringo Infrastructure, Inc., a subsidiary of Vringo, Inc., is an early stage technology company that was founded in August 2012 at which time it acquired a global patent portfolio covering a variety of technologies.

13.    Vringo is engaged in the innovation, development and monetization of intellectual property and mobile technologies.  Vringo's intellectual property portfolio consists of more than 600 patents and patent applications covering a variety of technologies related to Internet search, mobile handsets, telecommunications infrastructure, and wireless communications.

**<u>Vringo's Standard Essential Patents</u>**

14.    In August 2012, Vringo purchased a patent portfolio from Nokia Corporation.  A significant number of these patents are declared as essential or potentially essential to 2G, 3G, and 4G telecommunication standards – the Global System for Mobile Communications ("GSM") Standard (2G technology), the Universal Mobile Telecommunications System ("UMTS") Standard (3G technology), and Long Term Evolution ("LTE") (4G technology).  In other words, the technology of these patents is claimed as essential or potentially essential for the operation of telecommunication equipment and, thus, these patents are commonly referred to as

standard essential patents ("SEPs").  Vringo's patent portfolio includes over one hundred SEPs throughout the world (the "Vringo SEPs").  The Vringo SEPs cover fundamental aspects of telecommunications equipment and their operation.  Vringo's patent portfolio also includes hundreds of patents that are not SEPs.

15.     Since the Vringo SEPs are declared as essential or potentially essential to the GSM, UMTS, CDMA and LTE standards, to the extent that these patents are actually essential under the relevant definitions of the applicable rules of certain standard setting organizations ("SSOs"), Vringo must be prepared to grant licenses under those patents on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions.  The remaining Vringo patents are not subject to the FRAND requirements.

16.     As a part of the acquisition of the Vringo SEPs from their prior owner, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs.

**ZTE's Failure to Obtain a License to Vringo's SEPs**

17.     ZTE Corp., which is publicly traded on the Shenzhen and Hong Kong stock exchanges, manufactures, distributes, and sells telecommunications products such as infrastructure equipment and smartphones throughout the world through its subsidiaries.

18.     As of the 2014 Annual Report, publicized on March 2014, ZTE Corp.'s largest shareholder (approximately 30% of ZTE Corp.) is a state-owned holding company.

19.     Since 2002, ZTE has been selling GSM, UMTS, CDMA and/or LTE compliant telecommunications equipment that uses Vringo's patented technology.  ZTE has done and continues to do so without a license to the Vringo SEPs.

20.    Despite attempts by Vringo – including an in-person meeting at ZTE Corp.'s Shenzhen headquarters attended by Vringo senior management and follow-ups by phone and in-person meetings (including a meeting in Brussels on December 10, 2014 and Vringo's New York office on February 6, 2015) – to date, ZTE has not taken a license to any of the Vringo SEPs.

21.    In particular, on September 25, 2012, Vringo wrote to ZTE Corp. seeking to initiate potential license negotiations regarding the Vringo SEPs.  ZTE Corp. did not acknowledge this letter until Vringo filed numerous lawsuits.  On March 28, 2013, Vringo (through its UK counsel) provided ZTE with a proposed licensing term sheet that contained Vringo's rack rates and key license terms, including the royalty rate for a global license to the Vringo SEPs as well as separate royalty rates by technology standard (e.g., GSM, UMTS, and LTE) (the "Term Sheet").  The Term Sheet provided the FRAND terms and conditions under which Vringo would license its SEPs and proposed a worldwide license to any of Vringo's SEPs.  Vringo offered to negotiate the terms of the Term Sheet with ZTE.  ZTE failed to respond to that offer and has asserted that a world-wide, portfolio license is inappropriate under FRAND principles.  Yet, ZTE itself has offered to at least one third party, on a world-wide, portfolio basis, a license that includes ZTE's SEPs.  Moreover, despite having licenses to third-parties' SEPs, ZTE has never entered into a license for a third-party SEP that was on a per-patent basis, that only licensed ZTE activities in a single country and that covered only a single subsidiary of ZTE.  (Exhibit B, ZTE's Responses and Objections to Vringo's Second Set of Requests for Admission, response to RFA numbers 81 and 88 -90.)

22.     The Term Sheet was initially provided to ZTE on a confidential basis.   In June 2013, a case management conference ("CMC") related to the parties' UK litigation was held in the UK High Court.   During the CMC, Vringo's UK counsel informed the Court of Vringo's concern that if the Term Sheet was not designated confidential, ZTE would immediately use the term sheet in ZTE-friendly courts in China to obtain a ruling on a FRAND royalty rate for Vringo's SEPs.   Upon information and belief, during the CMC, at least one of ZTE's outside counsel indicated that this was not the case.   As a result, Vringo informed that Court that the confidential designation for the Term Sheet could be removed.

23.     Upon information and belief, when approached by the prior owner of the Vringo SEPs, ZTE also refused to take a license to any of the prior owner's SEPs, which included the Vringo SEPs.   Upon information and belief, this refusal lasted approximately 10 years.

24.     Upon information and belief, ZTE has similarly refused to take a license to other companies' SEPs.   Huawei, a telecommunications company that is also based in China, has had to sue ZTE in several jurisdictions around the world to secure a license in relation to Huawei's SEPs.

25.     As a result of ZTE continuing to sell products without a license, since October 2012, Vringo has brought patent infringement lawsuits against ZTE and its subsidiaries in certain countries where the Vringo SEPs are in force and ZTE sells infringing products, including in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania and the United Kingdom.   Vringo has won significant victories against ZTE in these litigations.   For example, a United Kingdom court has found one of

Vringo's SEPs to be valid and infringed by ZTE. In Germany, the Federal Patents Court held that one of Vringo's SEPs is valid as amended. And additional jurisdictions, including Brazil, Germany, the Netherlands, and Romania, have enjoined ZTE from infringing on Vringo's SEPs, including while the relevant patent infringement lawsuits are pending.

26.     In a number of these litigations throughout the world, ZTE has taken the position that it will not consider negotiating the terms of a license for any of the Vringo SEPs until that patent has been determined by a court to be both valid and infringed. As a result, Vringo has been forced as a precondition to any negotiations to bring lawsuits against ZTE to prove that the Vringo SEPs are valid and infringed.

27.     With Vringo successfully bringing litigations and obtaining injunctions against ZTE, ZTE has alleged either directly or implicitly that Vringo, through its litigations, has violated relevant obligations to grant a license to Vringo's SEPs on FRAND terms and violated certain antitrust laws that purportedly govern the enforcement of SEPs. In other words, ZTE insists that Vringo must prove that its patents are valid and infringed in court before ZTE will consider taking a license, but then contends that any attempt to obtain such a judgment breaches Vringo's FRAND obligations or violates competition law.

28.     In some instances, ZTE has even refused to take a license or make a FRAND offer after the patent has been found by courts to be valid and/or infringed. For example, after Vringo's victory in the UK, ZTE still refused to negotiate a FRAND license with Vringo. Instead, ZTE ultimately agreed to have an arbitrator hear the parties' FRAND dispute for only the patent that had just been found to be valid and

infringed – even though it previously refused to do so when this was proposed by Vringo in June 2013. And, even then, ZTE was initially unwilling to commit to be bound by the arbitrator's FRAND determination and only changed its view when Vringo was about to seek an injunction against ZTE in the UK.

29. ZTE more recently had its subsidiaries in Brazil and Germany send letters to Vringo requesting country-specific FRAND licenses. When Vringo attempted to engage in negotiations in regard to these letters, however, ZTE failed to follow up or engage in any way in negotiations. In early 2015, ZTE also had its subsidiaries in Spain and Romania (ZTE España S.L.U. and ZTE Romania S.R.L., respectively) send letters to Vringo seeking to engage Vringo directly in licensing discussions regarding Vringo's SEPs in their respective countries. Those letters appear to have been nothing more than ZTE's litigation tactics. Indeed, in Spain, the letter was written to try to preempt Vringo from filing a patent infringement claim, and in Romania, the letter was written as part of one of ZTE's many failed attempts to overturn the injunction ordered by that court against ZTE.

30. In pursuing these tactics, ZTE's alleged affiliates misrepresented facts to Vringo. Indeed, ZTE España S.L.U. and ZTE Romania S.R.L. claim to be separate companies from ZTE Corp. But, these subsidiaries are merely the sales and marketing departments of ZTE Corp. in Romania and Spain, and do not manufacture any ZTE equipment. (Exhibit B, Response to RFA numbers 52 and 56). Such tactics are reminiscent of early communications between Vringo and ZTE Corp.'s Australian subsidiary, in which Oliver Hu (an employee of ZTE Corp.) held himself out to be an IPR attorney for ZTE Corp.'s Australian subsidiary and stated that he did not represent ZTE

Corp.  In fact, Mr. Hu later admitted that he never worked for ZTE Corp.'s Australian subsidiary.

31.    And, while ZTE asserts that Vringo has violated its FRAND obligations/antitrust laws by seeking injunctions against ZTE, ZTE has admitted that ZTE has sought at least one injunction against at least one third party on one or more of ZTE's SEPs.  (Exhibit B, Response to RFA 80.)

**The Parties' Meeting in Shenzhen and the NDA**

32.    In an effort to settle the dispute between Vringo and ZTE, in late November 2013, after over a year of litigation, Vringo proposed a meeting with ZTE to discuss a resolution to the dispute between the parties.  ZTE personnel agreed to meet with Vringo personnel to discuss a resolution to the intellectual property dispute between the parties.  Vringo agreed to meet ZTE in Shenzhen, China at ZTE's headquarters.  A meeting was set for December 10, 2013.

