UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
VRINGO, INC., et ano.,

                        Plaintiffs,


            -against-                                    14-cv-4988 (LAK) (FM)


ZTE CORPORATION, et ano.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ZTE CORPORATION,

                        Plaintiff,


            -against-                                    15-cv-0986 (LAK) (FM)

VRINGO, INC., et ano.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**
(Corrected)


Appearances:

Karl Geercken
Amber Wessels-Yen
Mark McCarty
ALSTON & BIRD LLP
*Attorneys for Vringo, Inc. and*
*Vringo Infrastructure, Inc.*

Jeff E. Butler
John P. Alexander
CLIFFORD CHANCE US LLP

Robert F. Perry
Paul A. Straus
David A. Joffe
KING & SPALDING LLP

Jeffrey J. Catalano
BRINKS GILSON & LIONE

Charles M. McMahon
Brian A. Jones
Jay H. Reiziss
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP

*Attorneys for ZTE Corporation and*
*ZTE USA Inc.*

Lᴇᴡɪs A. Kᴀᴘʟᴀɴ, *District Judge.*

These actions arise out of a worldwide patent dispute between Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") and ZTE Corporation and ZTE USA Inc. (collectively, "ZTE").  The matter now is before the Court on ZTE's motion to modify the Court's July 24, 2015 order[1] which, in pertinent part, ordered ZTE to produce for deposition in New York its executive, Mr. Guo Xiaoming.  ZTE now asserts—for the first time—that Mr. Guo will not enter the United States because there is a real risk that Mr. Guo will be detained or arrested at the U.S. border in connection with a federal criminal investigation of possible unauthorized exports of US-origin equipment to Iran if he attempts to enter this country.[2]

---

[1]

14-cv-4988, DI 198.

Unless otherwise indicated, all subsequent citations to docket items are to the docket sheet in 14-cv-4988.

[2]

*See* Decl. of W. Wysong [DI 200] ¶ 3 & DI 200 Exs. A-B.

*Facts*

*The Parties and the Worldwide Patent Infringement Litigation*

Vringo is engaged in the innovation, development, and monetization of intellectual property and mobile technologies. It holds an intellectual property portfolio of more than 600 patents and patent applications covering telecommunications infrastructure, internet search, and mobile technologies.[3]

In August 2012, Vringo purchased from Nokia Corporation a patent portfolio that included at least several patents that have been declared essential to wireless communications standards and are therefore necessary for the operation of telecommunications equipment.[4] The parties agree that Vringo must grant licenses to practice those essential patents on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions.[5]

ZTE, headquartered in Shenzhen, China, designs, develops, manufactures, and sells telecommunications products and equipment.[6] It claims to be one of the five largest smartphone manufacturers in China and one of the ten largest worldwide.[7]

ZTE allegedly has been selling telecommunications equipment covered by Vringo's

---

[3]

Decl. of A. Berger [DI 5] (hereinafter "Berger Decl. I") ¶ 3.

[4]

First Am. Compl. [DI 52] (hereinafter "FAC") ¶ 14; Decl. of Z. Wang [DI 16] ¶ 3.

[5]

FAC ¶¶ 15-16; Wang Decl. ¶ 4.

[6]

Wang Decl. ¶ 2.

[7]

*Id.*

4

patents without a license for several years.[8]  Beginning in October 2012, Vringo initiated patent infringement litigation against ZTE in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania, Spain, and the United Kingdom, perhaps among other places.[9]

*The Non-Disclosure Agreement*

In late 2013, ZTE and Vringo agreed to meet to discuss possible settlement of the international patent litigation.[10]  Vringo believed that the "only way to create an environment for productive discussions with good faith settlement offers was . . . to exchange information setting forth the parties' respective positions" pursuant to a non-disclosure agreement ("NDA").[11]  Accordingly, on November 26, 2013, Vringo sent a proposed NDA to ZTE.[12]  ZTE returned it to Vringo on December 9, 2013, signed and initialed by ZTE's chief operating officer and chief intellectual property counsel and dated effective as of December 6, 2013.[13]

As spelled out in the formal agreement, the NDA served to allow Vringo and ZTE "to explore a potential settlement of some portion of or all of the outstanding litigation as well as

---

[8]     FAC ¶¶ 18-19; Decl. of A. Berger [DI 24] (hereinafter "Berger Decl. II") ¶ 4; *see also* Wang Decl. ¶ 5.

[9]     Berger Decl. II ¶ 4; Wang Decl. ¶¶ 5, 7.

[10]    Berger Decl. II ¶ 5; Wang Decl. ¶ 5.

[11]    Berger Decl. I ¶ 4; *see also* Wang Decl. ¶ 5.

[12]    Berger Decl. II ¶ 7.