33.    Prior to the meeting, in late November 2013, Vringo provided ZTE with a proposed NDA so that the parties could engage in good faith negotiations and freely discuss their settlement positions.

34.    Consistent with industry practice, Vringo would not make any detailed settlement offer specific to ZTE without the protections of the NDA in place.  This industry practice is common in nearly every negotiation of this kind.  ZTE understands the importance of having a non-disclosure agreement in place before parties engage in negotiations having, on information and belief, successfully stalled at least one significant negotiation for many years simply by creating conditions whereby ZTE was "unable" to execute a non-disclosure agreement.

35.     On December 9, 2013, ZTE returned a signed copy of the NDA (which is dated effective December 6, 2013) to Vringo.  ZTE never sought to discuss, comment upon, or otherwise amend the terms of the NDA.  The NDA was executed on behalf of ZTE by ZTE's Chief Intellectual Property Counsel, Shen Nan.  (Exhibit A.)

36.     The NDA places strict restrictions on the use and disclosure of confidential settlement information:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and without prejudice and ***shall not be used or referenced in any way by any Party in any*** existing or ***future judicial*** or arbitration ***proceedings*** or ***made the subject of any public comment*** or press release.

(Exhibit A, ¶2) (emphasis added).

37.     The NDA provides additional restrictions on the use, disclosure, and protection of confidential settlement information including the Prohibited Material:

> In addition, ***each Party agrees not to disclose information covered by this Agreement*** to any of its personnel or representatives except on a strictly "need to know" basis, or ***to any third party, and not to use such information for its commercial advantage, dispute advantage, or any other purpose (whether similar or dissimilar to the foregoing) other than the Discussions.  Each Party further agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into*** the public domain or ***the possession of persons other than those persons authorized hereunder to have any such information***, which measures shall include the highest degree of care that such Party utilizes to protect its own confidential information of a similar nature.

(Exhibit A, ¶2) (emphasis added).

38.     In order to prevent uncontrolled distribution of confidential settlement information, the NDA prohibits a party who receives confidential settlement information from duplicating or copying that confidential settlement information including the

Prohibited Material:  "Each Party agrees that neither it nor its representatives shall duplicate, copy or make summaries of the Confidential Information without the other Party's prior written consent except in connection with the Discussions . . . ."  (Exhibit A, ¶2).

39.    The NDA also provides that it shall be "governed by and construed and enforced in accordance with the laws of the State of New York" and that it "shall be binding upon the parties hereto in the United States and worldwide." (Id., ¶12.).

40.    Pursuant to the NDA, the parties also agreed that they would be "entitled to seek equitable relief, including injunction and specific performance, for any actual or threatened breach of the provisions of this Agreement, in each case, without the necessity of posting bond or other security or proving actual damages." (Id., ¶10).

41.    ZTE understood the provisions of the NDA when it entered into the NDA. At the time ZTE executed the NDA, ZTE had outside counsel in the United States and at least one in-house United States lawyer, J. Ray Wood, ZTE USA's Chief Patent Counsel.

42.    On December 10, 2013, Alexander R. Berger, Vringo's then Chief Operating Officer, and Jason S. Charkow, Vringo's then Senior Intellectual Property Counsel, traveled to ZTE's headquarters in Shenzhen, China to personally engage ZTE in an attempt to commence FRAND licensing and settlement negotiations. At that meeting and in reliance on the NDA, Vringo provided ZTE with a few printouts of a 40-page presentation which included pricing terms and a roadmap explaining how Vringo arrived at Vringo's opening settlement offer (the "Prohibited Material").  The pricing terms and the roadmap, which gives insight into how Vringo applies its rack rates in the context of the litigation between Vringo and ZTE to arrive at a settlement offer, are highly sensitive

and confidential business information.  Disclosure of the roadmap and pricing terms to third parties, such as Vringo's competitors and potential licensees, would be harmful to Vringo's patent licensing business.

43.    Vringo's opening settlement offer was a proposed application of Vringo's rack rates to ZTE's infringing activity and was expressed in a dollar amount (the "ZTE Specific Offer").

44.    Each and every page of Vringo's presentation was clearly designated "CONFIDENTIAL – VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA."  The excerpt below shows the designation as it appeared on Vringo's presentation:



CONFIDENTIAL - VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA

The cover page of Vringo's presentation is attached hereto as Exhibit C.

45.    Unbeknownst to Vringo, ZTE digitized a copy of (duplicated) the Prohibited Materials and emailed them to Mr. Michael Burdon – the Olswang[1] partner who is coordinating ZTE's worldwide FRAND and antitrust strategy – within weeks of the December 10th meeting.   ZTE providing the Prohibited Material to Mr. Burton in electronic form resulted in the type of uncontrolled distribution of confidential settlement information that the NDA sought to prevent.

46.    Over the following months, Vringo and ZTE continued to engage in discussions subject to the NDA.

## ZTE FRAUDULENTLY INDUCES VRINGO TO ENTER INTO THE NDA

---

[1] ZTE is represented by the European law firm, Olswang LLP, in both patent litigations in Europe, and in an antitrust complaint brought by ZTE against Vringo before the European Commission.

47.     Unbeknownst to Vringo, upon information and belief, prior to ZTE executing the NDA, ZTE considered filing an antitrust lawsuit against Vringo in China and considered lobbying (or was already lobbying) Chinese regulatory authorities, including the NDRC, to investigate Vringo.  Upon information and belief, prior to ZTE executing the NDA, ZTE believed it was missing a critical piece of evidence to bring an antitrust lawsuit against Vringo in China and to lobby Chinese regulatory authorities, including the NDRC, to investigate Vringo – a ZTE Specific Offer which ZTE could allege was not compliant with FRAND principles.

48.     Upon information and belief, ZTE used the litigation strategy of Huawei in China as a model for ZTE's potential Chinese litigation against Vringo.

49.     In December 2011, Huawei brought two complaints before the Shenzhen Court against a US-incorporated company and SEP holder InterDigital, Inc. ("InterDigital").  Similar to ZTE's lawsuit against Vringo in China, the first Huawei lawsuit against InterDigital sought damages and alleged that InterDigital had (1) engaged in practices constituting an abuse of its dominant market position, and (2) as an owner of several SEPs for 2G, 3G and 4G telecommunications technology, failed to negotiate on FRAND terms in violation of Chinese antimonopoly laws.  In 2013, the Shenzhen Court found that InterDigital violated Chinese antimonopoly laws and awarded damages; the Guangdong Appellate Court upheld the ruling later that year.

50.     In addition, the Chinese regulatory authorities have been using China's new anti-monopoly laws with increasing frequency to bring regulatory actions against foreign companies at the urging of Chinese manufacturers, including one widely-reported

action in which the NDRC levied a $975 million dollar fine against another telecommunications company, Qualcomm.[2]

51.     Chinese companies using protectionist Chinese courts to attack foreign companies' patents is according to the Chief Judge of the Guangdong Higher People's Court- encouraged in China to "break technical barriers and win space for development." In October 2013, after the InterDigital ruling was upheld by the Guangdong Appellate Court, an article was posted on the Guangdong Appellate Court website with a section entitled "Anti-Monopoly: A Powerful Weapon To Break Technical Barriers" which states:

> Due to the fact that domestic companies are far behind companies of developed countries in terms of independent innovation, the establishment of standards and the ownership of patent rights in many fields are substantially controlled by multinational companies of developed countries. Even in the Chinese market, many patents are owned by foreign companies, the use of which requires overseas licensing. Many Chinese enterprises end up with the situation of "working for foreigners" by engaging in business with low profits and low added-value.
>
> * * * *
>
> Huawei's success in the anti-monopoly lawsuit is quite meaningful. ***Qiu Yongqing, the Chief Judge [of the Guangdong Higher People's Court], believes that Huawei's strategy of using anti-monopoly laws as a countermeasure is worth learning by other Chinese enterprises. Qiu suggests that Chinese enterprises should bravely employ anti-monopoly lawsuits to break technology barriers and win space for development***.

(Exhibit E (emphasis added)).

52.     In its second lawsuit against InterDigital, Huawei had asked the Shenzhen Court to determine a FRAND rate for InterDigital's SEPs.   The Shenzhen Court determined that InterDigital's licensing offer to Huawei should be evaluated under

---

[2] *See* Exhibit D attached hereto, China's Latest Anti-Trust Probes Revive Protectionism Concerns, dated August 7, 2014, available at http://www.reuters.com/article/2014/08/07/us-china-antitrust-idUSKBN0G70VA20140807.

Chinese law and issued an unprecedented ruling against InterDigital setting an extraordinarily low FRAND rate (without any explanation of how the Shenzhen Court arrived at its determination).[3]

53.     In addition, the National Development and Reform Commission (the "NDRC") one of China's antitrust authorities, opened an anti-monopoly investigation against InterDigital.  It only dropped this anti-monopoly investigation once InterDigital reached a settlement with Huawei.

54.     Similar to the Huawei/InterDigital case, ZTE has commenced proceedings in the Shenzhen Court against Vringo[4] in an attempt to force Vringo to accept non-FRAND licensing rates that would be far lower than any rates that any other court or arbitral tribunal would establish.