[13]    *Id*. ¶ 10; Wang Decl. ¶ 5.

any other disputes."[14]  It specified that "any and all statements made, positions taken, or documents used or exchanged by either Party during the course of the Discussions" constituted "Confidential Information."  It detailed also the parties' agreement that no party would use Confidential Information "in any existing or future judicial or arbitration proceedings" or "for [their] commercial advantage, dispute advantage, or any other purpose."[15]  In relevant part, paragraph 2 of the NDA provided:[16]

> In order to facilitate the Discussions, the Parties hereby agree . . . that any and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ('Confidential Information') *shall be confidential, inadmissible, and without prejudice and shall not be used or referenced in any way by any Party in any existing or future judicial or arbitration proceedings or made the subject of any public comment or press release.*  In addition, each Party agrees not to disclose information covered by this Agreement to any of its personnel or representatives except on a strictly 'need to know' basis, or to any third party, and *not to use such information for its commercial advantage, dispute advantage, or any other purpose. . . .*  Each Party further agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized hereunder to have any such information.

The NDA contemplated the possibility that a governmental entity or another stranger to the agreement might seek access to Confidential Information.  In the event that one of the parties received a request for such information from a governmental entity or a third party, whether via a discovery request or a subpoena, the NDA provided that the recipient must (i) "maintain the confidentiality of the Confidential Information;" (ii) "timely seek a protective order . . . that would afford the Confidential Information the highest level of confidential treatment possible;" and

---

[14]    FAC Ex. A [DI 52-1] (hereinafter "NDA") ¶ 1.

[15]    *Id*. ¶ 2

[16]    *Id*. (emphasis added).

(iii) "notify the other Party within three business days of receiving the initial request for Confidential Information."[17]

The NDA stated also "that money damages may not be a sufficient remedy for any breach of this Agreement and that, in addition to all other remedies to which it may be entitled, the Parties will be entitled to seek equitable relief, including injunction and specific performance, for any actual or threatened breach of the provisions of this Agreement."[18]   The NDA was to "be governed by and construed and enforced in accordance with the laws of the State of New York" and "binding upon the parties hereto in the United States and worldwide."[19]   In addition, it included a forum selection clause that provided that federal or state courts located in New York County would be the exclusive *fora* for any disputes "which may arise out of or in connection with" the NDA, and the parties consented to personal jurisdiction here.[20]

*The Settlement Meeting*

The parties met on December 10, 2013—the day after ZTE returned the executed NDA to Vringo—to discuss a possible resolution of the patent litigation.[21]   Vringo there made a

---

[17]   *Id.* ¶ 3.

[18]   *Id.* ¶ 10.

[19]   *Id.* ¶ 12.

[20]   *Id.* ¶ 13.

[21]   Berger Decl. II ¶ 11; Wang Decl. ¶ 6.

40-page presentation to ZTE, which, among other things, included its settlement proposal.[22]  Each and every page of the presentation stated:  "CONFIDENTIAL - VRINGO/ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA."[23]  But no settlement was reached.

*Chinese Litigation*

On February 21, 2014, ZTE initiated an antitrust lawsuit in Shenzhen, China, claiming that Vringo had abused its market position by refusing to license its essential patents on FRAND terms and conditions.[24]  ZTE's complaint—filed just over two months after ZTE executed the NDA—specifically relied on Vringo's Confidential Information.  It stated:  "In the second price quotation in December 2013, the Defendant [Vringo] actually intended to charge the Plaintiff USD [Redacted] for its standard-essential patents' portfolio license . . . ."[25]  Moreover, ZTE attached Vringo's December 10, 2013 presentation as an exhibit to the complaint itself.[26]

Vringo long remained entirely unaware of the Shenzhen litigation.  It was not until June 26, 2014—more than four months after the lawsuit was initiated—that it received a copy of the

---

[22]     Berger Decl. I ¶ 6.

[23]     *Id*.

[24]     Wang Decl. ¶ 10; Berger Decl. I ¶ 10; FAC ¶ 41.

[25]     FAC Ex. D (Shenzhen Complaint) [DI 52-4] at 6-7; Berger Decl. I ¶ 7.

       Vringo redacted the Confidential Information from the documents filed before this Court, but it was not redacted in the complaint filed with the Shenzhen court.  *See* FAC ¶ 45 n.2.

[26]     *See* Berger Decl. I ¶¶ 8-9; *see also* FAC Ex. C (Dec. 10, 2013 Presentation) [DI 52-3]; FAC Ex. E (Shenzhen Evidence List Provided by ZTE) [DI 52-5].

complaint and supporting documents from the Shenzhen court on its own initiative and learned that

ZTE had disclosed Confidential Information in its Shenzhen filing.[27]


*European Commission Litigation*

On April 10, 2014, ZTE filed another complaint against Vringo, on that occasion with

the European Commission ("EC").[28]  On May 15, 2014, Vringo received a copy of the complaint

from the EC with the opportunity to respond.[29]  As mentioned, Vringo then still was entirely

unaware of the Shenzhen litigation.  So, on June 4, 2014, Vringo requested "a waiver from ZTE to

allow Vringo to disclose any information that constitutes Confidential Information (as defined in

clause 2 of the Vringo/ZTE Non-Disclosure Agreement) to the European Commission in connection

with ZTE's complaint."[30]  ZTE did not respond before Vringo was required to answer the EC

complaint.[31]  Consistent with its obligations under the NDA, Vringo redacted any Confidential

Information from its EC response.[32]

On June 24, 2014, a week after Vringo's EC submission, ZTE responded to Vringo's

---

[27]

   Berger Decl. I ¶¶ 7-10.

[28]

   Berger Decl. II ¶ 13.