55.     Moreover, ZTE also sought the involvement of Chinese regulatory authorities, including the NDRC, in an attempt to reduce and/or eliminate royalties paid by ZTE (and other Chinese companies) to Vringo – royalties that Vringo would otherwise be entitled to under applicable laws including outside of China – and/or to attempt to force Vringo to surrender or forgo relief, remedies and/or other legal rights to which Vringo is entitled under applicable laws including outside of China.

56.     ZTE developed a plan to induce Vringo to provide information that ZTE could use in its Chinese antitrust complaint and share with Chinese regulatory authorities, including the NDRC.

---

[3] *See* Exhibit F attached hereto, "Chinese Court Issues Landmark Decision Determining a FRAND Royalty Rate, available at,
http://www.americanbar.org/content/dam/aba/publications/antitrust_law/at315000_tidbits_20130405.authc heckdam.pdf.
[4] InterDigital's SEC filings disclose that ZTE has also filed a similar lawsuit against InterDigital.

57.    Prior to ZTE executing the NDA, ZTE believed that the rack rates provided by Vringo to ZTE in the Term Sheet were insufficient to state a claim for an antitrust lawsuit against Vringo in China or to lobby Chinese regulatory authorizes, including the NDRC, to investigate Vringo.

58.    ZTE believed that it needed a ZTE Specific Offer to file its antitrust complaint and to lobby Chinese regulatory authorities, including the NDRC, to investigate Vringo, at least in part, because ZTE's own rack rates were substantially higher than Vringo's rack rates.  For example, on December 22, 2008, ZTE published a 1% rack rate for its LTE SEP portfolio.  (Exhibit G, "The Licensing Policy on LTE essential patents of ZTE," formerly available on ZTE's website at http://wwwen.zte.com.cn/en/press_center/news/200810/t20081008__350799.html).    In 2008 and 2009, ZTE had fewer than 10 granted patents that it believed to be essential to the LTE Standard.  (Exhibit B, Response to RFAs 77 and 78.)  As of December 22, 2008, ZTE's LTE SEP portfolio only included 1 granted patent (1 family).  On the other hand, Vringo's rack rate for its LTE SEP portfolio, which includes 30 granted patents (5 patent families), is 0.5%.

59.    However, because the actual monetary amount to be calculated using this rack rate would take into account such factors as: (1) twelve years' worth of ZTE's use of Vringo's patents without any compensation whatsoever; and (2) the billions of dollars' worth of equipment that ZTE had sold in those twelve years and would be selling in the future, ZTE expected that the ZTE Specific Offer would contain a high enough price that it could use that number to file its antitrust complaint and to lobby Chinese regulatory

authorities, including the NDRC, and claim that Vringo was charging too high a price in absolute dollar terms.

60.     Prior to the December 10th meeting, the ZTE Specific Offer, the roadmap explaining how Vringo arrived at the ZTE Specific Offer, and payment terms were unknown to ZTE.

61.     Upon information and belief, ZTE knew that Vringo would not make any ZTE Specific Offer to ZTE or engage in settlement discussions with ZTE without the protections of an NDA.

62.     Upon information and belief, in order to obtain a ZTE Specific Offer from Vringo that ZTE could use as part of an antitrust lawsuit and investigation by Chinese regulatory authorities, including the NDRC, against Vringo in China, ZTE agreed to meet with Vringo in December 2013 and entered into the NDA under the guise of discussing possible settlement of Vringo's patent infringement claims.

63.     Vringo entered into the NDA believing that ZTE shared Vringo's objectives of engaging in good faith settlement discussions and would abide by the terms of the NDA.   Moreover, Vringo entered into the NDA as part of Vringo's effort to comply with its FRAND obligations.

64.     However, ZTE entered into the NDA knowing that it would not comply with one or more provisions of the NDA.   Specifically, ZTE never intended to comply with the NDA's restrictions regarding the use/disclosure of Prohibited Material under Paragraph 2 of the NDA, including the restrictions (1) against using the Prohibited Material in a judicial proceeding, (2) against disclosing the parties' settlement discussions and/or materials including the Prohibited Material to a third party, and (3) requiring

protection of the confidentiality of such discussions/materials including not duplicating or copying materials.

65.    Moreover ZTE intended to breach the NDA in a public manner and to induce regulators, including the NRDC, to investigate Vringo so as to harm or otherwise affect Vringo's ability to engage in SEP licensing discussions with ZTE as well as third parties including, but not limited to, other Chinese companies.

66.    In reliance on the fact that ZTE had entered into settlement negotiations in good faith, and would honor the NDA, at the December 10th meeting, Vringo provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer, in order to engage in good faith discussions with ZTE regarding a potential settlement.  Until the December 10th meeting, ZTE did not have payment terms or an offer from Vringo that applied Vringo's royalty rates to ZTE's sales revenue and provided a price.

67.    But for ZTE's stated willingness to engage in settlement negotiations, and but for the NDA being signed by ZTE and in place before the December 10th meeting, Vringo: (1) would not have provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer; (2) would have limited its discussions at the December 10th meeting; and/or (3) would have cancelled or postponed the December 10th meeting.

**ZTE REPEATEDLY BREACHES THE NDA**

68.    As soon as ZTE had Vringo's Prohibited Material in hand, used that material as the basis for claiming abusive pricing in both civil and regulatory complaints in China.

**ZTE Uses the Prohibited Material in the Shenzhen Lawsuit**

69.     On February 21, 2014, ZTE filed a civil antitrust complaint against Vringo (the "Chinese Complaint") in its home jurisdiction in China, the Shenzhen Intermediate People's Court (the "Shenzhen Court").[5]

70.     The Chinese Complaint is based on the Chinese Anti-Monopoly Law.  In the Chinese Complaint, ZTE alleges that Vringo's royalty rates and the ZTE Specific Offer are an abuse of Vringo's purported dominant market position.  The alleged abuse is in large measure, according to ZTE, based on Vringo's alleged refusal to license the Vringo SEPs on FRAND terms.

71.     Yet, eight months earlier, it had been ZTE who refused Vringo's proposal to have a neutral arbiter – the UK High Court – decide a world-wide FRAND royalty rate and FRAND licensing terms for the Vringo SEPs, including for the Vringo SEPs in China.  And, upon information and belief, during the CMC in the UK, it was ZTE's outside counsel from Olswang and/or ZTE's barrister who was being instructed by Olswang that represented that ZTE would not run to a Chinese court to get some sort of FRAND determination.

72.     In order to demonstrate Vringo's purported abuse of a dominant market position, ZTE used the Prohibited Material, which includes the dollar price, payment terms and the roadmap contained in Vringo's December 10th presentation explaining how Vringo arrived at the ZTE Specific Offer, as the basis for ZTE's antitrust allegations in the Chinese Complaint.  ZTE included the Prohibited Material as an exhibit to the

---

[5] The General Counsel of ZTE, Mr. Guo Xiaoming, is a member of the Shenzhen Municipality People's Congress, which is the body that has supervisory authority over the activities of the Shenzhen Court and that is able to appoint and remove all judges and the president of the Shenzhen Court.  *See* Dkt. No. 25, Supp. Clark Decl., ¶ 27.

Chinese Complaint although Chinese procedural rules did not require ZTE to submit the Prohibited Material at the time of filing the Chinese Complaint. (Dkt. No. 25, Supp. Clark Decl., ¶9).

73.    ZTE also included the ZTE Specific Offer—an actual dollar amount that was calculated using the roadmap in Vringo's December 10th presentation—in the Chinese Complaint –. In particular, the Chinese Complaint states: "In the second price quotation in December 2013, the Defendant [Vringo] actually intended to charge the Plaintiff USD [REDACTED] for its standard-essential patents portfolio license...." (See Exhibit H at 6-7).[6]  For the purpose of this Second Amended Complaint, Vringo has redacted the ZTE Specific Offer from the above quote. ZTE heavily relied upon this opening settlement offer as the basis for its claim that Vringo had charged too high a price.

74.    ZTE and/or its attorneys also provided the Chinese Complaint to a translation company, Beijing Baijia Translation Company, based in Beijing, China.

75.    Vringo did not become aware of the Chinese Complaint until it received a copy of the Chinese Complaint on June 26, 2014.

76.    By June 26, 2014, multiple judges in the Shenzhen Court and possibly the Guangdong Higher People's Court ("Guangdong Appellate Court") had had access to, and carefully considered, the Prohibited Material and Chinese Complaint for more than four months.

---

[6] Attached hereto as Exhibit H is an English-language translation of the relevant pages of the Chinese Complaint as received from the Shenzhen Court. Vringo made all the redactions in Exhibit H.

77.     ZTE's inclusion of the Prohibited Material[7] and ZTE Specific Offer in the Chinese Complaint is in violation of the NDA, which states that such information "shall not be used or referenced in any way by any Party in any . . . judicial . . . proceedings." (Exhibit A, ¶2).

78.     At the time that it filed the Chinese Complaint, ZTE did not seek to have the Chinese Court treat the Prohibited Material as confidential.  Nor did ZTE initially request that the Prohibited Material not be discussed or disclosed at public hearings including hearings for the exchange of evidence.  ZTE only requested that hearings in China be closed after Vringo filed its breach of NDA lawsuit in this Court.

79.     The hearings for the exchange of evidence took place in May 2015.

80.     Also in May 2015, ZTE amended its complaint to quintuple its damage claims, so that it is now requesting 99.7 million yuan in damages plus legal fees plus it reserves the right to increase the damages claim by several hundred million.