[29]

   *Id*. ¶¶ 13-14; Decl. of P. Chappatte [DI 28] ¶ 4.

[30]

   Wang Decl. Ex. A (Ltr. from A. Berger, Vringo, to S. Jianfeng, ZTE (June 4, 2014)); Berger Decl. II ¶ 14.

[31]

   Chappatte Decl. ¶ 6; Berger Decl. II ¶ 15.

[32]

   Chappatte Decl. ¶¶ 6, 9, 11-13.

9

letter.[33]  ZTE wrote that it "considered [Vringo's] request to waive clause 2 of the Non-Disclosure Agreement concluded between ZTE and Vringo on 6 December 2013 ('the NDA')" and could "only agree to such a waiver under . . . two conditions."[34]  *First*, "[t]he waiver should be made reciprocal, meaning that Vringo, Inc. . . . should also waive the confidentiality obligations under the NDA on ZTE Corporation."[35]  *Second*, "the reciprocal confidentiality waiver only concerns the information exchanged under the NDA that is of direct relevance to the complaint ZTE has filed with the European Commission in April 2014."[36]  In other words, ZTE took the position that the NDA remained in force and in effect, that disclosure to the EC was permitted only by written agreement, and that Vringo could disclose Confidential Information to the EC only if it permitted ZTE to do so.

*NDRC Investigation*

On January 13, 2015, Vringo received a letter from the Bureau of Price Supervision and Anti-Monopoly of China's National Development and Reform Commission ("NDRC") stating that the NDRC had initiated an investigation after "receiv[ing] a claim that your corporation has violated 'Anti-Monopoly Law of P.R. China.'"[37]  The following week, the NDRC informed Vringo that its investigation was "based on complaints which contain prima fac[i]e evidence of . . . anti-

---

[33]

Wang Decl. Ex. C (Ltr. from S. Jianfeng, ZTE, to A. Berger, Vringo (June 24, 2014)) [DI 16-3].

[34]

*Id.*

[35]

*Id.*

[36]

*Id.*

[37]

Ltr. from L. Jian, NDRC, to A. Berger, Vringo (Jan. 12, 2015) [DI 76-1].

competitive behavior of your company."[38]   While discovery remains ongoing, ZTE now has admitted that it "submitted the December 10, 2013 presentation to the NDRC in or about April 2014."[39]

*The First Action*

   Vringo commenced the first of these actions on July 2, 2014, for breach of the NDA, and moved by order to show cause for a temporary restraining order ("TRO") and a preliminary injunction on July 3, 2014.  Vringo sought injunctive relief (1) requiring that ZTE withdraw the Shenzhen complaint and all of its supporting documentation, (2) enjoining ZTE from any further litigation in Shenzhen or any other court in the Guangdong Province of China regarding the same or similar claims, (3) requiring that ZTE withdraw any Confidential Information provided to any other court or tribunal and notify Vringo of any such circumstances, and (4) enjoining ZTE from referencing any Confidential Information in any pending or future litigation.

   Following argument on July 7, 2014, the Court granted a TRO much more limited than that which Vringo had sought.  It restrained ZTE "from using, referencing, or disclosing any Confidential Information, as defined in Paragraph 2 of the [NDA] . . . in any manner inconsistent with the terms of that [NDA]."[40]

   Vringo filed an amended complaint on August 13, 2014, asserting additional claims

---

[38]
  Email from L. Jian, NDRC, to D. Cohen, Vringo (Jan. 21, 2015) [DI 78-1].

[39]
  *See* Vringo's Mot. for Sanctions and Confidentiality De-Designation (June 1, 2015) [DI 111] Ex. A at 4 (under seal).

[40]
  TRO (July 9, 2014) [DI 13]; *see also* Tr. of July 7, 2014 Oral Arg. [DI 19] at 26:17-24.

for fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unfair competition.  The amended complaint alleges that ZTE executed the NDA to elicit the Confidential Information only to use it for its commercial advantage in the Shenzhen lawsuit, perhaps among other places.

On April 6, 2015, the Court granted Vringo's motion for partial judgment on the pleadings to the extent that it determined that the parties entered into the NDA and that ZTE's actions in disclosing the Confidential Information breached its obligations under the NDA.[41]  On June 3, 2015, the Court granted the motion for a preliminary injunction, which was framed in the same terms as the TRO.[42]

*The Second Action*

Meanwhile, on February 5, 2015, ZTE filed the second of these actions in the District of Delaware.  The complaint there asserts in substance that Vringo has breached contractual obligations to negotiate in good faith and/or grant licenses on FRAND terms to purported standard-essential patents, including the patents asserted by Vringo against ZTE.  It seeks declaratory and injunctive relief.

Almost immediately after the second action was filed, Judge Gregory M. Sleet of the

---

[41]     *See* Order (Apr. 6, 2015) [DI 91].

That same day, the Court granted ZTE's motion for judgment on the pleadings to the extent that it dismissed Vringo's unfair competition claim, asserted in a counterclaim, but denied the ZTE motion in all other respects. *See* Order (Apr. 6, 2015) [DI 90].

[42]     *Vringo, Inc. v. ZTE Corp.*, No. 14-cv-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015). (The TRO had remained in effect during the pendency of the preliminary injunction motion on consent of the parties.)