**ZTE Uses the Prohibited Material to Induce the NDRC Investigation**

81.     On July 2, 2014, Vringo filed a complaint in this Court.  In a July 7 hearing to discuss Vringo's request for a Temporary Restraining Order, ZTE's counsel represented to the Court that ZTE "did one thing with [Vringo's Prohibited Material]. They filed it in litigation" in the Shenzhen Court.  This representation was reiterated in a July 14, 2014 letter between the parties in which ZTE's counsel stated "this will confirm

---

[7] The Chinese Complaint was accompanied by an "Evidence List" (attached as Exhibit I hereto) and fourteen exhibits.  Vringo's presentation is exhibit number eight on that list, which is described as "the second offer from defendant to plaintiff and its translation", with an alleged "purpose of evidence" that "the defendants abuse its [sic] dominant market positions."  In fact, the document attached to this Amended Complaint as Exhibit I is the cover page from the actual version of Vringo's presentation that was submitted to the Shenzhen Court as exhibit eight to the Chinese Complaint.

that the Chinese antitrust matter is the only matter in which ZTE has used or referenced the material to which I was referring."

82.     ZTE's representation to this Court and to Vringo was incorrect.   In or around March 2014, ZTE initiated communications with the NDRC regarding Vringo. Ex. J. ZTE's Responses and Objections to Vringo's First Set of Requests for Admission, Response to RFA 9. By the end of April 2014, ZTE submitted a formal complaint to the NDRC that used/referenced the ZTE Specific Offer (the "NDRC Complaint").   (Exhibit J, Response to RFA 15.)   ZTE also submitted a copy of the Prohibited Material (Vringo's 40-page presentation) to the NDRC in or about April 2014 as an attachment to its NDRC Complaint.   Moreover, ZTE informed the NDRC that ZTE had filed a complaint against Vringo before the Shenzhen Court.   (Exhibit J, Response to RFA 9; Exhibit K, NDRC Complaint.)

83.     The  NDRC  Complaint, ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████ (Exhibit K.)

84.     The  NDRC  Complaint ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ (Exhibit K.)

85.    ZTE simultaneously launched a lobbying campaign to convince the NDRC to investigate Vringo, and then strategized with the NDRC about how to exert the most pressure on Vringo.  This campaign included one or more ZTE communications with the NDRC in each of March, April, May, June, July, August, and October of 2014, and again in January of 2015.

86.    In internal communications, ZTE stated that "[a] main component of our company's [ZTE's] worldwide reactive measures involves using the influence of the Nation Development and Reform Commission to check Vringo's litigation activities." Accordingly, ZTE's main goal was striving to get the NDRC to establish a case against Vringo, and its secondary goal was to get the NDRC to issue an investigation notice to Vringo "as a deterrent to" Vringo.

87.    Upon information and belief, the mandate of the Bureau of Price Supervision and Anti-monopoly of the NDRC extends only to investigations of alleged price-fixing and other allegedly anticompetitive behavior related to the setting of prices of goods in China.  Since Vringo would not fall in either of these categories, upon information and belief, an investigation of Vringo is outside of the mandate of the NDRC.  In fact, ZTE's own internal communications show ZTE employees questioning whether the NDRC could actually investigate Vringo.

88.    Nevertheless, upon information and belief, ZTE used its executives and/or board members, including those with positions high in the Chinese Communist Party, to induce the NDRC to open an investigation of Vringo that is outside of the NDRC's

power.  In particular, ZTE's own General Counsel, Guo Xiaoming is a member of the Shenzhen Municipality People's Congress.

89.    Upon information and belief, ZTE Corp. has kept its board of directors including ZTE Corp.'s audit committee – including, but not limited, to Chen Naiwei (a board member who is also a prominent intellectual property lawyer) – apprised of developments in ZTE's litigation with Vringo.

90.    As of June 10, 2014, ZTE circulated an internal memorandum in preparation for a June 11, 2014 meeting complaining that the NDRC was not focusing on Vringo, and stating that, when the NDRC received Vringo's complaint in April, the NDRC had indicated that it would be "extremely difficult" for the NDRC to establish a case against Vringo.  ZTE concluded that it must "increase the awareness of" the NRDC concerning Vringo, and "strengthen our public relations capabilities toward" the NDRC.

91.    ZTE's efforts to exert influence over the NRDC to act appear to have worked quickly:   meeting minutes circulated on June 16, 2014, show that ten representatives of the NDRC visited ZTE *at ZTE's headquarters* on June 11, 2014, and met with ZTE representatives including Fan Qingfeng (ZTE's Executive Vice President), Guo Xiaoming, Shen Jianfeng ("Alvin"), Wen Ming, Shen Nan, and Hu Yi ("Oliver"). During the meeting, the NDRC representatives reported to ZTE's leadership regarding antimonopoly activities and countermeasures.  During the meeting, it was discussed that "Vringo is a company that dedicated to bullying other companies with its patents, and *it [Vringo] is a listed company*." The NRDC then advised ZTE that ZTE should *"proceed first of all with countermeasures, using mass public opinion, making announcements*

*as soon as lawsuits are filed, and allowing the government to become involved when necessary*."

92.    Just a few days later, on June 17, 2014, two ZTE employees drafted sample investigation notices "using official language" which could be sent from the NDRC directly to Vringo.  One of the employees' draft notices contains language similar to the notice that the NDRC eventually sent to Vringo.

93.    In accordance with the "countermeasures" strategy that the NDRC recommended, ZTE launched a press campaign against Vringo.  It also began, upon information and belief, to engage in activities in an attempt to manipulate Vringo's stock and harm Vringo by driving down Vringo's stock price.

**ZTE Discusses its Vringo Litigation with the Chinese News Media**

94.    As part of ZTE's and the NDRC's media strategy, ZTE caused an article to be published by the People's Daily, the official newspaper of the Central Committee of the Communist Party of China, and then by the Xinhua News Agency, the official news agency of the Government of China, and other media in China.  (Attached hereto as Exhibit K, and available in the original Chinese-language version at http://news.xinhuanet.com/tech/2014-07/25/c_126795305.htm.)

95.    The article which was published on July 25, 2015, was titled "Patents: Why fight back."  It discusses Vringo's dispute with ZTE and lays out ZTE's case for why Vringo should be investigated by the NDRC, relying heavily on interviews given by: (1) an unnamed "ZTE representative;" (2) ZTE's Vice President and Chief Counsel, Guo Xiaoming; and (3) ZTE's Chief Intellectual Property Officer, Shen Jianfeng.  Shen Jianfeng is the ZTE lawyer who has been leading the discussions with Vringo.

96.    The article contains the following statement:    "In the course of negotiations by both sides in past two years, Vringo has always insisted on its **high and obviously unreasonable patent licensing prices** and continually filed lawsuits against ZTE in many countries."  (Exhibit L) (emphasis added).

97.    ZTE's senior in-house legal staff, who have intimate knowledge of the parties' settlement discussions, went "on the record" with a Chinese newspaper and/or news agency and, upon information and belief, provided information about the parties' settlement discussions, as part of ZTEs and the NDRC's press strategy.  Notably, the People's Daily article concludes by recommending that "[t]he antitrust law enforcement authorities should pay more attention to the new patent holding companies, especially those so-called 'patent trolls' aiming at Chinese enterprises."  (Exhibit L.)

98.    For example, Mr. Jianfeng Shen was quoted as saying:  "We will respond to lawsuits actively, and take various methods allowed by law to defend our legitimate rights and interest.  Our sole aim is to make Vringo responsible and rational, and to resolve the IP disputes between us through negotiations."  (Exhibit L.)

**ZTE Attempts to Harm Vringo's Stock Price**

99.    As part of ZTE's coordinated "countermeasures" against Vringo, upon information and belief, ZTE is also engaging in an ongoing effort to manipulate Vringo's stock price and, in particular, to drive down Vringo's stock price (market value) and, thus, the perceived value of Vringo's patent portfolio.

100.    In accordance with the NDRC's instructions that when ZTE takes actions against Vringo, ZTE should make announcements and use mass public opinion, ZTE has (1) issued numerous press releases regarding actions against Vringo, (2) informed one or

more bloggers about ZTE press releases regarding Vringo at least through its public relation firm, Edelman, and (3) upon information and belief, engaged in a campaign to establish one or more user accounts on StockTwits.com and/or other message boards to use those account(s) to disseminate derogatory comments about Vringo as well as Vringo's stock price. In fact, upon information and belief, one or more of those user accounts have been suspended by StockTwits for suspicious activity.

101. In addition, upon information and belief, ZTE (or those on ZTE's behalf or request) has, in a potential violation of paragraph 4 of the NDA, traded in Vringo's stock and/or taken one or more trading positions in Vringo's stock, including short positions. In particular, upon information and belief, ZTE (or those on ZTE's behalf or request) took trading actions designed to drive down Vringo's stock prices to make it appear as if ZTE's self-touted actions are having a negative impact on Vringo's stock prices.

102. Upon information and belief, ZTE is attempting to restrict Vringo's access to financing sources by creating uncertainty and volatility around Vringo's stock prices. In addition, upon information and belief, ZTE is attempting to drive down Vringo's business valuation in an attempt to affect the perceived value of Vringo's portfolio of patents. The patents at issue in this litigation comprise a significant portion of Vringo's assets, so if ZTE can negatively affect Vringo's value as a business, ZTE can also argue that those assets are worth less from a FRAND perspective.

103. Indeed, ZTE has already put Vringo's stock price at issue in many of the parties' patent litigations around the world, including in the Netherlands (where it argued

that an injunction should not be granted against ZTE because, in part, of the state of Vringo's stock price and valuation), the United Kingdom, Romania, and France.