District of Delaware transferred it to this Court "to be consolidated with" the first action "in the interests of convenience, efficiency, consistency, and fairness."[43]

*Discovery and the Guo Deposition*

This Court consolidated the two actions for discovery purposes.[44] And to say that discovery has been difficult would understate the matter considerably, a fact that is pertinent to the context in which the present dispute has occurred (though the details need not detain us). Suffice it to say for present purposes that ZTE aggressively has resisted producing documents and responding to other written discovery requests,[45] abused the privilege conferred by a confidentiality order of designating certain documents as being available only to opposing counsel,[46] withdrawn assertions of privilege when those assertions were challenged,[47] and has been the subject of sanctions motions that remain pending.[48] Which brings us to the present event.

---

[43]     15-cv-0986, DI 28.

[44]     Order ¶ 1 (Apr. 7, 2015) [DI 92].

[45]     *See, e.g.*, Memorandum and Order at 3, 9 (May 14, 2015) [DI 109] (granting Vringo's motion to compel responses to its interrogatories, document requests, and requests for admission in light of ZTE's refusal to "to provide any information regarding its communications with any Chinese authorities, including communications that predated the investigation by the NDRC").

[46]     *See, e.g.*, Order ¶ 1 (June 24, 2015) [DI 139] (granting Vringo's motions to remove confidentiality designations from certain of ZTE's responses to written discovery requests).

[47]     *See, e.g.*, Order (Aug. 4, 2015) (Maas, M.J.); Vringo's Resp. to Am. Order re: Sealing at 1-3 (Aug. 7, 2015) [DI 205].

[48]     *See* Vringo's Am. Mot. to Sanction ZTE (Aug. 5, 2015) [DI 193]; DI 111. *See also* Order (July 24, 2015) [DI 167] (directing certain attorneys for ZTE to show cause why sanctions

Mr. Guo is described as ZTE's chief counsel.  While the parties dispute the precise degree of his personal involvement in the events at issue here—including the allegedly fraudulent inducement of Vringo to participate in the settlement meeting and to make the disclosures it there made, the use of those disclosures in the Chinese court and with the NDRC, and so forth—there is no real doubt that he was involved in a supervisory capacity and considerable reason to suspect that he was at least one of the architects of ZTE's tactics and strategy.  At the very least, it is clear from emails sent or received by Mr. Guo that he knew and approved of ZTE's plan to "forc[e]" Vringo to settle by "making war" over what ZTE characterized as Vringo's refusal to resolve the dispute between the companies at a "reasonable price."[49]  Moreover, Mr. Guo is a member of the Shenzhen Municipality People's Congress, which has supervisory authority over the Chinese court in which ZTE sued Vringo.[50]  Vringo therefore quite reasonably sought to take his deposition.

ZTE first stalled.  It proposed that any decision as to Mr. Guo's "suitability for a deposition" be deferred until after the deadline for substantial completion of document production, adding that it "did not *yet* have authority to agree to have him deposed in New York."[51]  Vringo then moved to compel, among other things, the deposition of Mr. Guo and for a determination that all

---

should not be entered against them).

[49]

Vringo's Mot. to Compel Guo's Testimony (July 21, 2015) [DI 158] Ex. A at 1-2.  In response to an email sent by a ZTE employee to help "the leaders to make strategic considerations" with respect to the litigation with Vringo, Mr. Guo said that he "agree[d] with the strategy to use war to make peace."  *Id.*

[50]

Vringo's Mot. to Compel (June 1, 2015) [DI 115] at 4.

[51]

Email from J. Catalano to A. Wessels-Wen (May 29, 2015) [DI 115-2 at 2] (emphasis added).

14

depositions of ZTE witnesses would be held in New York.[52]  It offered, however, to withdraw the request for Mr. Guo's deposition "in the unlikely event" that complete ZTE responses to written discovery requests and other deposition testimony showed that Mr. Guo had no unique knowledge.[53]

In response to Vringo's motion, ZTE asserted in substance that "Mr. Guo is a high-ranking executive" and, though it provided no sworn evidence to this effect, that he had "at most a tangential relationship to the facts of this case and [that his] travel to the U.S. would be unnecessarily disruptive to ZTE and would adversely affect ZTE's affairs."[54]  In other words, ZTE argued that he was a so-called "apex" witness.  It did not refer to the criminal investigation that it raised for the first time on this motion and certainly did not suggest that Mr. Guo would not come to New York for a deposition if ordered to do so.

On June 16, 2015, Magistrate Judge Frank Maas determined that ZTE witnesses would be deposed in New York but deferred ruling on whether Mr. Guo would be deposed until the other ZTE witnesses testified.[55]

In due course, ZTE produced further documents which, Vringo asserts, demonstrate that Mr. Guo was heavily involved in matters of central relevance here.[56]  And a related issue then arose.

_____

[52]

DI 115.

[53]

*Id.* at 4.

[54]

ZTE's Mem. of Law in Opp. to Vringo's Mot. to Compel (June 3, 2015) [DI 122] at 4.

[55]

DI 132 ¶ 2.

[56]

DI 158 at 1-2.