### ZTE ATTEMPTS TO IMMUNIZE ITSELF FROM BREACH OF THE NDA

104.    On June 4, 2014, Vringo sent a letter to ZTE requesting permission (i.e., a waiver from ZTE) to disclose the parties' settlement discussions to the European Commission. Vringo sought to use this information to respond to ZTE's EC complaint to defend itself and because Vringo could foresee questions from the EC about the course of the parties' negotiations. Vringo understood that any materials submitted to the EC would be governed by strict confidentiality rules and could not normally be disclosed to third parties.

105.    On June 18, 2014, ZTE's senior legal employees sent an internal email about Vringo's June 4, 2014 letter, stating "Let's all give some input together."

106.    ZTE is represented in the European Commission action by Olswang, whose partner Michael Burdon had received from ZTE a copy of the Prohibited Materials months prior to Vringo's June 4, 2014, letter.

107.    On June 25, 2014, ZTE responded to Vringo's June 4th letter but refused to provide a waiver unless Vringo agreed to two conditions: (1) the waiver should be reciprocal; and (2) the parties agreed that the "waiver only concerns the information exchanged under the NDA that is of direct relevance to the complaint ZTE has filed with the European Commission in April 2014." Dkt. No. 16-3. ZTE's letter did not say that the NDA was void as against public policy or that settlement discussions could be freely used if legally required, nor did either ZTE or Olswang mention that ZTE had used the

Prohibited Material in both a civil complaint and in a complaint filed with the NDRC, or that Olswang was also already in possession of a copy of the Prohibited Material.

108.    Vringo never responded to ZTE's June 25, 2014 letter.

109.    At the time of writing and sending its June 25th letter, ZTE believed that Vringo had not received a copy of the Chinese Complaint, and Vringo was thus unaware of the Chinese Complaint.    ZTE saw Vringo's June 4th request as a fortuitous opportunity to immunize itself from its breach of the NDA that occurred when it filed the Chinese Complaint in February 2014.    Since the Prohibited Material was "of direct relevance" to the EC Complaint as well as the Chinese Complaint, which also alleged antitrust violations, if Vringo agreed to ZTE's conditions, ZTE would have received a retroactive waiver for use of the Prohibited Material in the Chinese Complaint and, thus, avoided its breach of the NDA.

110.    The fact that ZTE attempted to obtain such a broad mutual waiver from Vringo further evidences that ZTE is (and was) fully aware of the obligations imposed by the NDA.

111.    In ZTE's opposition to Vringo's motions for a temporary restraining order and a preliminary injunction, ZTE not only publicly filed Confidential European Commission materials but also wrongly accused Vringo of having unclean hands and breaching the NDA by providing materials to the European Commission.    The fact that ZTE attempted to accuse Vringo of breaching the NDA provides additional proof that ZTE is (and was) fully aware of the obligations imposed by the NDA.

112.    ZTE's accusation was based on an affidavit by its senior licensing director Zhao Wang, which was sworn under penalty of perjury.    That affidavit, however, was

based on no evidence and was false.  When confronted by the falsity of the accusation, ZTE withdrew it.

113.    When this Court demanded that ZTE submit an affidavit from outside counsel explaining why ZTE had provided a sworn affidavit without any evidentiary support, a lawyer from Olswang provided that affidavit.

114.    In addition, on September 9, 2014, ZTE sought to limit its exposure to breaching the NDA by sending a letter that unilaterally and retroactively declared that the NDA had only covered the December 10, 2013 Discussions between the parties, and had not covered any Discussions beyond that date.  In fact the NDA is clear that it cannot (a) be terminated retroactively; and (b) cannot be terminated unilaterally.   ZTE's letter suggests that it has already used or referenced other NDA materials, the extent of which still remains to be seen, and that it is now attempting (after the fact) to place these NDA materials outside of the scope of the NDA's protections.

### ON ZTE'S BEHALF, THE NDRC EXERTS EXTRAORDINARY PRESSURE AGAINST VRINGO

115.    On Tuesday, January 13, 2015, the Bureau of Price Supervision and Anti-monopoly of China's NDRC sent Vringo an investigation notice and ordered Vringo to send its representatives to China within ten days.  The investigation notice states that "[r]ecently, we (NDRC) received a claim that your corporation has violated 'Anti-Monopoly Law of P.R. China' and has conducted monopoly action."  (Exhibit M.)

116.    That same day, Vringo sent a letter to ZTE's United States counsel requesting that they inform Vringo by close of business, January 14, 2015, whether ZTE provided any of Vringo's confidential information to the Chinese regulatory authorities. ZTE refused to provide that information until it was compelled to do so.

117.    On January 21, 2015, Vringo received additional emails from the NDRC further informing Vringo that the investigation was "based on complaints which contain **prima face [sic] evidence**" of Vringo's alleged anticompetitive behavior and demanded Vringo's cooperation and that Vringo provide "relevant documents as well as information" or Vringo would "bear corresponding legal responsibilities."  (Exhibit N.) None of the correspondence from the NDRC provided any information regarding the nature of the complaint to the NDRC or the basis of the investigation, what documents were to be provided by Vringo or how Vringo could cooperate.

118.    On March 10, 2015, under threat of penalty, Vringo's Chief Legal Officer, David Cohen, traveled to China to meet with the NDRC.  During the meeting, which was attended by the head of the NDRC and other top officials, the NDRC asserted that should Vringo not "cooperate" with the NDRC and/or be found guilty of violating China's anti-monopoly laws, Vringo and Mr. Cohen (personally) could be subject to criminal and civil penalties, including monetary penalties and seizure of Vringo's Chinese patents.

119.    Unprovoked and for no apparent reason, the Director of the NDRC mentioned several times during the meeting that the armed guards outside the NDRC were not working for the NDRC.  In addition, the Director yelled extensively and Mr. Cohen and his counsel for not showing the NDRC proper respect and obsequiousness by, among other "infractions", not sitting with a straight back and not exhibiting a sufficiently deferential demeanor during the meeting. Given the extensive yelling and the number of times that the armed guards were mentioned, Mr. Cohen was significantly concerned for his personal safety.

120.    After the March 2015 meeting, the NDRC subsequently backtracked on its position and explained to Vringo that if Vringo would negotiate with ZTE and quickly accept ZTE's terms, the NRDC would not need to launch a full investigation of Vringo.

121.    When Vringo then declined to submit to ZTE's non-FRAND license terms, the NDRC reacted by demanding that Mr. Cohen travel to China for another face-to-face meeting on short notice.  When Mr. Cohen ultimately met with the NDRC again on June 3, 2015, the NDRC threatened that if Vringo was not seen by the NDRC to be "cooperating," the NDRC would:

       a.  Bar Vringo employees from ever entering China;

       b.  Bring criminal charges against Vringo's employees, including Mr. Cohen, so that they would never be able to leave the United States;

       c.  Seize all of Vringo's assets in China; and

       d.  Auction off all of Vringo's Chinese patents, starting at one penny.

122.    Mr. Cohen was also told by the NDRC that even if Vringo won any of its litigation against ZTE, it was possible that Vringo would never be able to collect money from ZTE.  A senior NDRC official, Mr. Xu Xinyu, also stated that he was personally insulted by Vringo's successful effort in compelling ZTE to produce responsive information in Vringo's litigation against ZTE in this Court regarding ZTE's complaints to the NDRC.

123.    Mr. Xu, upon information and belief, has earned the sobriquet, "Mr. Confession", for his aggressive approach in NDRC investigations.[8]

---

[8] Exh. O, http://www.reuters.com/article/2014/09/15/us-china-antitrust-ndrc-insight-idUSKBN0HA27X20140915

124.    The NDRC further stated that Vringo had only ten days to reach a settlement with ZTE, and stated that the NDRC was going to start requiring Mr. Cohen to attend in-person meetings at the NDRC offices in China every week.  This schedule would make it impossible for Mr. Cohen to return home or adequately oversee Vringo's worldwide litigation and other projects, and would keep him in a jurisdiction where he is being consistently threatened with criminal penalties.

125.    The NDRC then demanded that Vringo provide documents responsive to dozens of itemized categories, all translated into Chinese, within two weeks.  Many of the NDRC's document demands were near exact copies of Vringo's Requests for Production to ZTE in the litigation before this Court.  Upon information and belief, ZTE provided at least Vringo's document requests to the NDRC or assisted the NDRC in drafting the NDRC's document demands.  Indeed, the only way that the NDRC could have known about Vringo's document requests was if ZTE had provided them to the NDRC.

126.    Notably, one of ZTE's recent document requests to Vringo asked Vringo to produce to ZTE all documents that Vringo had given to regulators, including, explicitly, the NDRC.  Upon information and belief, ZTE is using the NDRC process to require Vringo to provide translated information to ZTE at great expense to Vringo.

127.    Additionally, on June 4, 2015, NDRC explicitly demanded that Vringo produce the Prohibited Material directly to the NDRC – material already in possession of the NDRC since at least as early as April 2014 – in an apparent attempt to insulate ZTE from its second breach of the NDA.  In yet another example of the coordinated campaign between ZTE and the NDRC, just a few weeks after the NDRC's demand, ZTE sent Vringo its request for admission number 659, asking Vringo to "Admit that Vringo

provided the PowerPoint to the NDRC."  Vringo has attempted to work with the NDRC to ensure that any NDA materials are properly protected pursuant to the NDA.