Months ago, ZTE's counsel represented that they had collected the hard drives of ZTE's relevant employees for review and production.[57]   But on July 20, 2015, ZTE's outside counsel admitted to their adversary, in the words of Vringo's counsel, that they were "not sure whether [they] had Mr. Guo's hard drive after all, and that [they] where 'trying to hammer out' precisely how Mr. Guo's documents had been collected and reviewed."[58]   A few days later, ZTE's counsel admitted in a letter to Magistrate Judge Maas that Mr. Guo's hard drive had not been imaged or collected but asserted that the search of his computer (apparently by ZTE rather than outside counsel) had been sufficient.[59]   Thus, there was (and remains) a serious and unresolved issue as to the adequacy of ZTE's efforts to collect and produce relevant documents from Mr. Guo.

In this context, Vringo filed another motion to (i) compel Mr. Guo's deposition, (ii) require that the deposition take place in New York, and (iii) direct that a full search and production of Mr. Guo's documents be made immediately.[60]   ZTE responded that the issue was premature, that Mr. Guo should not be deposed because he has no "unique knowledge" of any pertinent facts, and that any deposition of Mr. Guo should proceed in the first instance by written questions and that any subsequent oral testimony should take place in Hong Kong.[61]   In particular, ZTE argued, oral testimony should not take place in New York because (i) depositions of defendant

---

[57]    Ltr. from K. Geercken to M.J. Maas (July 21, 2015) [DI 154] at 2.

[58]    *Id.* at 2-3.

[59]    Ltr. from P. Straus to M.J. Maas (July 21, 2015) [DI 159] at 3.

[60]    DI 158.

[61]    *See* ZTE's Mem. of Law Opposing Vringo's Mot. to Compel (July 23, 2015) [DI 161].

personnel ordinarily are taken where those personnel reside, (ii) travel by Mr. Guo to the United States "would be unnecessarily disruptive to ZTE's affairs," and (iii) "it would be personally disruptive to Mr. Guo if he were required to travel halfway around the world to a deposition that should, in any case, be strictly limited in time and subject matter in light of the general and high-level nature of his involvement in this case."[62]   Once again, there was no affidavit or other evidence substantiating the claims of disruption by a New York deposition.  Even more important for present purposes, once again there was no mention of the criminal investigation or of any unwillingness on Mr. Guo's part to come to New York if ordered.  On July 24, 2015, the Court granted Vringo's motion.  It stated in relevant part:[63]

> Vringo's motion to compel Guo Xiaoming's deposition and to produce documents . . . is granted in each and every respect.  Without limiting the generality of the foregoing, the deposition shall take place in New York on a date or dates agreed upon by the parties in a written stipulation filed with the Court or, if no such stipulation is executed within one week from the date of this order, a date or dates fixed by Magistrate Judge Maas.  Among other considerations, it is essential, given the history of this litigation, that the deposition take place here in order to permit immediate resolution of disputes during the deposition.  The ordinary default position that depositions of out-of-state defendants' personnel should take place in the area where they work does not apply here because, among other things, Guo Xiaoming's employer, ZTE, is a plaintiff in one of these cases and thus voluntarily chose to litigate in this forum.  Moreover, as Magistrate Judge Maas already has observed, this individual is not a class[ic] "apex" witness.  And even if he were, the motion would be granted anyway.  *See, e.g.*, *Chevron Corp. v. Donziger*, No. 11-cv-691 (LAK), 2013 WL 1896932 (S.D.N.Y. May 7, 2013) (requiring deposition of chief executive officer of plaintiff Chevron); *Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116 (S.D.N.Y. 1997) (requiring deposition of chief executive officer of defendant Federated).

---

[62]     *Id.* at 4.

[63]     DI 167 at 1-2.

*The Present Motion*

On August 5, 2015, ZTE—now represented here for the first time by Clifford Chance (in addition to King & Spalding, Brinks Gilson & Lione, and McDermott Will & Emery, all of which previously had appeared on its behalf)—moved for an order modifying the Court's July 24, 2015 order "so as to allow the deposition of Guo Xiaoming to take place outside of the United States."[64]  The motion discloses to the Court for the first time the existence of the federal criminal investigation and the concern that Mr. Guo would be questioned and perhaps detained were he to enter the United States.   The moving declaration of counsel states:[65]

> 2.  It is a matter of public record that ZTE is under investigation by United States civil and criminal authorities for alleged export control violations. Specifically, the government is investigating possible unauthorized exports of US-origin equipment to embargoed countries. The existence of this investigation has been reported in the press. Attached hereto as Exhibits A and B are true and correct copies of news articles published by Reuters in 2012 describing the investigation.

> 3.  Press reports indicate that both the Federal Bureau of Investigation and the Department of Commerce are involved in the investigation. In connection with the investigation, several ZTE executives and employees have been subject to temporary detention at the time of entry into the United States. They have been searched and items seized from them. We have no way of knowing, at this time, whether there may be sealed indictments or arrest warrants outstanding for certain individuals in the case.

> 4.  An affidavit sworn by an FBI Special Agent names the company and several individuals who were allegedly involved in the conduct that is the subject of this investigation. They are facing a substantial risk of detention or possible arrest if they attempt to enter the United States. I believe that Guo Xiaoming would almost certainly be questioned, subjected to a border search, served with a grand jury subpoena to appear, or worse, be detained in connection with the investigation.