128.    Only after Vringo informed ZTE on July 1, 2014 that Vringo was filing this suit in New York for breach of the NDA did ZTE change course in at least its written materials to the NDRC.  ZTE's written filings to the NDRC prepared after that date explicitly referenced the fact that the December 10, 2013 negotiations had happened, but told the NDRC that it could not discuss those materials pursuant to the NDA. ZTE's papers then nominally focused on Vringo's rack rate, which is not subject to the NDA.

129.    However, upon information and belief, the NDRC has realized that it cannot base any punishment against Vringo solely on comparing rack rates.  In fact, in the June 3, 2015 meeting between the NDRC and Vringo, the NDRC referred repeatedly to pricing ███████████████████████████████████████████ ████████████████████████████████The NDRC is therefore demanding that Vringo supply it with the pricing information that exists only in the Prohibited Material, so that the NDRC can still use that Prohibited Material as the foundation for the NDRC's findings.

## ZTE CORP. PARTICIPATES, DIRECTLY OR INDIRECTLY, IN THE CONDUCT OF AN ENTERPRISES AFFAIRS THROUGH A PATTERN OF FRAUDULENT ACTIVITY

130.    ZTE and Vringo have engaged in numerous discussions pursuant to the NDA and exchanged materials through email, on international telephone calls and in person.

131.    Upon information and belief, ZTE Corp. – including Fan Qingfeng (ZTE Corp.'s Executive Vice President), Guo Xiaoming (ZTE Corp.'s General Counsel), Shen

("Alvin") Jianfeng (ZTE Corp.'s Chief IP Officer), Yi ("Oliver") Hu (ZTE Corp.'s Chief Litigation Officer), the Chinese state-owned company holding at least 30% of ZTE's shares, and/or those acting at their direction or behalf (collectively "ZTE Parties") – successfully influenced Chinese regulatory authorities, including the NDRC and their officials/employees, to initiate an investigation against Vringo (and continue to investigate Vringo) including by using the parties' settlement discussions and/or materials including the Prohibited Material.

132.    Upon information and belief, ZTE Corp., which is a publicly traded company in which the Chinese government holds at least a 30% interest, successfully influenced Chinese regulatory authorizes, including the NDRC, to exert pressure on Vringo to surrender or forgo relief, remedies and/or other legal rights to which Vringo is otherwise entitled under applicable laws, including outside of China.

133.    These individuals (ZTE Parties and NDRC officials/employees) and entities (ZTE Corp. and the NDRC) are a union or group of individuals associated in fact, constitute an ongoing organization, and function as a continuing unit or enterprise. This is due to, for example, their common goal of reducing and/or eliminating royalties paid by ZTE Corp. and/or other Chinese companies to patent owners, including Vringo, and/or attempting to force patent owners, including Vringo, to surrender or forgo relief, remedies and/or other legal rights to which patent owners, including Vringo, are entitled under applicable laws in China and/or outside of China.

134.    Outside of China, major worldwide telecom companies have agreed to FRAND licenses to the Vringo SEPs from their previous owner. ZTE's complaint to the NDRC, as well as its campaign to induce the NDRC to investigate Vringo, emphasized

that Vringo should not be allowed to assert Vringo's patent rights against ZTE and other Chinese companies.

135.    ZTE Corp. and the NDRC have a continuing and substantial interaction and involvement (including through individuals associated with the entities) as alleged herein.  These individuals and entities were and are associated for the common purpose of engaging in a course of conduct, at least one aspect of which is to attempt to reduce and/or eliminating royalties paid by ZTE Corp. and/or other Chinese companies to patent owners, royalties that patent owners would otherwise be entitled to under applicable laws and/or attempting to force patent owners to surrender or forgo relief, remedies and/or other legal rights to which patent owners are entitled under applicable laws in China and/or outside of China.  These individuals and entities have relationships among themselves, including relationships between and among their respective executives, directors, officials, representatives and/or employees.  The association between these individuals and entities also has longevity sufficient to permit these associates to pursue ZTE Corp.'s and/or the NDRC's purpose, including by virtue of their ongoing financial relationship (a Chinese government controlled entity owns a controlling share of ZTE Corp.'s stock), alignment of interests and ongoing interactions.

136.    ZTE Corp. conducts or participates, directly or indirectly, in the conduct of the NDRC's affairs through a pattern of fraudulent activity (including through emails and international phone calls), for example, by (1) obtaining information from Vringo through fraudulent/deceitful means for sharing with Chinese regulatory authorities, including the NDRC and (2) making material misrepresentations to Vringo and various foreign courts regarding ZTE's willingness to negotiate and/or enter into a FRAND

license to a Vringo SEP if that SEP was found to be valid and infringed when, upon information and belief, ZTE Corp. took this position to set up a situation where Vringo was forced to sue ZTE on SEPs so that Chinese regulatory authorities, including the NDRC, had a basis to investigate Vringo and/or conclude that Vringo violated the Chinese AML even if it was as a mere pretense for investigating Vringo and/or finding a violation of the Chinese AML by Vringo.

137.    ZTE Corp. and the NDRC engage in, and its activities affect, foreign commerce.  ZTE Corp. sells products in the United States through Defendant ZTE USA and worldwide through ZTE Corp.'s other subsidiaries.  ZTE Corp.'s products incorporate intellectual property of other companies including U.S. companies – ZTE Corp. has publicly announced that it has taken licenses from U.S. companies such as AT&T, Qualcomm, Microsoft and Dolby as well as foreign companies such as Siemens and Ericsson.  The NDRC has used its powers in China to influence royalties paid by Chinese companies to non-Chinese companies, including U.S. companies, for the right to use intellectual property of those companies.  For example, in February 2015, Qualcomm announced that it had settled with the NDRC which found that Qualcomm violated China's AML.  Qualcomm agreed to pay nearly $1 billion in fines and limit royalties charged to Chinese companies, among other concessions related to the sale of Qualcomm's baseband chips to Chinese companies.  Upon information and belief, in addition to Vringo, ZTE Corp. and/or the NDRC is targeting the licensing practices of a number of U.S. and/or other non-Chinese companies.

138.    The pattern of activities by ZTE Corp. referred to herein consists of a variety of schemes which were and are specifically intended to and do use means and

influence to enrich the Defendants and others at the expense of Vringo – and, upon information and belief, other patent owners – by attempting to reduce and/or eliminate royalties paid by ZTE Corp. (and other Chinese companies) to Vringo, royalties that Vringo would otherwise be entitled to under applicable laws, and/or attempting to force Vringo to surrender or forgo relief, remedies and/or other legal rights to which Vringo is entitled under applicable laws in China and/or outside of China.

139.    These means include, for example, fraud on Vringo as discussed below in the Third Cause of Action (fraudulent inducement) committed through emails and/or international phone calls.

140.    Each instance of ZTE sending Vringo an email or engaging in discussions over the phone in which ZTE attempted to gain settlement information and/or any other materials from Vringo (including, but not limited to, information and material covered by the NDA or by the Protective Order of this Court), with any intent on passing that information to Chinese regulatory authorities, including the NDRC (or informing Chinese regulatory authorities about the existence of certain materials), or knowledge that ZTE would do so or would have to do so, is a separate instance of fraud.

141.    The acts referenced above are related because they have a common purpose and goal, common methods of commission (e.g., fraud) and common participants.  Each of the foregoing acts by ZTE is related, continuous, ongoing, and part of a pattern of conduct which, upon information and belief, has continued at least since the end of 2013.  Accordingly, ZTE has engaged and is engaging in a continuing and related pattern of acts, which poses a threat of continuing harm.

## CHINESE REEXAMINATION OF VRINGO'S PATENTS

142.    ZTE filed reexamination requests for 33 of Vringo's Chinese patents with the State Intellectual Property Office of the People's Republic of China.  A vast majority of these patents are not being litigated anywhere else in the world.

143.    To date, the Chinese Patent Re-examination Board has maintained the validity (or partial validity) of 19 Vringo patents and invalidated 12 Vringo patents, several of which Vringo is appealing or plans to appeal.  Many of the patents that were invalidated happen to have corresponding patents (with similar claim scope) in litigation elsewhere in the world.  On numerous occasions, ZTE has issued press releases when the Chinese Patent Re-examination Board invalidated a Vringo Chinese patent, including when the particular invalidated Vringo Chinese patent referenced had no such corresponding patent in litigation elsewhere in the world.

144.    Vringo has also found ZTE's actions in the reexamination proceedings to be interesting.  In a number of cases, ZTE attempted to withdraw its reexamination request just prior to the Chinese Patent Re-examination Board publicly issuing (and informing Vringo of) an adverse decision to ZTE – maintaining the validity of Vringo's patents.  In at least two of these cases, ZTE filed a second reexamination request relying on substantially the same arguments that proved to be unsuccessful in the first instance.  Upon information and belief, ZTE is attempting to shop for a favorable panel to invalidate Vringo's Chinese patents, as these second requests may result in appointment of a new review panel, which will consider anew ZTE's previously unsuccessful arguments.  In one of these cases, although the Chinese Patent Re-examination Board had everything it needed to make a decision, the reexamination was abruptly terminated

without a decision having been made, in contradiction to the applicable Chinese patent regulation.