The memorandum of law makes clear that ZTE no longer presses any of the previous

---

[64]   DI 198.

[65]   Wysong Decl. ¶¶ 2-4.

grounds it asserted to avoid the deposition, to limit its subject matter, or to avoid travel to the United States because it would be disruptive.  The memorandum states:  "Mr. Guo does not have an issue with the deposition itself."[66]  Rather, the argument is that "ZTE finds itself between the proverbial rock and hard place.  *The Court is under no obligation to extricate ZTE from this location*, but we respectfully ask the Court to do so as a matter of  discretion and—for lack of a better word—mercy."[67]  Moreover, ZTE plainly states its intention to defy the July 24, 2015 order if that order stands unmodified:  "*If the Court declines to modify the Order, this motion should serve as notice that ZTE is unable to comply with the Order and, regrettably, the time would be ripe for the Court to consider what sanction should be imposed for such noncompliance.*"[68]

*Discussion*

*There Is No Proper Ground for Reconsideration*

ZTE does not specify the basis upon which it seeks reconsideration of the July 24, 2015 order.  Nor does it cite any legal authority in support of its application.  But there is no sufficient basis for the relief it seeks.

Had ZTE acted with appropriate diligence in preparing this motion, it perhaps might

---

[66]    ZTE's Mem. of Law. in Support of its Motion to Modify the Court's July 24, 2015 Order [DI 199] at 2.

[67]    *Id.* at 1 (emphasis added).

[68]    *Id.* at 2 (emphasis added).

have cited S.D.N.Y. Local Civil Rule 6.3.[69]  But resort to that rule would have been to no avail. Relief is available under Rule 6.3 "only if the movant demonstrates that the Court overlooked controlling decisions or factual matters *that were put before the Court on the underlying motion.* Such a motion may not advance new facts, issues or arguments not previously presented to the court."[70]  Indeed, as our former Chief Judge (and later U.S. Attorney General) Mukasey has written, a party seeking reconsideration "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings."[71]

The facts concerning the federal criminal investigation and the concern that Mr. Guo would be detained and questioned, if not more, were well known to ZTE.  Indeed, the lengths to which it went to avoid the deposition entirely or, failing that, to have it take place in Hong Kong reinforce that conclusion.  Yet those facts were not disclosed to the Court in the proceedings that led to the July 24, 2015 order.  Relief under Rule 6.3 is therefore is not available.

The other basis that ZTE might have cited is Federal Rule of Civil Procedure 54(b), which states in relevant part that:

---

[69]

The Southern District's local rules are available at http://www.nysd.uscourts.gov/rules/rules.pdf.

[70]

*In re Rezulin Prods. Liab. Litig.*, 224 F.R.D. 346, 349 (S.D.N.Y. 2004) (citations and internal quotation marks omitted) (emphasis added).  *Accord, e.g.*, *Flynn v. Nat'l Asset Mgmt. Agency*, 303 F.R.D. 448, 451 (S.D.N.Y. 2014); *Hogan-Cross v. Met. Life Ins. Co.*, 568 F. Supp.2d 410, 413 (S.D.N.Y. 2009).

[71]

*Polsby v. St. Martin's Press, Inc.*, No. 97-cv-690 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (internal quotation marks omitted).

> "[A]ny order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

The clause providing that interlocutory orders "may be revised" confirms the Court's necessary power to correct itself. But Rule 54(b) is of no more help to ZTE than S.D.N.Y. Civil Rule 6.3.

The fact that a court may revise a prior order does not give a litigant the right to require that it do so, particularly where the litigant seeks revision in light of materials that should have been submitted earlier.[72]  As this Court has written previously:[73]

> "Rule 54(b) motions are subject to the law of the case doctrine.  Accordingly, the Court need not reconsider prior adjudications unless doing so would be consistent with the objectives of the doctrine which include promoting efficiency and avoiding endless litigation by allowing 'each stage of the litigation [to] build on the last and not afford an opportunity to reargue every previous ruling.'  Hence, a court will 'generally adhere to [its] own earlier decision on a given issue in the same litigation' and not depart from earlier rulings without good reason.  This provides the Court with discretion to revisit earlier rulings 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'  Accordingly, courts will consider revising earlier orders only when presented with 'cogent or compelling reasons.'  The moving party ordinarily must demonstrate 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"

Here, there has been no intervening change of controlling law, no proffering of new evidence, and no previous clear error.  Nor, in the circumstances, is relief necessary to prevent manifest injustice.

As noted, ZTE was well aware of the criminal investigation since even before it

---

[72]  *See* 10 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 54.25 [4] (3d ed. 2015).