## **IRREPARABLE HARM TO VRINGO**

145.    Vringo entered into the NDA so that Vringo would not have to litigate over materials exchanged by the parties under the NDA and so that the parties could engage in candid and open negotiations without the fear of terms being disclosed to third parties.  Through no fault of Vringo, that is no longer the case.  ZTE breached the NDA by filing the Prohibited Material in the Shenzhen Court and by basing its NDRC Complaint on the Prohibited Material as well.  ZTE also duplicated/made copies of the Prohibited Material to provide to at least Mr. Burdon. Vringo must now defend against specious litigation claims in China and an extraordinarily onerous regulatory investigation that are based on the Prohibited Material.  And, Vringo no longer has control over the dissemination of the Prohibited Material – Vringo's confidential information is now in the hands of third parties that are not bound by the NDA in its use or further disclosure of that confidential information.

146.    Moreover, an unknown number of judges in the Shenzhen Court and possibly the Guangdong Appellate Court have been exposed to the Prohibited Material. Because ZTE concealed from Vringo for over four months that it was using the Prohibited Material while multiple judges in the Shenzhen Court (and potentially the Guangdong Appellate Court) reviewed, analyzed and discussed that material before deciding that the Chinese Complaint adequately stated a claim, the Shenzhen Court and possibly the Guangdong Appellate Court have been irretrievably tainted by ZTE's wrongful acts.

147.    By the time Vringo received notice of the Chinese Complaint on June 26, 2014, third parties were already aware of and investigating the Chinese Complaint.  (Dkt. No. 26, Laight Decl., ¶¶3-4).

148.    Indeed, in the Chinese legal system, lawyers who are not involved in a particular case have nevertheless generally been able to access court files to obtain documents that have been filed in that case.  (Dkt. No. 6, Clark Decl., ¶8).  While this has become less common in recent years, there are cases in which individuals uninvolved in the case had access to the court file containing the types of material filed in the Shenzhen Court.  (Id.; see also Dkt. No. 25 Supp. Clark Decl., ¶17).  Further, Chinese courts are not immune from corruption and improper behavior, as has been substantiated by official Chinese government reports.[9]  (Dkt. No. 25, Supp. Clark Decl., ¶¶22-27).

149.    ZTE has engaged in a series of improper acts which demonstrate that ZTE is likely to repeat its behavior in the future and provide the Prohibited Material to third parties, publicly disclose the Prohibited Material, and/or take actions that will result in the public disclosure of the Prohibited Material:

(a) ZTE filed the Shenzhen lawsuit and the NDRC Complaint using Vringo's settlement presentation in two separate flagrant and willful violations of the NDA;

(b) when preparing the Shenzhen lawsuit, ZTE provided the Chinese Complaint to a translation company;

(c) there is no evidence that ZTE has sought to protect Vringo's settlement information from public disclosure  or further dissemination by the Shenzhen Court, the NDRC, the Chinese translation company, or otherwise;

---

[9] The Chinese government has also documented judicial corruption in Shenzhen.  In particular, five judges from the Shenzhen People's Intermediate Court were arrested in 2006 on corruption charges, and three of them were sentenced to jail terms.  Dkt. No. 25, Supp. Clark Decl., ¶23.

(d) ZTE's senior in-house legal staff went "on the record" with a Chinese newspaper and/or news agency regarding litigation between ZTE and Vringo and, upon information and belief, the parties' discussions;

(e) without informing Vringo of the Shenzhen lawsuit or the NDRC Complaint, ZTE sought a reciprocal waiver of the NDA's confidentiality provision from Vringo in an apparent attempt to retroactively obtain immunity for ZTE's breach of the NDA;

(f) a ZTE employee swore under oath, without any evidentiary support, that Vringo had breached the NDA, only to have that affidavit proven false; and

(g) in July 2014, ZTE misrepresented to this Court that it had not provided the NDA material to any parties other than the Shenzhen Court, and only admitted that it had provided the NDA material to the NDRC ten months later, after an order on a motion to compel.

150.    Amongst other things, Vringo is in the business of licensing its patents. Vringo's economic worth as an enterprise is intrinsically linked to the value of its patent portfolio.  ZTE is seeking to harm Vringo by making the Prohibited Material public and available to third parties including, but not limited to, the NDRC, resulting in the Prohibited Material falling into the hands of Vringo's competitors as well as every other third party, including Chinese companies, that might negotiate with Vringo in the future for a license to the Vringo SEPs.  ZTE is also seeking to harm Vringo by inducing the NDRC to levy penalties against Vringo, including potential seizure of Vringo's Chinese patents, and by making it impossible for Vringo to obtain licenses from other Chinese companies that have refused to take a license to Vringo's worldwide portfolio.

## FIRST CAUSE OF ACTION: WILLFUL BREACH OF CONTRACT AS AGAINST VRINGO

151.     Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 150 above as if set forth fully herein.

152.     Vringo and ZTE entered into the NDA which restricted the use and disclosure of the parties' settlement information:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and without prejudice and *shall not be used or referenced in any way by any Party in any* existing or *future judicial* or arbitration *proceedings* or *made the subject of any public comment* or press release.

(Exhibit A, ¶2) (emphasis added).

153.     The NDA is a valid and binding contract.

154.     Vringo has at all times complied with its obligations under the NDA and is willing and able to perform any remaining obligations.

155.     ZTE has been and is able to perform its obligations under the NDA, but has instead flagrantly, willfully and maliciously breached the NDA by at least including the Prohibited Material in the Chinese Complaint.  ZTE is also engaged in an ongoing breach of the NDA, which by its express terms requires ZTE to take all reasonable measures to protect the secrecy of and avoid disclosure and use of Vringo's Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those person authorized under the NDA to have any such information. In particular, ZTE has failed to withdraw Vringo's information covered by the NDA from the Shenzhen Court.  ZTE's ongoing breach can only be remedied by an order requiring specific performance of ZTE's obligations under the NDA.

156.    Vringo has suffered and will continue to suffer harm, including irreparable harm, by ZTE's flagrant, willful and malicious breach of the NDA.

157.    The harm to Vringo includes, but is not limited to, the following:  Vringo has been forced to incur costs related to disruption of its business caused by ZTE's activities.   For example, Vringo has incurred significant legal cost in the Shenzhen lawsuit and related appeals.  ZTE has used the existence of the Shenzhen lawsuit (which was accepted by the Shenzhen Court based on the Prohibited Material) in litigations with Vringo and to issue public statements in an ongoing effort to harm Vringo's stock price, to drive down Vringo's market value and/or the perceived value of Vringo's patent portfolio, and to bolster ZTE's arguments in patent litigations between the parties around the world.  Chinese regulatory authorities, including the NDRC, and/or ZTE may use the existence of the Shenzhen lawsuit (and any adverse ruling against Vringo by the Shenzhen Court) in an attempt to reduce/eliminate royalties that all Chinese companies (not just ZTE Corp.) should pay to Vringo, and/or force Vringo to make other concessions regarding its licensing of Vringo's patents in China and to all Chinese companies.

158.    Vringo has no adequate remedy at law for the irreparable harm.

159.    ZTE's flagrant, willful and malicious breach of the NDA undermines important New York public policies including, but not limited to, policies encouraging settlements.  Vringo is entitled to permanent injunctive relief and specific performance. Vringo has also suffered additional damages as a result of this misconduct in an amount to be determined at trial.

## SECOND CAUSE OF ACTION: WILLFUL BREACH OF CONTRACT AS AGAINST VRINGO

160.    Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 150 above as if set forth fully herein.

161.    Vringo and ZTE entered into the NDA which restricts the use and disclosure of the parties' settlement discussions and/or materials including the Prohibited Material:

> [A]ny and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ("Confidential Information") shall be confidential, inadmissible, and without prejudice and shall not be used or referenced in any way by any Party in any existing or future judicial or arbitration proceedings or made the subject of any public comment or press release.

(Exhibit A, ¶2) (emphasis added).

162.    The NDA puts further restrictions on the use and disclosure of the parties' settlement discussions and/or materials including the Prohibited Material:

> In addition, *each Party agrees not to disclose information covered by this Agreement* to any of its personnel or representatives except on a strictly "need to know" basis, or *to any third party, and not to use such information for its commercial advantage, dispute advantage, or any other purpose (whether similar or dissimilar to the foregoing) other than the Discussions. Each Party further agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into* the public domain or *the possession of persons other than those persons authorized hereunder to have any such information*, which measures shall include the highest degree of care that such Party utilizes to protect its own confidential information of a similar nature.

(Exhibit A, ¶2) (emphasis added).

163.    The NDA also prohibits duplication or copy confidential settlement information including the Prohibited Material:  "Each Party agrees that neither it nor its representatives shall duplicate, copy or make summaries of the Confidential Information

without the other Party's prior written consent except in connection with the Discussions . . . ." (Exhibit A, ¶2).

164.     The NDA is a valid and binding contract.

165.     Vringo has at all times complied with its obligations under the NDA and is willing and able to perform any remaining obligations.

166.     ZTE has been and is able to perform its obligations under the NDA, but has instead flagrantly, willfully and maliciously breached the NDA by at least including a copy of the Prohibited Material in its complaint to the NDRC in April 2014.  Upon information and belief, ZTE duplicated/copied the Prohibited Material and provided a copy to the NDRC, Shenzhen Court, Michael Burdon, and a translation company.  ZTE is also engaged in an ongoing breach of the NDA, which by its express terms requires ZTE to take all reasonable measures to protect the secrecy of and avoid disclosure and use of Vringo's Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those person authorized under the NDA to have any such information.  In particular, there is no evidence that ZTE sought to have the prohibited material treated as confidential by the Shenzhen Court, certainly not before Vringo informed ZTE that it was filing a breach of NDA lawsuit in New York. Moreover, ZTE has failed to withdraw Vringo's information covered by the NDA from the NDRC.  ZTE's ongoing breach can only be remedied by an order requiring specific performance of ZTE's obligations under the NDA.