[73]  *In re Rezulin Prods. Liab. Litig.*, 224 F.R.D. at 349-50 (footnotes and some internal quotation marks omitted).

signed the NDA with its exclusive New York forum selection clause and before it brought the second action in New York.  A number of its employees have been questioned upon seeking to enter this country, and the matter had been reported in press (a fact of which it plainly was aware) well before those events.  Indeed, its U.S. counsel in that criminal investigation (Clifford Chance) evidently has reason to believe that "there may be sealed indictments or arrest warrants outstanding for certain individuals in the case,"[74] quite possibly including Mr. Guo.  ZTE obviously instructed its lead U.S. counsel in this litigation (King & Spalding) to seek to avoid Mr. Guo being deposed at all—or, if that could not be prevented, to ensure that any deposition of him take place outside this country.  Yet it litigated two motions to compel in this Court on those very issues without ever once informing the Court of the criminal investigation or of its concerns with respect to Mr. Guo coming to this country.  It thus put both the Court and its adversary to considerable burden for reasons that never were disclosed.[75]

In light of ZTE's lack of candor and its stalling and game playing with respect to the Guo deposition in the months prior to the present, ZTE has no claim on the favorable exercise of the

---

[74]

Wysong Decl. ¶ 3.

[75]

Clifford Chance now seeks to exculpate King & Spalding of any deliberate concealment from the Court, asserting (albeit without sworn substantiation by either firm) that King & Spalding "was not aware of Mr. Guo's unwillingness to travel to the U.S. at the time of the prior briefing on the motion to compel Mr. Guo's deposition."  DI 199 at 1 n.1.

King & Spalding knew that Mr. Guo was most reluctant to come to the United States.  It stated to the Court in briefing, among other things, that "it would be personally disruptive to Mr. Guo if he were required to travel halfway around the world to a deposition that should, in any case, be strictly limited in time and subject matter covered in light of the general and high-level nature of his involvement in this case."  DI 161 at 4.  Whether it knew all of the reasons for that reluctance or, indeed, that he would refuse to come if ordered are other matters.  It is unnecessary for purposes of this motion to determine exactly what King & Spalding knew or whether its actions were culpable, and the Court does not do so.

Court's discretion.  In all the circumstances, its motion will be denied on the ground that relief is not available and, in any case, not warranted under Local Civil Rule 6.3 or Federal Rule of Civil Procedure 54(b).  In the last analysis, however, these procedural points are not outcome dispositive. The Court would deny the motion even if it were to reconsider its July 24, 2015 order on the merits.

*The Court Would Deny the Motion on the Merits in Any Event*

The essence of ZTE's merits position is that the Court should permit Mr. Guo to be deposed outside the United States because it fears that he would be questioned by the FBI, subpoenaed to appear before a U.S. grand jury, or perhaps even arrested and arraigned on an as-yet sealed warrant and indictment (if any exists) in connection with alleged sale of embargoed equipment to Iran in violation of U.S. law.  Thus, it seeks the Court's aid to avoid providing information to U.S. law enforcement and, perhaps, to avoid answering charges of violation of U.S. law while at the same time it wants the benefit of Mr. Guo's testimony to (1) pursue the lawsuit ZTE voluntarily brought here against Vringo and (2) defend against Vringo's lawsuit against ZTE, which Vringo brought here upon ZTE's express agreement that any lawsuit against ZTE arising out of the NDA would be venued exclusively in a court in New York.[76]

There are not many cases dealing with analogous situations.  Those in this circuit have looked to the Supreme Court's decision in *Degen v. United States*[77] as providing an important

---

[76]  It bears mention that ZTE signed the NDA, which contains the exclusive forum selection clause, after the criminal investigation was under way.  According to the Clifford Chance declaration, Reuters reported the criminal investigation in 2012.  *See* Wysong Decl. ¶ 2. ZTE signed the NDA in late 2013.  *See* FAC ¶ 31; ZTE's Answer to the FAC [DI 58] ¶ 31.

[77]  517 U.S. 820 (1996).

background principle.

>*Degen* involved the simultaneous indictment and civil forfeiture action by U.S. authorities against an American citizen, Degen, who then was living in Switzerland.  Degen refused to travel to the United States to face the criminal charges but sought to litigate the civil forfeiture action.[78]  Rather than permit Degen to defend the civil forfeiture action while a fugitive, the district court struck Degen's defenses and entered summary judgment in favor of the government on a theory of fugitive disentitlement.  The Supreme Court held that this was improper.[79]  In reaching this result, the Court responded to the government's concern that allowing Degen to litigate civilly while a fugitive on criminal charges might give him an improper advantage in the criminal proceeding.  The Court stated:[80]

>>[O]f course, Degen's absence entitles him to no advantage.  If his unwillingness to appear in person results in non-compliance with a legitimate order of the court respecting pleading, discovery, the presentation of evidence, or other matters, he will be exposed to the same sanctions as any other uncooperative party.  A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case.  Again, its powers include those furnished by federal rule [citing Rule 37] and by inherent authority.

With this important background principle in mind, we turn to the relevant cases.

>At least two magistrate judges of this Court have held that the possibility or reality of a criminal indictment is irrelevant to a court's decision as to whether a civil deposition of an

---

[78]     *Id.* at 822.

[79]     *Id.* at 829.