167.     ZTE flagrantly, willfully and maliciously breached the NDA by inducing Chinese regulatory authorities, including the NDRC, to initiate an investigation against

Vringo using the parties' settlement discussions and/or materials including the Prohibited Material.

168.    Vringo has suffered and will continue to suffer harm, including irreparable harm, by ZTE's flagrant, willful and malicious breach of the NDA.

169.    The harm to Vringo includes, but is not limited to, the following:

(a) Without having received any information from Vringo, without having talked to Vringo and without having afforded Vringo the opportunity to defend itself, upon information and belief, the NDRC already concluded that Vringo violated the Chinese AML based, at least in part, (even if used as a mere pretense for finding a violation) on the parties' settlement discussions and/or materials including the Prohibited Material.

(b) Under threat of penalty, Vringo and its Chief Legal and IP Officer was forced to travel to China to meet with the NDRC.

(c) The NDRC has threatened Vringo with civil and criminal liability.

(d) The NDRC has threatened at least one Vringo executive with civil and criminal liability in his personal capacity.

(e) The NDRC also threatened to take Vringo's property in China.

(f) Upon officially finding a violation of the Chinese AML, the NDRC may fine Vringo, impose criminal penalties on Vringo's employees and prevent their international travel, seize Vringo's Chinese patents and auction them starting at one cent, reduce/eliminate royalties that all Chinese companies (not just ZTE Corp.) should pay to Vringo, and/or force Vringo to make other concessions regarding its licensing of Vringo's patents in China and to all Chinese companies.

(g) Vringo has also been forced to incur cost related to disruption of its business caused by ZTE's activities.  For example, Vringo has incurred significant legal costs in responding to the NDRC's demands for frequent meetings and for document production at the apparent behest of ZTE.

170.    Vringo has no adequate remedy at law for the irreparable harm.

171.    ZTE's flagrant, willful and malicious breach of the NDA undermines important New York public policies, including but not limited to policies encouraging settlements.  Vringo is entitled to permanent injunctive relief and specific performance. Vringo has also suffered additional damages as a result of this misconduct in an amount to be determined at trial.

### THIRD CAUSE OF ACTION: FRAUDULENT INDUCEMENT

172.    Vringo repeats and reiterates the allegations contained within Paragraphs 1 through 150 above as if set forth fully herein.

173.    Upon information and belief, ZTE made a material misrepresentation to Vringo that: (1) ZTE would comply with the terms of the NDA including the terms restricting the use and/or disclosure of settlement information; (2) ZTE would not use and/or disclose the Prohibited Material in any judicial proceeding; and/or (3) ZTE agreed to meet with Vringo in December 2013 with the sole intent to discuss possible settlement of Vringo's patent infringement claims.

174.    Upon information and belief, ZTE made these misrepresentations knowing their falsity and intending to deceive Vringo.  Upon information and belief, ZTE never intended to honor all of its obligations under the NDA.  Only a few months after signing

the NDA, ZTE included the Prohibited Material in the Chinese Complaint and, sent the Prohibited Material to the NDRC, to induce it to investigate Vringo.

175.    Upon information and belief, ZTE entered into the NDA with the intent to induce Vringo to rely on ZTE's misrepresentations in order for ZTE to obtain a settlement offer from Vringo that ZTE could use as part of an antitrust lawsuit and/or regulatory investigation against Vringo in China.   Upon information and belief, ZTE knew that Vringo would not make an offer without an NDA in place.

176.    Given that ZTE had signed an NDA and agreed to meet to have settlement discussions, when entering the NDA and providing the Prohibited Material, Vringo justifiably relied on the representations that: (1) ZTE would comply with the terms of the NDA including the terms restricting the use and/or disclosure of Prohibited Material; (2) ZTE would not use and/or disclose the Prohibited Material in any judicial proceeding; and/or (3) ZTE had agreed to meet with Vringo in December 2013 with the sole intent of discussing possible settlement of Vringo's patent infringement claims.   Vringo did not become aware of ZTE's true motives until Vringo received the Chinese Complaint in June 2014 – months after the December 10th meeting.

177.    But for ZTE's representation that it wanted to engage in settlement negotiations, and but for the NDA being signed by ZTE and in force before the December 10th meeting, Vringo: (1) would not have provided ZTE with a presentation, including payment terms and a roadmap explaining how Vringo arrived at the ZTE Specific Offer; (2) would have limited its discussions at the December 10th meeting; and/or (3) would have cancelled or postponed the December 10th meeting.

178.    Vringo has suffered and will continue to suffer harm, including irreparable harm, by at least ZTE's prosecution of a lawsuit that is based on the Prohibited Material and disclosure of the Prohibited Material to third parties, including but not limited to the NDRC.

179.    By its breach of the NDA and its Chinese press strategy, ZTE sought, among other things, to create circumstances under which the NDRC or other Chinese regulatory authorities would investigate Vringo based on the Prohibited Material, which will cause further irreparable harm to Vringo.

180.    The harm to Vringo includes, but is not limited to, the following:

(a)    Without having received any information from Vringo, without having talked to Vringo and without affording Vringo the opportunity to defend itself, upon information and belief, the NDRC already concluded that Vringo violated the Chinese AML based, at least in part, (even if used as a mere pretense for finding a violation) on the parties' settlement discussions and/or materials including the Prohibited Material and/or the Chinese Complaint (which was based on the Prohibited Material).

(b)    Under threat of penalty, Vringo and its Chief Legal and IP Officer have been forced to travel to China to meet with the NDRC.

(c)    The NDRC has threatened Vringo with civil and criminal liability.

(d)    The NDRC has threatened at least one Vringo executive with civil and criminal liability in his personal capacity.

(e)    The NDRC also threatened to take Vringo's property in China.

(f)     Upon officially finding a violation of the Chinese AML, the NDRC may fine Vringo, impose criminal penalties on Vringo's employees and prevent their international travel, seize Vringo's Chinese patents and auction them starting at one cent, reduce/eliminate royalties that all Chinese companies (not just ZTE Corp.) should pay to Vringo, and/or force Vringo to make other concessions regarding its licensing of Vringo's patents in China and to all Chinese companies.

(g)     Vringo has also been forced to incur costs related to the disruption of its business caused by ZTE's activities.   For example, Vringo has incurred significant legal costs investigating ZTE's fraudulent activities and initiating litigation to protect Vringo's confidential material, which was supposed to be protected under the parties' NDA.

(h)     Vringo has also incurred significant legal cost in responding to the NDRC's demands for frequent meetings and for document production at the apparent behest of ZTE.

(i)     ZTE has used the existence of the Shenzhen lawsuit (which was accepted by the Shenzhen Court based on the Prohibited Material) in litigations with Vringo and gain the input and assistance of the NDRC in coordinating a collective strategy against Vringo.   This strategy includes issuing public statements and planting anonymous derogatory comments on message boards in an ongoing effort to harm Vringo's stock price, to drive down Vringo's market value and/or the perceived value of Vringo's patent portfolio, and to bolster ZTE's arguments in patent litigations between the parties around the world.

(j)     Chinese regulatory authorities, including the NDRC, and/or ZTE may use the existence of the Shenzhen lawsuit (and any adverse ruling against Vringo by the Shenzhen Court) in an attempt to reduce/eliminate royalties that all Chinese companies (not just ZTE Corp.) should pay to Vringo, and/or force Vringo to make other concessions regarding its licensing of Vringo's patents in China and to all Chinese companies.

181.    Vringo has no adequate remedy at law for the irreparable harm.

182.    Vringo has been damaged by this misconduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Vringo prays for judgment as follows:

a.      That ZTE has willfully breached the NDA, causing harm to Vringo, by providing that material to the Shenzhen Court;

b.      That ZTE has willfully breached the NDA, causing harm to Vringo, by providing that material to the NDRC;

c.      That ZTE fraudulently induced Vringo to enter into the NDA, causing harm to Vringo;

d.      That ZTE's conduct warrants the imposition of compensatory and punitive damages including, but not limited to, the FRAND royalties that Vringo would have received from ZTE and other Chinese companies without the involvement of the Shenzhen Court and Chinese regulatory authorities, including the NDRC;

e.      That ZTE, and its officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to comply with the NDA and be required pursuant to the NDA's express terms to specifically perform their obligations to take all reasonable measures to protect the secrecy of and avoid disclosure and use of Vringo's Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those person authorized under the NDA to have any such information;

f.      That ZTE, and its officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to take all steps necessary to ensure that the Prohibited Material is not discussed or disclosed in a public hearing or otherwise made public;

g.      That ZTE, and its officers, agents, servants and employees and those persons in active concert or participation with any of them, be ordered to disclose any other instances in which ZTE has used, disclosed or otherwise referenced the Prohibited Material;

h.      That Vringo be awarded its attorneys' fees and costs; and

i.      That Vringo be awarded such other and further relief as this Court deems just and proper.

Dated: July 15, 2015                    Respectfully submitted,

                                        VRINGO, INC.
                                        VRINGO INFRASTRUCTURE, INC.


                                        _____/s/ Karl Geercken_____
                                        KARL GEERCKEN
                                        AMBER WESSELS-YEN
                                        Alston & Bird LLP
                                        90 Park Avenue
                                        New York, New York 10016
                                        Telephone: (212) 210-9400
                                        Facsimile: (212) 210-9444

                                        *Attorneys for Vringo, Inc. and*
                                        *Vringo Infrastructure, Inc.*