[80]     *Id.* at 827 (citations omitted).

accused or potential accused should occur here.  In *Mill-Run Tours, Inc. v. Khashoggi*,[81] Magistrate Judge Francis addressed several foreign defendants' arguments that their depositions should occur where they lived (*i.e.*, abroad) and not in the United States.  The court reasoned that the most appropriate location for a defendant's deposition is presumed to be where a defendant resides, but that circumstances often undercut that presumption.[82]  Looking to factors including cost, convenience, and litigation efficiency, Magistrate Judge Francis concluded that the depositions ought to occur in the United States.[83]  He rejected also any argument that fear of a pending U.S. indictment should affect his analysis:[84]

> It would be inappropriate for this Court to act as prosecutor and order [the defendant] to be deposed here as a means of apprehending him.  By the same token, it would be anomalous if the indictment were to give [the defendant] an advantage in this civil litigation by being considered as a factor making it "inconvenient" for him to appear here for deposition.  Accordingly, [the defendant's] criminal difficulties have not been taken into account in connection with the instant motions.

In *Doe v. Karadzic*,[85] Magistrate Judge Pitman arrived at a similar conclusion.  Defendants there argued that pending indictments justified holding depositions of defendant

---

[81]

124 F.R.D. 547 (S.D.N.Y. 1989).

[82]

*Id.* at 550 (citing cases).

[83]

*Id.* at 550-51.

Foreshadowing the Vringo-ZTE *contretemps*, Magistrate Judge Francis reasoned that "the degree of acrimony over discovery issues indicates that the depositions are likely to generate further disagreement" and that "[h]olding them in New York would accelerate the resolution of these disputes and minimize the risk that any deposition will be interrupted for a significant period."  *Id.* at 551.

[84]

*Id.* at 551-52.

[85]

Nos. 93-cv-878, 93-cv-1163, 1997 WL 45515 (S.D.N.Y. Feb. 4, 1997).

witnesses abroad.  The court disagreed.  It concluded that, "as in *Mill–Run* and *Degen*, the pendency of criminal charges is simply not a factor to be considered in determining the location of the deposition," because "[a]ny other result would place this Court in the inappropriate role of assisting defendant in his efforts to evade apprehension on these charges."[86]

> *Mill-Run* and *Karadzic* therefore stand for the proposition that pending or feared criminal charges are of no moment in determining the location of civil depositions.  The one case that ZTE cites as authority contradicting this line of cases, *Farquhar v. Shelden*,[87] is not persuasive in these circumstances.  While the court there did state that it was uncomfortable effectively bringing about extradition via discovery order,[88] its decision to permit the deposition of a witness abroad turned on a variety of case-specific factors (including the defendant's willingness to advance expenses and his cooperation in previous litigation).[89]

> This Court tends to agree that even the pendency of criminal charges against a deposition witness in a criminal case should not excuse the witness from appearing in the United States for a deposition in a civil case where that otherwise would be appropriate.  A contrary rule would put the Court in the position of aiding the criminal defendant-civil deposition witness in avoiding apprehension on U.S. charges while simultaneously permitting such a witness to take advantage of the benefits of the U.S. legal system for the resolution of civil disputes.  But it is

---

[86]

*Id.* at *5.

[87]

116 F.R.D. 70 (E.D. Mich. 1987).

[88]

*Id.* at 73 & n.5.

[89]

*Id.* at 73.

unnecessary to reach such a categorical view in this case.

First, this case is much stronger for Vringo even than *Karadzic* was for the parties seeking those depositions, as there is no evidence here of any outstanding indictment or arrest warrant for Mr. Guo.  All that can be said with any assurance is that some ZTE employees have been delayed and questioned upon arriving in the United States and that there is or, at least, was a federal criminal investigation.  Thus, although it is possible that Mr. Guo would be questioned or even arrested if he came to this country, it is possible also that nothing of the sort would occur.

Second, a deposition outside the country likely would be a very poor substitute for a deposition here.  There already have been substantial problems in the conduct of discovery against ZTE, and there is an as-yet unresolved but apparently substantial issue as to whether a proper search was conducted for Mr. Guo's documents.  Privilege objections have been asserted and, when challenged by Vringo, withdrawn.  The strong likelihood is that a deposition of Mr. Guo would be rife with disputes over the propriety of questions, the responsiveness of answers, the duration of the examination, and assertions of privilege.  Were that deposition to occur here, rulings by a judicial officer or special master could be made quickly and—equally important for present purposes—with ready means of enforcement, as Mr. Guo would be here and subject to the Court's contempt powers. If it were to take place abroad, even in the presence of a judicial officer or special master, one would be left to speculate as to whether orders issued could be enforced.

In all the circumstances, the Court would adhere to its July 24, 2015 order in all respects even if it were persuaded that the order should be reconsidered *de novo* on its merits.

*Conclusion*

For the foregoing reasons, ZTE's motion to modify the July 24, 2015 order [14-cv-4988, DI 198; 15-cv-0986, DI 125] is denied in all respects both on the law and in the exercise of discretion.  While ZTE has stated in its present motion that it does not intend to comply with the July 24, 2015 order regardless of the outcome of its motion and that "the time would be ripe for the Court to consider what sanction should be imposed for such noncompliance" in the event its motion is denied,[90] the Court declines to take that step at this time.  ZTE and Mr. Guo may reconsider their position in light of this ruling.  Should they fail to do so, Vringo presumably will move for sanctions and the Court then will deal with the issue after affording all parties an opportunity to be heard.

SO ORDERED.

Dated:          August 11, 2015
Corrected:      August 12, 2015


/s/    Lewis A. Kaplan
_____
Lewis A. Kaplan
United States District Judge

---

[90]  DI 199 at 2.